Exhibit A

3/13/24, 8:38 PM
Case 2:23-cv-00597-MEF-JSA    Document 47-1    Filed 03/13/24    Page 2 of 115 PageID:
Gmail - Discovery Email: Please Read Down to the Dotted Line
944

 **Gmail**

Anna Kapellan <annakapellan@gmail.com>

---

## Discovery Email: Please Read Down to the Dotted Line

1 message

---

**Anna Kapellan** <annakapellan@gmail.com>                                      Sun, Jun 11, 2023 at 9:23 PM
To: Kat Kaplan <katkaplan5@gmail.com>, Brian Brenner <bbrenner@rrjhlaw.com>, Sam Rosenberg
<srosenberg@rrjhlaw.com>

**This electronic communication was generated in connection with an ongoing litigation.  If you received this message in error, notify the sender at your earliest convenience, and do not open the attachment(s), if any.  Any unauthorized use of this communication or the attachment(s) might warrant referral to law enforcement authorities.  Further, while this communication is not meant for docketing in this litigation, the conduct requiring a judicial determination as to propriety of the parties' use of or response to this communication might require disclosure of this communication to the presiding tribunal for the purposes of, e.g., a limited *in camera* review.  Any unauthorized alterations to the documents shared or produced as attachment(s) to this communication might warrant referral to the presiding tribunal for the purposes of seeking sanctions, as well as to entities addressing matters of attorneys' ethics.**

**PLEASE READ ALL THE WAY DOWN TO THE DOTTED LINE NOW**

Good Evening, Brian (and Sam):

This email is in light of my previous exchange with Brian revealing our mutual understanding that it would be in all parties' best interests to commence a good-faith voluntary mutual preliminary discovery and disclosure process while our joint motion is pending before Judge Padin so that, once Judge Padin – hopefully – grants our joint motion, and your answer to my amended complaint becomes due in 30 days (or the period Judge Padin selects), both of us would be able to hit the ground running and have a short and efficient mandatory discovery process, just putting final touches on what we can start now, plus doing depositions, without unduly burdening either Judge Allen or Judge Padin with applications that we can avoid by a good-faith preliminary voluntary mutual discovery.

I am cc'ing this email to Sam and, out of an abundance of caution, also to my daughter Katherine Kaplan (since this is the first substantial communication that you and I are having without producing a document that would be reflected in the docket: having had the strokes that are part of the events underlying my claims, I've learned that, within less than 15 minutes, a human being can go from being completely fine to screaming at the ceiling and begging the Almighty for an easy death to relieve the pain.  In other words, if my health plummets or this case starts taking too much toll on me either emotionally or time-wise, and Katherine and/or I would retain a law firm to represent me in this matter, I would like to make sure that such a law firm would have not only the documents available on PACER but also all my substantial off-the-docket communications with you/Sam).  Plus, while I hope to never have a reason to submit any of our off-the-docket communications with you/Sam to the Court, I am mindful that such a possibility cannot be ruled out.  Therefore, out of an abundance of caution and just so that we would be clear on this aspect, I am adding the red banner, *supra*, to each of my emails.  Hence, <mark>please send me a "Received" confirmation AFTER YOU READ DOWN TO THE DOTTED LINE and let me know when you would like to have our first informal conference.</mark>  I suggest scheduling our first informal conference on June 22 or 23, and any time in the afternoon is fine by me.  (I can also make myself available in the afternoons on weekends if it is easier for you and you don't mind having a weekend conference, but I don't want to prey on your personal time, especially if you have a family you would like to spend time with.)  The reason I am not proposing an informal conference prior to June 22 is because I would like to make sure that you have enough time to *carefully* read: (a) my *entire* amended complaint; and (b) my *entire* proposed voluntary mutual discovery and disclosure letter.  Please read the amended complaint first because, without reading it, you would be unable to understand my proposed voluntary mutual discovery and disclosure letter.  Simply put, while I realize that my case is not the only case you are handling, it would be unproductive for us to confer unless you know what I am talking about really well.  In addition, since – for reasons that I cannot begin to fathom – Sam still has not added you to PACER, even though he added five other persons at his law firm, and these five persons are not communicating with me (and I have no reason to believe that any of them is working on my lawsuit), I am including, as a courtesy, a PDF copy of my amended complaint and a copy of the PACER record: in addition to the set of documents that I am producing as an additional gesture of good faith.  Accordingly, this email is accompanied by *eight* emails that carry attachments that I am listing below.

LIST OF THE EMAILS CARRYING ATTACHMENTS (each Attachment/set of Attachments is carried by a separate email having a subject line that includes the word "Attachment," e.g., "Attachment 1," "Attachment 2," etc.):

1. Amended Complaint containing a very substantial section titled "Supplemental Facts" and amounting to my good-faith voluntary disclosure that was made on April 18, 2023;
2. Proposed voluntary mutual discovery and disclosure letter ("Letter"), which contains additional clarifications, thus being my second good-faith voluntary disclosure act;
3. Five pages of Electronic Disclosure I received from JCMC (they sent me a link and a code allowing downloading, the document begins with a medications bill, and I refer to it as the "medications bill," it is poorly searchable); this is my third good-faith voluntary disclosure act;
4. The first half of the largest document I received from the Kessler Institute for Rehabilitation ("KIR"), *i.e.*, my fourth good-faith voluntary disclosure act. (It is a searchable document);
5. The second half of the largest document I received from KIR, together with two smaller documents that I received from KIR (since I received a total of three), *i.e.*, a continuation of my my fourth good-faith voluntary disclosure act. (They are also searchable documents);
6. Two scans of two sets of documents that Nurse-5 provided me with when she informed me that I was being discharged from JCMC on February 7, 2021; that is, my fifth good-faith voluntary disclosure act. Please note that one document has nine pages while the other has 20 but states at the low right corner of each page that there are 21: the unstapled blank 21st page (containing only the footer) was given to me by Nurse-5 separately, as a loose page, and I left it in JCMC since I hated but did not expect to sue JCMC. (Katherine scanned them so that they both are searchable);
7. A quick "cheat-sheet" that I stumbled upon shortly after I joined the Board and just loved it: it compares the Model Code of Civil Procedure to Federal Rules of Civil Procedure for the purposes of discovery and disclosure, and it is a fabulous in-a-glance source that I am sharing with you/Sam so that you/he would not do/write something that makes no sense in a Federal litigation;
8. A combined set of internet records that I am sparing you from fetching on your own: (a) a copy of the PACER docket, as it stands on June 10, 2023 (since you really, really need to be able to have access to it and the ability to open and download files, so please remind Sam about that!); (b) Ms. Bernardo's LinkedIn page; (c) Mr. Mazur's LinkedIn page; (d) Ms. Arauz's LinkedIn page; (e) Dr. Morales' RWJ BH specialization page; and (f) Mr. Mebane's LinkedIn page, given that I refer to these LinkedIn pages in my Letter. Thus, to the extent my reliance on these online documents is relevant, this is my sixth good-faith voluntary disclosure act.

I am, therefore, counting on your good-faith efforts. Finally, let me stress that the contents of this email and the content of my Letter are subject to the red banner warning. Therefore, I am replicating the red banner at the beginning of this Email and, in addition, the Letter (plus each of the Attachment-carrying emails contains the red banner.

Reminder: I am expecting your "Received" confirmations for:

(a) *this* email (with a statement from you as to the date when you would like to have our conference);

and

(b) *each* of the eight emails carrying the Attachments.

Have a nice evening,

Anna (Anya) Kapellan

…………………………………………….this is the dotted line……………………………………….

Exhibit B

**THE PLAINTIFF'S PROPOSED VOLUNTARY MUTUAL DISCOVERY AND DISCLOSURE**

This document is furnished by means of an electronic communication and was generated in connection with an ongoing litigation. If you received this message in error, notify the sender at your earliest convenience and do not open the attachment(s), if any. Any unauthorized use of this communication or the attachment(s) might warrant referral to law enforcement authorities. Further, while this communication is not meant for docketing in this litigation, the conduct requiring a judicial determination as to propriety of the parties' use of or response to this communication might require disclosure of this communication to the presiding tribunal for the purposes of, e.g., a limited *in camera* review. Any unauthorized alterations to the documents shared or produced as attachment(s) to this communication might warrant referral to the presiding tribunal for the purposes of seeking sanctions, as well as to entities addressing matters of attorneys' ethics.

Good Evening, Brian (and Sam):

This Letter is subdivided into three sections (each having its heading highlighted in turquoise).

First, mindful of your/Sam's confusion about the letter and spirit of the Federal Rule of Civil Procedure and the Court's Local Rules (that confusion led to our joint motion that included your clients' application to withdraw Sam's submission titled "Answer," as well as Sam's first set of interrogatories and request to produce), I will briefly summarize the tenor and nuances of the Federal discovery process and related matters to make sure that I could responsibly state that you/Sam were put on notice by me in addition to the obvious fact that law is presumed known.

That said, you/Sam are certainly not expected to rely on me for your information about any Federal law, and I strongly encourage you/Sam to conduct your own research of the Federal and Local Rules, and interpretative caselaw, and you/Sam and I can confer about the applications of the Federal law to the matters that we might disagree upon to minimize any discovery-related motion practice: as you know, my mantra is that good-faith negotiations are more efficient than litigation, but sometimes motion practice is unavoidable, especially if it is about pure matters of law. In other words, I respect your right to disagree with me about a whole range of points and would welcome motion practice as to the issues we might have a good-faith impasse about.

In the second part of this Letter, I will try to stand in your/Sam's shoes and address the discovery that you might want from me. Toward that goal, I will first reflect on some of the most serious errors in Sam's first set of interrogatories and requests to produce (I cannot address all errors since there were too many, and this is why I was planning to seek Sam's first set of interrogatories and requests to produce stricken *in toto*, and the Defendants sanctioned: since I abandoned that intent only because we filed our joint motion requesting, *inter alia*, the Court's leave allowing your clients to withdraw, in addition to Sam's submission titled "Answer," Sam's first set of interrogatories and requests to produce).

After pointing out the most serious mistakes, I will suggest, for your consideration, the documents that you might want to ask me for in addition to the mass of information that I have already included in the amended complaint and providing now, in this Letter and in the attachments: since I would like to start sorting out our differences, if any, as early as possible in the hope that we would not need to pester Judge Allen or Judge Padin with matters that we can sort out on our own or, if we would need Judge Padin's or Judge Allen's intervention, the issues would be very well developed. And, needless to say, if you can think of anything else you might

want from me in addition to what I propose, and this additional information falls within the scope of information allowed by law, I would be happy to provide it to you since I expect you/Sam to act in good faith in response to my requests.

In the third portion of this Letter, I will provide you with very clear explanations as to the discovery and disclosure items that I seek: my requests are embedded in additional information that should enable you to orient with ease.  In other words – and as you have probably noticed by now – I prefer to be very thorough in general, and I will do the same as to my discovery/ disclosure requests.

With that, let's proceed to the first portion of this Letter.

## I. BASICS OF FEDERAL DISCOVERY: JUST A REMINDER

### Discovery in General

Discovery must be practiced in good-faith and in the spirit of mutual cooperation and civility, meaning that any "gotcha" or ambush practice is not only prohibited but may result in sanctions. (Speaking of sanctions: as long as I keep proceeding *pro se*, I will never ask for monetary sanctions against you/Sam or your clients since such sanctions are rarely granted and, to top it off, useless to a *pro se* litigant like myself.  Therefore, if I have to move for sanctions, I intend to seek a negative presumption rebuttable by clear and convincing evidence.  The District of New Jersey is well known for taking the clear-and-convincing standard very seriously, and while this standard is, of course, not the same as the beyond a reasonable doubt one, it is a high standard to meet, meaning that a party engaging in sanctionable conduct risks to have the point in dispute being deemed *de facto* admitted by him/her since the party can rarely disprove this point sufficiently to rebut a presumption taken in favor of his/her opponent.)

Before filing any motion other than seeking an injunctive relief or judgment on the pleadings (like a Rule 12(b) motion that you can file or like my motion to, *inter alia*, strike Sam's submission titled "Answer" addressing my original complaint), or motions inapposite to here (e.g., to certify a class), or motions that you or I can file later on in this case, e.g., seeking a summary judgment, the movant must confer with the opposing party in a good faith and submit, jointly with the motion, his/her certification stating the scope of conferring and the resolution, if any, the parties agreed upon, plus – if the motion is opposed – the process used for conferring should be described in the certificates.  Exceptions to the certificate of conferring are few and, as a matter of best practices, I always recommend describing the process in the certificate.

Now, two very important aspects that are directly relevant to my litigation against your clients:

First, since you wrote to me that you had seen Judge Allen's Standing Orders, you know that she stresses that "full compliance with the [Federal and Court's discovery and disclosure] Rules will be expected."  This is why our clean record of interactions is necessary: discovery/ disclosure material related to the process, including emails like this one, are filed with the Court only in limited circumstances, e.g., if ordered by the Court or in connection with the presentation/defense of a motion (e.g., to compel discovery, to strike an improper discovery instrument, for extension of time based on dilatory or other bad-faith practice, etc.), in which

B-2

case such material is as an exhibit to a motion.  Motions to seal are granted sparingly since sealing is, generally, against public policy.  If you need to withhold certain information, I recommend redacting it and offering Judge Allen to permit an *in camera* review of unredacted documents: Judge Allen would consider such a permission if the redacted portion is highly relevant and material to the position of the party making the *in camera* request, and that party cannot obtain that information by other means.

Second.  Since you wrote to me that you had seen Judge Padin's preference, you know that she has a requirement specific to diversity-jurisdiction cases.  Specifically, she stated, "the parties in all diversity cases are required to complete and file a Joint Certification of the Citizenship of the Parties within . . . 30 days after an answer, other responsive pleading, or [a Rule 12(b) motion other that the Rule 12(12)(1)] motion has been filed."  Since we filed our joint motion seeking withdrawal of Sam's submission titled "Answer" that addressed my original complaint, there would be no Defendants' response to my pleadings (until you respond to my amended complaint) in the event Judge Padin grants our joint motion.  In light of this fact, I am not pressing you for a Joint Certification of the Citizenship of the Parties until you answer my amended complaint.

However, once Judge Padin grants our joint motion, you/Sam would have to make a choice to either: (a) file a pre-answer Rule 12(b)(1) motion challenging the Court's diversity jurisdiction; or (b) join me in filing a Joint Certification of the Citizenship of the Parties within 30 days from the date of your filing of any other response, including an answer or any other motion addressing my amended complaint.  If you don't file a proper Rule 12(b)(1) motion and decline to join me in a Certification of the Citizenship of the Parties, I would have no choice but to move for having you compelled to do that since – even though Sam, unbelievably enough, refused to concede that your clients are New Jersey corporations (and mind you that I have already filed, twice, your clients' reports with the NJ Department of Treasury showing that they both are incorporated in New Jersey, plus they both have their primary places of business in New Jersey) – the Certificate would be due unless you want to challenge my New York domicile.

If the fact of my receipts of Sam's mailings addressed to me in my name and sent to my home address in Staten Island (demonstrated by my exhibits consisting of photographs of Sam's mailings to me: because the return portion of the certified mail sent to me was, hilariously enough, not removed from Sam's envelope and, thus, I have it in my possession), as well as my declarations of my New York domicile are, somehow, insufficient for you, it is surely your right to ask me for an additional evidence.  However, Sam's line "the defendant leaves the plaintiff to her proofs" is not a proper request.  Rather, you must let me know what type of document you would like me to produce to alleviate your/Sam's concerns.  (Please read, below, the fairytale-based explanation that I used when I was providing legal training on this matter to make sure you don't act as the king in that fairytale.)

For instance, if you want to, I can provide you copies of the documents utilized by the U.S. Board of Veterans' Appeals ("BVA"), my employer to certify my New York domicile (since I have to get recertified each year to work remotely from the place of my residence).  Or you can inform me of the type of other documents that would satisfy you, like credit card bills, bank

B-3

statements, TSP statements, insurance statements, etc. (I will redact all financial information, obviously, plus all references to my SS#). Pick one or two documents that would make you feel comfortable to execute a Certification of the Citizenship of the Parties, and I would gladly provide you with copies of these documents, plus my affidavit of content (as you know, such an affidavit involves averring that the original is identical to the document produced). Needless to say, if you are okay to complete and file a Certification of the Citizenship of the Parties prior to responding to my amended complaint, I am game, but I am okay with waiting until you respond.

Now, returning to the general tenor of Federal discovery and disclosure. It is critical that each party tailor discovery requests to the needs of the case, and any everything-but-the-kitchen-sink requests or inapposite, immaterial, bad-faith, etc. requests are sanctionable. Further, a particular form of discovery requested should be the one best suited to obtain the information sought, with the goal of avoiding requests that are likely to be costly, time consuming, or otherwise burdensome to the opponent. And, since all forms of discovery are subject to their own deadlines, deadlines are usually enforced unless the Court sets different deadlines, or the parties stipulate such different deadlines, and the Court does not find the stipulated deadlines inappropriate. Refusal to agree to a reasonable request for an extension, same as any dilatory tactic with the goal of having the opponent unable to meet a relevant deadline, is evidence of bad faith. On my part, I promise you to be cooperative and very fair.

### Interrogatories

Federal courts strongly favor an informal exchange of information in good faith. Therefore, while interrogatories are limited to 25 per party (and each subpart is deemed its own interrogatory), the parties may agree on a different number, or the Court could order more. Interrogatories are expected to be *highly relevant and well-focused*, meaning that a party's intent to overwhelm his/her opponent by requesting overly broad or irrelevant information is sanctionable. Narrowly drafted interrogatories are usually exchanged jointly with requests to produce, requests to admit, and requests to stipulate if these requests address the same topic. In a case based on multiple sets of events, as is the situation in my case, the effective interrogatories tend to be transaction-based.

Interrogatories should be brief, simple, particularized, unambiguous, and capable of being understood by jurors when read in conjunction with the answer. If the context of an interrogatory is not self-evident, an interrogatory or a set of interrogatories might be accompanied by a narrative explaining the rationale of the inquiry, and I personally find such a method the most efficient not just substantively but also in terms of preserving the parties' good-faith relationship since each side then knows what is being asked and why.

While well-focused interrogatories are at the "excellent" end of the spectrum, the "awful" side of the spectrum is populated by interrogatories that are objectionable not only individually but are so systemically "off" that they should be stricken as a whole. And while such deficiencies are too numerous to give you a full laundry list, especially since such deficiencies are often raised by analogy to objections to other discovery instruments, I would like to stress – upon reflecting on the defects of Sam's interrogatories – that overly broad, unspecific, obscure, immaterial, and

B-4

duplicative inquires, plus requests for information that is already known since it has already been provided, are textbook examples of interrogatories that are objected and stricken as a whole.

## Admissions, Stipulations, and Production of Documents

There is no limit on the number of requests for admissions. While requests for admissions of self-standing single facts (that are in the record and not subject to veracity challenges) are permitted, they are frowned upon by the courts: because it's like beating a dead horse, and these points are better made when addressing the jurors. Conversely, admissions as to sets of two or more self-standing facts reflected in the record are favored if these sets allow to substantially trim down depositions/trial testimonies. To illustrate, if facts A and B are in the record, and A + B = C, then a request for admission that C took place is appropriate because it reduces litigation.

Notably, some attorneys, out of an abundance of caution, prefer to stipulate, rather than admit that A + B = C to make sure that they are not accused by their clients of making admissions against their clients' interests. Since I am mindful of this wrinkle, I phrase many of my *de facto* requests for admissions as requests for stipulations, and request admissions only as to aspects that seem to be undeniable to me. However, since I am not hanging on technicalities because it goes against the spirit of Federal discovery, you can admit matters that I request to stipulate, or you can stipulate matters that I request to admit: it depends on your/Sam's comfort with your clients, and my goal is to merely crystalize the issues, so I don't care which way we achieve it. If you decline to make these stipulations or admissions, I will obviously respect your choice(s), but I would then have to move for declaratory judgments, negative presumptions, the Court compelling your admissions/stipulations, etc., and I am sure you would expect me to do just that.

Finally, there are: (a) requests to produce documents in control/possession of a party; and (b) subpoenas *duces tecum* requesting documents from witnesses. Both must be specific and not overbroad; otherwise, they are deemed abuse of the legal process. Now, let's talk about abuse.

When I was providing training as to this subject, I was usually illustrating it by two examples of requests that should *not* be made. One example was, "produce all documents related to X" – this would is facially too obscure and overly broad, unless you provide a very clear narrowing context: without such a context, nobody knows what "all documents related to X" means. For the purposes of my other example, I was telling a fairytale where a vicious king who did not want his daughter, the princess, to marry a poor peasant, told the peasant that he could marry the princess if he complies with the king's order to "go there I don't know where and bring me something I don't know what." As you can guess, the peasant outwitted the vicious king and married the princess, but the point is that directing an opponent to produce a "proof," without explaining what proof would be sufficient, is a facially defective request because the requesting party could always state that the produced "proof" is not enough, rendering the production futile.

To fight such abusive tactic, the courts simply construe the request as satisfied by the narrowest interpretation of the request. To illustrate, if our joint motion had not requested the Court's leave to withdraw Sam's submission titled "Answer," as well as his first set of interrogatories and requests to produce, I would have argued that the fact of me producing photographs of Sam's certified mail, return receipt requested, addressed to my name at my Staten Island address (I

submitted this photo as one of my exhibits) is a sufficient proof of my New York domicile: because my photo meets the narrowest construction of the word "proof" with an abundance.

**E-Discovery (ESI)**

E-discovery stands on equal footing with the production of paper documents, and e-discovery is governed by the joint effects of the Fed. R. Civ. P. and Fed. R. Evid. However, even though we, as a society, have already entered the AI era, attorneys keep still stumbling on e-discovery. Thus, let me spend a couple of minutes on that issue.

Parties and their attorneys are obligated to preserve electronic material that might be relevant to an upcoming litigation. Since e-discovery might be a tad more complex than paper discovery, the courts tend to rely on the court's common sense when addressing e-discovery disputes, and such considerations as the right of unfettered access, the cost of retrieval, the scope of the search, privacy concerns, etc. are factored in, and the parties are expected to either have a string of separate informal conferences as to e-discovery or allocate a separate portion of their initial and follow-up informal conferences to e-discovery: to address the matters of location/possession of e-documents, complexity/cost of retrieval, the time needed to retrieve/produce, and the manner of production. The manner of production is usually limited to three options: PDF, TIFF, and the native form. If the parties cannot agree of the manner, the courts select "reasonably usable" options of production to prevent unwarranted costs, undue investment of time, and prohibited access to privileged or inapposite private information.

**Depositions**

The place for deposition could be negotiated, and courts often allow a use of court premises, if available. The deponent and the party/counsel taking depositions are expected to confer in good faith as to when and where each deposition would be held, as well as the scope of the deposition: unless the scope is obvious from pleading and post-pleading pre-deposition developments. The rule of thumb is that, if in doubt, the parties should confer about any aspect of deposition that might be in dispute; otherwise, the deposition might end up being adjourned, sometimes midway, and the parties might have to contact the Court for immediate interference. Therefore, let's iron out our differences, if any, as to depositions well in advance by good faith conferring. Please keep in mind that, while a deposition could be videotaped and no stenographer is required, a transcript must be both produced and settled if any portion of the deposition is to be introduced at trial. Plus, unless the parties stipulate or the Court orders otherwise, there are 10 depositions per side (meaning your clients and all natural-person defendants are the same "side" and have 10 depos total), and a deposition should not last in total longer than seven hours unless stipulated or ordered by the Court otherwise. With that, I proceed to:

**II. SUGGESTIONS AS TO DISCOVERY YOU MIGHT WANT  & HOW TO OBTAIN IT**

I begin with examples from Sam's interrogatories and requests to produce as examples of what you should *never-ever* do, meaning that – if you/Sam do it again – I would consider it evidence of a pattern of bad faith and abuse on the legal process, and I will act accordingly.

For instance, Sam's first interrogatory requested my "full name and date of birth." However, not only my name and address were on the original complaint, amended complaint, and every document I filed with the Court, but – to top it off – the medical records that your client, JCMC, created during my first and second hospitalizations in February 2021 repeated my name and date of birth, dozens of times. Indeed, page one of the very first medical record JCMC created on February 6, 2021, began by stating my name and date of birth that was copied by the ER staff from my then-active NJ nondriver identification card. Since my filings with the Court demonstrate that my name has not changed since February 2021, and it is self-evident that my date of birth could not change since February 2021, it follows that the answer to Sam's first interrogatory is, "objection: it is facially frivolous due to asking for information already known." In other words, while such a question might make sense if you were to ask it of a witness of a car accident, it is nonsense if you ask it of a plaintiff asserting medical malpractice committed by your client, a hospital: it was not in the middle of a war zone where patients are unidentified.

The second interrogatory is funny, it reads, "Describe, in detail, your version of the occurrence setting forth the date, location, time and weather." The answer to that interrogatory is: "Buddy, read the complaint!" Indeed, my original complaint dedicated 71 paragraphs consuming over 30 pages that described the events in great detail, provided dates, as well as approximate hours and even minutes, stated the exact location (JCMC) and even the weather (snow on the ground when Katherine had to effectively drag me to the Uber car after JCMC discharged me into Katherine's care on February 7, 2021). And, as to the weather that was outside while I was hospitalized at JCMC twice (for a total of 11 days), this inquiry qualifies as immaterial: because I was in JCMC (first trying not to die and then trying to come to terms that my life and career), rather than monitoring weather outside since I was a lawyer experiencing acute strokes, not a meteorologist.

The third interrogatory is even funnier since it reads, "If confined to a hospital, state its name and address, and the dates of admission and discharge." The answer to this interrogatory: "Buddy, I am so pleased to introduce you to your own client, JCMC": because my original and amended complaints began with identifying the Defendants, and JCMC is listed as one of the Defendants, plus I stated that the events took place on the JCMC premises, and I also provided the address of these premises (just in case you and Sam do not know where to find your own client).

The fourth interrogatory is hysterically funny since it reads "If treated by any healthcare provider, state the name and present address of each healthcare provider, the dates and places where treatments were received and the date of last treatment. Attach copies of all written reports provided to you and by you any such healthcare provider whom you propose to testify on your behalf." Leaving aside that the last sentence is in poor English and is a request to produce, not an interrogatory, my original complaint stated the date, place, and described the appearances and voices of the providers whose medical care amounted to medical malpractice, *i.e.*, the staff of JCMC, your client: it is you/JCMC who/that should provide this info to me, not vice-versa.

And so on and on. By the seventh interrogatory, facial frivolousness became so clear that the entire set of interrogatories warranted a strike: because that interrogatory read, "Identify all documents that might relate to this action and attach copies of such documents." However, a request for "all documents" related to six separate causes of action (plus a contractual theory

B-7

of liability raised in the amended complaint) is facially overbroad, while a request for copies of anything is a request to produce, not an interrogatory, *i.e.*, a different discovery instrument.

And, from that point on, all interrogatories have become overbroad, e.g., the tenth interrogatory requested "the names and addresses of all people who might know of any facts relating to [my case]." You gotta be kidding! Leaving aside that every relative and friend I have keep in touch with knew I had strokes that left me in a wheelchair and made me take FMLA for over a year, these people are scattered through the entire United States, plus Israel, Ukraine, Russia, and Austria. To top it off, my request for donated leave (that allowed me to extend my FMLA from 120 days to 13 months) was posted twice through the entire U.S. Department of Veterans Affairs ("VA," the umbrella agency encompassing my current employer, BVA) and also at the U.S. Merit Systems Protection Board ("MSPB," my prior employer), and while MSPB is one of the smallest U.S. Federal agencies, VA is the third largest Federal agency employing almost half a million permanent employees, plus contractors on top of that, and many of these employees are stationed overseas at Department of Defense (DoD) military bases.

In other words, Sam's request makes a great example why the word "all'' should be used very carefully and only within a clearly limiting context: since Sam's use of the word "all" ended up asking me for names and addresses of half a million people around the world!

Further, starting from the eleventh interrogatory, each interrogatory began having six to eight subparts. However, each subpart, as you know, is treated as its own interrogatory, and – since Sam did not obtain my stipulation or the Court's order to serve more than 25 interrogatories – Sam's set of interrogatories was also deficient for failure to adhere to the 25-only requirement. Plus, the inquiry posed in the eleventh interrogatory (about the Defendants' admissions to me) begs the same reply on my part: "Buddy, read the complaint!" since, in my original and amended complaints, I detailed the statement of Nurse-5 (admitting that I had been administered Ativan during the night from February 6 to February 7, 2021), as well as the expression of regret by Nurse-7 (about the logrolls she made me do in the evening of February 11, 2021).

By the seventeenth interrogatory, Sam's questions became plain weird, since that interrogatory asked to "State whether you have ever been committed of a crime, YES or No, if YES, date, place, and nature." Well, I am happy to inform you/Sam that I was not convicted of any crime, ever. But even had I been, how could it be material, unless the crime was perjury? Assuming, *arguendo*, had I been convicted of stealing a loaf of bread, like Jean Valjean in Hugo's "Les Miserables," how would that be relevant to me being a victim of medical malpractice: since there is no dispute that I was questioning my February 7, 2021, discharge on the grounds of my need for medical care, not because I wanted to continue eating JCMC food (that, I can responsibly state, was uneatable short of the Wonder-bread sandwiches with a slice of scarily orange American cheese and oversalted processed ham that were unpleasant but at least eatable). And, if – somehow – perjury was Sam's concern, then his interrogatory should have read, "Were you ever charged with or convicted of perjury?" Then I would have answered, "No," albeit while wondering why this fact was not self-evident to Sam from the fact of my Federal clearance: since criminal convictions almost always operate as a disqualifier for the purposes of such a clearance.

B-8

Analogously, you *cannot* ask the question asked in, e.g., Sam's 21st interrogatory about any "video or other image of the plaintiff." As stated in my original and amended complaints, a photograph of my legs (covered by hematomas so badly that I was like a leopard with blue, purple, and green spots, but Nurse-5 ignored it when I showed her my legs) were taken at KIR (and no, I don't have copies of these photographs, though I am thinking of obtaining them and, if I do, I would gladly share them with you, or you can request them, and I would gladly sign any release-of-records form). My guess is that the name of the doctor who took these photographs was Dr. Parvathy Thiruwilwamala: everyone called her Dr. Parvathy since her last name was rare and long, *i.e.*, I found her last name by searching my KIR records for her first name. As for videos, it is your client (JCMC) that *owes me* these videos, as I detail *infra*, not vice-versa.

Now, let me address briefly Sam's requests to produce (which accompanied his first set of interrogatories) since these requests were even more problematic. First, Sam is constantly citing New Jersey procedural rules, and – had I been writing a brief in support of my motion to strike his requests to produce – I would have begun my brief with Dorothy's line in the Wizard of Oz, "Toto, I've a feeling we're not in Kansas anymore" because, if you have an urge to cite a rule of evidence or a rule of civil procedure, you have to cite to the Fed. R. Evid. or Fed. R. Civ. P., or the Court's Local Rules: this is so because New Jersey substantive law governs adjudication of diversity claims on the merits (and the AoM requirement is adopted as a substantive law requirement imported into the screening stage: Federal courts adopted AoMs because Federal courts are not meant to be a passport to litigating meritless suits barred by state systems), but rules of procedure and evidence are necessarily Federal, so please do *not* cite any other NJ rules.

Moreover, Sam's first request to produce reads, "Any and all statements made prior to the date of the filing of the plaintiff's Complaint by any person other than witnesses or parties which relates or refers in any way to the cause of action." This is facially overbroad, plus nonsensical. First, the "any and all" should never be used unless it is within a limiting context, as I have already explained. Second, do you really want me to list any statement that a truckload of people made to me during almost two and a half years, when people saw me in a wheelchair or using it as a walker? And how could this list, had I actually composed it, be relevant since most people were expressing natural concern, compassion, and basic human outrage about what happened to me?

Then, there is a stream of inapposite overbroad questions as to expert witnesses that I am yet to retain (because I first need your admissions or stipulations as to the licenses, if any, of the JCMC staffers whose conduct underlies my claims, or a fair chance to serve them interrogatories and depose them), and Sam should have known that these questions were premature and violated due process: since my original and amended complaints expressly stated that I was yet to determine/ verify natural-person Defendants' identities/licenses, and retain experts with the same licenses.

Moreover, Sam also asked for "any and all blueprints, diagrams, drawings, graphs, maps, plats, plans, models, and any other visual reproductions," as well as "surveys of the scene of the accident." My response to that would be, "Buddy, do you know that this is a medical malpractice case, not a slip-and-fall or a fender-bender with a whiplash? What do you expect me to have? JCMC's floor plan at the time it was built? A diagram of my JCMC bed?"

B-9

*A fortiori*, Sam's request for "any and all benefits of any kind and from any source to which the plaintiff or *defendant* were entitled as a result of the incident" is senseless. What do you mean by "benefits"? Do you mean the insurance compensation JCMC got from my health insurance? If yes, these documents of the *defendants'* benefits are in your client's possession, not mine. Or do you mean that my medications, wheelchair, walker, commode (*i.e.*, portable toilet), medications, etc. partially covered by my health insurance qualify as "benefits"? If yes, you are not asking about "benefits," you are asking about damages: because the issue is how much I had to pay out of pocket. Thus, this request is confusing or qualifies as an abuse of the legal process.

Another "beauty" is Sam's request to produce "copies of each and every pleading including, but not limited to, complaint, answers, interrogatories, interrogatory answers, transcripts of oral depositions, settlement papers, releases, stipulations of dismissals, agreements limiting liability or damages (including 'Hi/Lo' agreements) covenants not to sue, etc., in any action filed by the plaintiff in any court in which the plaintiff sought damages for personal injuries at any time in plaintiff's lifetime, including, but not limited to this matter." Well, as I explained in my amended complaint, the only personal injury action I litigated was my product liability action against Smith & Wesson: it was based on me being a victim of accidental shooting.

As I extensively detailed in my amended complaint, my lawsuit was based on the synergetic effect of a design defect in a revolver and failure to warn secondary-market owners. That action was filed in 2000 and settled a few months after it was commenced: I, proceeding *pro se*, and the attorneys for Smith & Wesson made a single appearance for a conference at the U.S. District Court for the Southern District of New York ("SDNY") in Downtown Manhattan. I don't have that 23-year-old complaint: I had no reason to keep it. And the only document that Smith & Wesson served me was not an answer or an interrogatory, or a request to produce, or anything that could qualify as "responsive": they sent me a settlement agreement that these attorneys negotiated with me in less than 10 minutes in the SDNY corridor in front of the courtroom where we had made that 5-minute conference appearance before the Judge. At the time, I was already clerking at the U.S. Court of International Trade ("CIT"), which was right across the street from the SDNY building, so I took an early lunch with the permission of my Judge (the late Hon. Nicholas Tsoucalas) and went for that appearance being mostly worried about returning in time.

The Smith & Wesson attorneys were super pleasant, one was from out of state (I think, Colorado, but I might be wrong: it was almost a quarter century ago), and the other attorney was his SDNY liaison. Our 10-minute conversation was all that was needed for us to settle, and – after we agreed on the amount – they even told me how impressed they both were that I was not pushing for the lenience usually afforded to *pro se* plaintiffs (truth to tell, back then, I did not even know about the standard applicable to *pro se* litigants because there are no *pro se* parties in CIT litigations), and I reciprocated by telling them that they both turned out so much nicer than what I was expecting. In fact, their super-nice and super-professional conduct was the one that inspired me to later mandate mutual courtesy in many cases assigned to me for drafting opinions.

A couple of weeks after that in-corridor conversation, the Smith & Wesson attorneys sent me a settlement agreement that I, too, did not keep: because – two weeks after I signed and mailed that agreement – the money was sent to me by a Smith & Wesson check that cashed seamlessly, and I

B-10

took no part in preparing the settlement agreement, which I recall having a non-disclosure clause. In sum, I have nothing but utmost praise for legal ethics of the Smith & Wesson's attorneys.

Since the PACER system was implemented in all Federal district courts only in 2003 (we did not have it at the CIT when I clerked: everything was still in hard copy), I doubt but cannot rule out that the SDNY Clerk's Office uploaded my Smith & Wesson complaint into PACER. Therefore, if you want to seek disclosure of public records from the SDNY Clerk's Office, I will surely provide you with the names I and my ex-husband had back then (I legally changed my name almost a decade after our divorce, and he changed his after relocating to Israel), and you can try to request my complaint and whatever else that SDNY might have. Keep in mind that, since a settlement is not docketed unless the court's enforcement of the settlement is requested, you should request/litigate the settlement from/with Smith & Wesson: it's your duty, not mine.

And, if Sam was hoping to get proof that I habitually commence meritless law suits (which I found funny, but I understand that your client might have many patients who resort to such practices), and you/Sam merely want to verify that my lawsuit against Smith & Wesson was meritorious (in the sense that I really was a victim of an accidental shooting), you can get my medical records from the Elmhurst hospital, in Queens, NY, where I was taken by an ambulance after being shot (we lived at Woodside, Queens, NY, at the time): I will gladly sign a record release form for you so you would see that I was really shot, that my humerus was broken into five pieces by a hollow-point bullet that went through, that a cast was put and no surgery was performed due to the fear of damaging nerves, etc. In addition, if you want to do a search for a police report recording me being shot (police officers searched my ex's factory in Woodside and found the bullet, plus they visited me at Elmhurst and asked if I wanted to press charges against my ex, who was at that point completely hysterical and had a minor heart attack three days later from all the stress, especially due to him having to return home without me to tell Kathrine that I was shot, that he was the one who accidentally shot me, and that I was in a hospital, and then Katherine and he visited me at Elmhurst, and Katherine described me as being whiter than the Elmhurst's pillow case due to all my blood loss), I would sign any release-of-police-record that you might want. However, you would have to do the legwork on your own in the sense of figuring out the police precinct and how to obtain the record of the incident that happened in the Summer of 1997: I will give you only the info, but you and Sam would have to "play detectives."

That said, if you/Sam have/has only a general interest in the fact of me being a victim of an accidental shooting, all my medical records are likely to contain some form of a notation about the shooting: because this is the reason why I insist that my blood pressure be measured only on my left arm (since, as you know, a fractured bone never fully regrows; rather, what grows in its place is a cartilage-like tissue, and I obviously don't want to stress this cartilage tissue, ever).

**Now, having addressed what Sam did wrong, and what you should *not* do, let me offer for your consideration my suggestions as to what you might want to ask me for:**

The first thing that comes to mind is my statement of damages. There are two types of these statements, one is under Local Rule 8.1 (the Rule provides me with two weeks from the date of the request, and all you need to do is ask me in writing).

B-11

The other is Fed. R. Civ. P. 16 and Local Rule 16.1 statement of damages: this statement requires an explanation of how my damages are calculated. I keep updating my calculations because my damages consist of past and future damages, and – as we keep living – the future becomes the past, and, therefore, there are adjustments that I keep making, especially since the future expenses are calculated based on inflation rates for goods and for services, and the lasting nature of the currently ongoing round of inflation keeps affecting my future projections due to the increases in projected inflation. I have no problem providing you with these calculations together with my Rule 8.1 response, albeit I will keep adjusting the amount until the verdict: I am sure you understand.

Now, how to exchange any documents. I strongly prefer emails simply because receipt can be verified on the spot, and I am strongly against any hard-copy mail (it can get lost and triggers unnecessary litigation) or messenger service (unduly expensive, and the courts rarely approve it because they often consider it a waste), which leave meeting in person as my distant first-runner-up choice after email. I usually come to stay with Katherine in NJ on weekends (plus, if I expect to go for a medical appointment or to, say, turn my office laptop in and get a new one: because I rely on Katherine for buying me groceries and preparing food for me to heat and eat during weekdays, and I also need her to push my wheelchair if we go anywhere, and to be around if I suddenly get completely dizzy and feel like passing out, or develop a splitting headache since, unfortunately, all of it happens often, and I am terrified of being alone outside for a long time).

I typically come to NJ on Friday afternoons and leave on Mondays around noon (Katherine and I take PATH to the WTC and then SIM1/SIM1C express bus to my place in Staten Island because the bus stop is super close, but all SIM (Staten Island – Manhattan) express buses run only on weekdays). If I have appointments on weekdays, I tend to stay with Katherine for an extra day or two: since the commute is long. Given that your/Sam's office is only a bit more inland from Montclair where I worked for a year after the Court, and it was taking me less than an hour from Montclair to reach Katherine's place by public transportation (and when the Township Attorney was going my way, he was giving me a ride in less than 30 minutes), we can meet in person somewhere near Katherine's place: to split the commute (I used to adore the area where she lives before the strokes: it's very pleasant, plus Starbucks has seating outside, which is important since both Katherine and I are unvaccinated, so we prefer to meet people and chat outside. By the way, if you decide to meet in person, feel free to bring your family so they would walk around while we chat: there is also a charming children playground with a cute fountain for small kids).

Now, let's talk about ESI that I can produce to you: there are seven groups of documents.

1. One group is the Gmails that Katherine and I were writing to different people during and after my strokes (Katherine was writing initially since, as you know from my amended complaint, I was nearly dead when Nurse-5 forced my discharge on February 7, 2021, and then I forgot how to use a cellphone or a laptop, but I started writing such emails when I finally relearned how). I obviously cannot give you access to our personal emails, but I am certainly willing to produce these emails to you in any non-native form that would satisfy you/Sam and not be too burdensome on me in terms of cost/time. Usually, emails are produced in PDFs or TIFFs with affidavits of content, but if you/Sam have other reasonable preferences, I am game. Assuming

that the form of production you would request is reasonable, I should be able to produce these emails within 30 days from the date of your request or need a small extension, like two weeks.

2. The next group of ESI that comes to my mind are February 6 and February 7, 2021, text messages on my old cell phone (it began dying and then died during my second hospitalization at JCMC, and Katherine brought me a new cellphone when JCMC finally allowed visitations). These text messages are my and Katherine's texts to each other (including the one I typed when shaking from hypertensive crisis during the night from February 6 to 7, 2021, letting Katherine know that JCMC staff was not giving me anything for my blood pressure short of ice packs and it took them 10 minutes to bring ice packs since Nurse-2 was bringing them in "installments," and that I had finally realized that Nurse-1 had lied to me about giving me the same hypertension medication that the ER had administered to me: that text message has a zillion of typos and autocorrects, e.g., instead of "sue them," autocorrect put "sir them," "ices" became "icrs," etc. and shows that I was in too much pain/shivering from a hypertensive crisis to correct any typos).

These messages on my old cell could be produced in, say, a week if you accept photos with an affidavit of content: since I have already photographed these messages being worried that my old cellphone might become forever bricked.  Or you can photograph these messages on your own if we schedule an *in camera* examination in my and Judge Allen's presence at her Chambers: since I, obviously, cannot give you my phone into your unsupervised/unrestricted possession.  In such a scenario, I would request Katherine's presence because she has an MS in Computer Science (my knowledge of IT is very basic), and you can surely being your own IT expert if you want to.

3. Next, there are my communications with the HR Specialist who was my custodian liaison (approving my schedule to slowly increase my workload during my FMLA).  As I mentioned in my amended complaint, a few weeks after I was released from KIR, Dr. Bentsianov, my PCP/GP approved me to start working: first, one hour a week, and then we kept increasing gradually, so that I returned to fulltime employment on, I think, March 27, 2022.  The HR Specialist's name was (and I presume still is) Ms. Tammy XXXX, so I can produce all my emails to/from Tammy to you or just the emails with her approvals on the schedules that Dr. Bentsianov was approving for me: it's entirely your choice how many emails of this type you want to get because I don't want to overwhelm you unnecessarily (there was a year of emails).  If you do not want PDFs with an affidavit of content and affidavit of search, please select anything else that is reasonable.

4.  There are also my VATAS records.  "VATAS" is the Department of Veterans Affairs' (VA's) Time and Attendance System.  I was taking every available leave to make sure I would not lose my job and my government health insurance.  These leave requests were approved by my then-Supervisory Senior Counsels ("SSCs").  The BVA system was restructured last year, and now – instead of an SSC – we have a designated person who handles leave for attorneys for a few Veterans Law Judges ("VLJs," since each VLJ usually has a team of eight attorneys).  During and after my JCMC hospitalizations, my SSCs were Ms. Devon XXXX and Mr. Dustin XXXX.

Both Dustin and Devon have become VLJs this year (Dustin in the beginning of this year, Devon last month).  Both of them were super nice in my experience, and I can request their permission to provide you with their official emails (I don't know and never knew their private contact info).

B-13

As to how VLJs that were appointed upon White House approval would react to your inquiries or subpoenas, well, your guess is as good as mine since I knew both of them only professionally. Btw, I think they both live in the greater DC area, but I might be wrong: this subject never came up, but keep this fact in mind if you decide that you want to depose/subpoena either one of them.

That said, if you want just my VATAS records, I can provide you the record showing how many hours of what types of leave I requested to take and had approved.  I can send you each separate request (it would be well over 200 pages since each request, if opened as its own application, is a page, so I can send them to you to demonstrate that I took leave only to go to doctors or because I was incapacitated due to residuals of my strokes), or I can send you just a few full-page sample requests for each type of leave and accompany these samples with: (a) VATAS summaries showing the amount of leave hours I got approved per each particular date and the type of leave; and (b) a VATAS table explaining the types of leaves (since the system uses abbreviations that you would need to understand to read my VATAS summaries).  I can also send you my SF-50 forms (they show my annual salary and raises in my salary, so you would be able to verify the amount of my damages related to me taking leaves: I will redact only my SS# for emailing).

Relevant here, my position is that, while my sick leave and annual (vacation) leave used due to residuals of my strokes were paid leaves, I still experienced "a" loss.  This is so for two reasons: (a) I used that leave during the February 2021 to March 2022 period, when my salary was markedly lower than it is now; and (b) my use of these two types of leaves also amounted to an indirect loss since unused leaves are paid upon retirement and added to the period of Federal tenure for the purposes of pension calculation, plus 280 hours of an unused leave of a retired Federal employee add one percent to the amount of his/her Federal pension, and I used more than 280 hours during my FMLA that, otherwise, I could have saved (especially given that – due to having almost 20 years of Federal employment – I have been accruing and still accrue eight hours of annual leave and four hours of sick leave every pay-period, meaning that I was/am accrued/accruing 12 hours of combined sick and annual leaves every two weeks, and since I took all my sick and annual leaves that I had saved prior to February 6, 2021, and then everything that was accruing for over a year, *i.e.*, during 28 pay periods, it means that I had to use over 312 hours of my leave that would have been paid to me upon retirement and would have added one percent to my pension when I retire).  I will factor this indirect loss into my Rule 8.1 statement and explain how I am calculating this indirect loss in my Rule 16.1 statement.

Now, in terms of the method of production and time needed for VATAS purposes.  I suggest PDFs with my affidavit of content since, if you/Sam want access to VATAS, you/Sam would need to sort this aspect out with VA: because you would need to obtain a security clearance for this (I can provide you with a copy of my latest security clearance, but keep in mind that my re-investigation took 10 months, and an original investigation, even if authorized by VA, would take longer: because the level of my clearance is medium, so such clearance is not given priority by the DoD (that conducts the clearance), and I cannot allow anyone to even look into my laptop: I must lock the screen every time I step away, even if I am alone in my Staten Island apartment).

Indeed, when I was down with and after the strokes, Katherine had to write requests to Devon, and Devon had to write requests to Andre, her Timekeeper: because Katherine could not either

open my computer or even look into it (VA takes this matter very seriously because we have access to a lot of PII, so it would be a very serious disciplinary violation on my part to allow anyone, including you, Sam, Judge Allen, Judge Padin, etc., to look into my office laptop, and VATAS access is available only from my office laptop that can be opened only with my PIV and security code. Since Judges Padin and Allen should have similar requirements to adhere to, they should know it.) In sum, if you think of an option other than PDFs accompanied by my affidavit, I am game, but I am not risking violating VA rules to produce you my VATAS records. (If you need/want it, I can also email you a PDF of VA yearly mandatory TMI PII training: it expressly states that we cannot allow anyone look into our laptops.) Now, the time: I presume I can do it all in 30 days from the date of your request: it's a lot of material, but it should not be very hard for me to find it and save it all to PDFs, and I can do an affidavit and have it notarized in one day. (Also, please let me know if you, somehow, need an affidavit of search from me, although, in my opinion, it would be superfluous: since it is in my interest to provide you with every single record of leave that I had to take because any omitted leave period would lower my damages.)

5. Further, there are emails showing that BVA regularly solicited/solicits overtime since – unlike other Federal agencies – BVA pays overtime to attorneys regardless of us being exempt-service employees on a fixed salary, and I was taking overtime assignments before the strokes but have not taken any of them after JCMC, even though I keep writing law journal articles: because my law journal articles are never dead-lined, but overtime hours are strictly dead-lined and monitored, so the assignments must be completed within a fixed period of hours, usually eight, if the overtime is to be paid, and this stress has become too much for me after strokes: as you can see from my records, KIR physicians prescribed me Elavil (Amitriptyline), and my PCP/GP, Dr. Bentsianov, keeps increasing my Elavil doses because I never display it (due to the nature of my career), but it takes a substantial toll on me, and adding the stress of overtime was too dangerous.

So, toward this end, I can obtain permission of my former and current SSC's to produce to you the overtime-soliciting emails sent before my strokes by my first SSC, Ms. Lynne XXXX (who was appointed a VLJ at the same time as Devon) and, after my strokes, by Devon and Dustin, as well as the emails currently sent by my current SSC, Mr. Mike XXXX. (At my level, SSC's do not have any supervisory power, but it does not mean that I would treat Mike with disrespect, so I would feel obligated to ask him for his permission.) I doubt that any of them would deny me permission to produce their solicitation-of-overtime emails: VA does not hide the overtime, and Congress expressly allocates funds for overtime, so please let me know how many of these emails you want: they are sent weekly, so you would end up with over 200 if you want them all.

6. In addition, I have a few photos that I took with intent to send them – to eventually show them – to Dr. Bentsianov, my PCP/GP whom I think the world of. Some of these photos were attached to my emails to her, while others were just photos saved on my cell. Thus, I have:

> (a) my January 27, 2021, email with a photo of shingles that I had developed about 12 days prior to my first, that is, February 6, 2021, JCMC hospitalization (shingles were very slightly painful and not itchy at all: I suggested Dr. Bentsianov to prescribe me, for instance, Valacyclovir, and I think she prescribed exactly that);

B-15

(b) my June 1, 2020, photo of the hematomas on my lower legs (these hematomas had developed about a month or two before I had my second, that is, July-August 2021, period of my symptoms consistent with Covid, but these hematomas eventually cleared and showed up again, swiftly and in a much larger amount, on the morning of February 7, 2021, and I remember that I noticed them in shock when I was putting on my PJs while sitting in my JCMC bed, but these hematomas were ignored by Nurse-5 when I showed them to her in a few hours, *i.e.*, they were photographed only in KIR by Dr. Parvathy);

(c) a February 4, 2021, photo of my shingles clearing up (and that photo, while taken of my back for the purposes of monitoring my shingles, offers an idea of how my February 2, 2021, purpura looked like, albeit the purpura was more pronounced on my shoulders, upper chest, and upper back but the process of purpura clearing up is obvious from that photo and illustrates the fact that it was practically gone by February 6, 2021, when I showed the remaining couple spots to Dr. Wang and to the February 6, 2021, ER nurse;

(d) a photo of the February 5, 2021, power of attorney note that I executed in Katherine's favor because I wanted to carry that note with me after the February 2, 2021, episode, and I needed Katherine to have a copy if I suddenly become a vegetable;

(e) a February 6, 2021, photo of my JCMC room (where I met Nurses -1, -2, and -3) with my dinner (that I could not eat because it was… well, uneatable) on my bedside table;

(f) four photos of my February 13, 2021, room taken on my request by a nurse whose name I don't recall (she was unfamiliar with my phone and, thus, took one photo in error (since it merely shows the door into the corridor), but the other three show the commode that had been placed about five inches away from my JCMC bed (because I wanted Katherine to have an idea of what a commode was and buy it for me) and the remote control of my second JCMC bed (since I wanted Katherine to buy me a similar bed));

(g) March 24 and March 28, 2021, photos of my left hand showing that small hematomas kept appearing, even with all anticoagulants and blood thinners, after my discharge from KIR; and

(h) photos of my legs on December 3 and December 8, 2021, showing that, 10 months after the strokes, I was still experiencing a severe leg condition.

7. There are also two emails from Uber that Katherine has about purchasing one Uber ride (to take her from her Jersey City place to JCMC to pick me up after Nurse-5 had forced my discharge on February 7, 2021) and then another ride: to take me from JCMC to Katherine's place (we left JCMC at 4:34 P.M. on February 7, 2021). I can produce these emails to you with an affidavit of content, and I can have both my and Katherine's affidavits, if you prefer so.

On top of the ESI, I am, but of course, willing to sign release of record forms for you to get access to all my post JCMC/KIR medical records, even if I think these records are irrelevant: you can subpoena whatever you want since I have nothing to hide. I listed all doctors who treated me since the strokes (in New York and New Jersey) in my amended complaint. After the date of my execution of the amended complaint, I was seen by Dr. Arin Abrahamian, a dentist, at 255

Richmond Hill Rd, Staten Island, NY 10314 (it is the office of Dr. Parshin, my lead dentist), and I have an appointment scheduled on June 21, 2023, with Dr. Angie Wen, at 77 Worth Street, New York, 10013 (it is the Tribeca location of the New York Eye and Ear Infirmary of Mount Sinai, the same address where I usually see Dr. Landa, my lead ophthalmologist, since Dr. Wen is a cornea specialist that Dr. Landa wants me to see now).

Also, in light of my consultation with Dr. Abrahamian, I had to schedule an appointment for July 6, 2023, with Dr. Yaela Faitlowicz-Gayer, an endodontist at 3643 Richmond Ave, Staten Island, NY 10312, to redo my #14 molar root canal (the root canal had been done before the pandemic, and the temporary filling had fell out before I moved from Jersey City to Staten Island, so a permanent filling cannot be done without an endodontist doing the root canal cleaning anew), so I want you to know about these upcoming appointments and be able to subpoena my records if you need them. (I have dental insurance, but – same as my health insurance – it provides only partial coverage, so my copayments are part of my damages, and my dental copayments are, unfortunately, more substantial than my other medical copayments.)

If you want to get my medical records as to any of my preexisting conditions or anything medical that took place in my life before February 6, 2021, just let me know what you have in mind, and I will try to provide you with all the names and addresses that I can remember or can find, and I will certainly sign any record-release forms with regard to these records. Simply put, you can subpoena anything medical that I ever had, but please remember that you cannot shift this burden of production to me: because it is equally easy, if not much easier, for you, *i.e.*, an attorney with a law firm boasting about its wealthy clients and now representing a Fortune 500 Defendant to get these records (since I am still a *pro se* plaintiff, even though I am an attorney).

And, obviously, look at my JCMC treatment records plus keep in mind that there were also the records of Dr. Valentin Marian, M.D. (a rheumatologist with RWJ BH) who saw me at JCMC and then after JCMC. I already have his post-JCMC records (in hard copy, they are very small), but I would love to have these records in a searchable PDF, and they have his summaries of him treating me at JCMC. Plus, as you know from my amended complaint, I was briefly treated by Dr. Manjaree Daw after KIR. Dr. Daw was always "MIA," it was not even funny how she was never finding even one second for me, but her intern/resident, whose first name was Evelina (or sounded phonetically like Evelina) took very detailed notes of my reports: I saw her scribbling them on small pieces of paper but don't know if she added any of them to my file with Dr. Daw.

Thus far, I cannot find Evelina. However, you should be able to get Dr. Daw's records: because Dr. Daw was an M.D. with RWJ BH until she retired, and you should also be able to get Evelina's full name and the information how to reach her, plus you should be able to get Evelina's notes: because she was not only Dr. Daw's intern/resident but also one of the two interns/residents who sat at one of my visits with Dr. Marian. Therefore, Dr. Marian/his office should know Evelina's exact name and how to find her since she was doing residency with RWJ BH. Needless to say, when you provide me with Dr. Daw's records and Evelina's information and her notes/records, keep a copy for yourself. (I found a current RWJ BH intern/resident named "Evelyn Minis" from Greece, but she looks like a different person of her online photos.)

B-17

### III. MY DISCOVERY REQUESTS TO YOU/SAM

As noted *supra*, to help you understand and orient in my requests, including in all "who" and "why," I am providing you with the detailed explanations of events, people, logic, background, etc. underlying my requests. Please read these explanations carefully because, if you ask me the "who" and "why" questions about my requests after I invested the time and effort into spelling them out for you in this Letter, I would construe it as abuse of legal process and an act of bad faith. So, take a cup of coffee or two, and read it since we would have a much more amicable relationship and productive discovery process if you know what I am talking about. I start by listing my "general" interrogatories and requests to produce, then proceed to claim/transaction specific requests, and close with: (a) requests for financial disclosure; and (b) Last Preliminary Discovery Request.

### General Requests:

**Interrogatory # 1:** State the full name and the latest known address of the intern/resident of Dr. Manjaree Daw who was doing her RWJ BH residency during the period that encompassed the period from March 2021 to September 2021. Her name phonetically sounded as "Evelina," and she: (a) was one of the two interns/ residents present during the Plaintiff's first visit to Dr. Valentin Marian (RWJ BH, M.D., rheumatologist); (b) was young-to-middle aged, of a slender constitution; (c) had blond hair at the time; and (d) stated that she was of Polish origin on the side of at least one of her ancestors.

**Request to produce # 1**: Please produce the Plaintiff's entire JCMC records generated in connection with her February 2021 hospitalization in electronic format amenable to emailing directly to the Plaintiff (preferably, in searchable PDF), with an affidavit of search (*i.e.*, what was searched to get this record) and an affidavit of content.

**Request to produce # 2:** Please produce the Plaintiff's entire RWJ BH records generated in connection with her treatment by Dr. Manjaree Daw in 2021 in electronic format amenable to emailing directly to the Plaintiff (preferably, in searchable PDF), with an affidavit of search and an affidavit of content.

**Request to produce # 3:** Please produce all notes or other records generated by Evelina (*see* general interrogatory #1) in connection with the Plaintiff's treatment by Dr. Manjaree Daw in 2021, with an affidavit of search and an affidavit of content.

**Request to produce # 4:** Please produce the record and notes generated by the February 6, 2021, EMTs showing the exact address where the EMTs picked up the Plaintiff and the medical reason for delivering her to the JCMC ER, with an affidavit of search and an affidavit of content.

### Fact-specific Requests Based on Six Counts/Claims (Transactions)

Having read my amended complaint, you can see that my claims are organized by transactions. Therefore, my discovery requests are also organized by the same transactions. As noted *supra*, I am providing you with narratives that I hope would help you orient with ease in my requests.

## 1. First Transaction

As you know from my amended complaint, the events of the night from February 6 to February 7, 2021, were related to the events that had taken place about 16 hours prior, when the JCMC ER nurse had administered me Labetalol with Ativan because the ER doctor had directed these IVs and made the notes showing that he was Dr. Bill Cheng-Teng Wang ("Dr. Wang").

Notably, Dr. Wang made only minor errors in his notes. For example, I noticed Dr. Wang stated that my PCP/GP was too far away from me (back then, I lived in NJ at Katherine's place) since Dr. Wang presumed that my PCP/GP moved to Astoria, and this was why my PCP/GP told me to find a local PCP/GP in NJ. This is a bit incorrect. The office of my PCP/GP, Dr. Marie Bentsianov, is and always was in Brooklyn, and she never recommended me to find anyone in NJ, plus I would not want to lose her in any case. Rather, my cardiologist, Dr. William Schwartz, who was/is with the Mount Sinai hospital chain, had held his office near Rockefeller Center, in Manhattan, but – because that location was needed to be dedicated to Covid treatment during the pandemic – Dr. Schwartz moved his office to Astoria for good, to a place that could be reached only by a very long Uber trip or by going first to Manhattan, then taking a subway to Queens, then a bus in Queens, and then walking at length, and that is why Dr. Schwartz's current office became too far for me to travel either from NJ, where Katherine still leaves (her lease expires next April, I cannot wait) or from where I am in Staten Island. And this is why when, not long before the events underlying my complaint, I called Dr. Schwartz and had a telehealth appointment with him (all doctors were doing telehealth in early 2021 due to the pandemic), he recommended me to find a local cardiologist.

While the errors in Dr. Wang's notes were minor, there is still one puzzling aspect related to him. At 9:35 A.M. on February 6, 2021, Dr. Wang made a note that he "ordered . . . [A]tivan 1mg IV as well as . . . [L]abetalol 10mg IV." Indeed, I very well remember that IV: the medications were administered into the tube going into my left-arm vein by the February 6, 2021, ER nurse. However, the medications bill that I received from JCMC and am providing to you states, "LABETALOL 20 MG/4 ML IV SOL" and "LORAZEPAM 2 mg/1 ML INJECT" on February 6, 2021.

So, the date of the Labetalol/Ativan treatment is correct, the time is correct, the ratio is the same, that is, 10-to-1, and the statement that Lorazepam (the formal name for Ativan) was injected into the Labetalol solution administered intravenously is not exactly incorrect (since the mix of two IVs is substantively the same as an IV into which another IV was "injected"), but the doses stated in the medications bill are twice higher that those stated by Dr. Wang in my medical treatment records. I am not asking for any specific stipulations or admissions as to this fact now; rather, I will include this inconsistency as to systemic errors in JCC's records underlying my Last Preliminary Discovery Request, *i.e.*, a stipulation, which is at the end of this Letter.

Now, having sorted this finer wrinkle out, I am now requesting

**Stipulation # 1:** While Dr. Wang's entry of the Plaintiff's IV treatment with Labetalol, read jointly with JCMC record that the Plaintiff's condition markedly improved after that treatment, established an easy roadmap for the JCMC medical staff to follow in the event the Plaintiff

B-19

began experiencing another hypertensive condition, the Plaintiff was not administered Labetalol at JCMC ever again, including during the night from February 6 to February 7, 2021, meaning that the successful roadmap drawn by Dr. Wang remained available but was never used.

As you know from my amended complaint, there were three nurses involved in the first transaction, *i.e.*, Nirse-1, Nurse-2, and Nurse-3, and other transactions depicted in the amended complaint reflected the conduct of Nurses -4, -5, -6, and 77, plus one Patient Transporter.

Therefore, now is a good point to have a discussion of different professional licenses, specializations, and positions not requiring a license. As you know, in addition to Physicians (medical doctors), dentists, psychologists, and psychiatrists, there are registered nurses ("RNs"), assistant physicians ("APs"), and registered-nurse practitioner ("RNPs") certified or board-certified, as well as APNs (advance-practice nurses who are typically treated as RPNs for legal purposes), plus various hospital lab Technicians, Patient Care Technicians ("PCTs"), Point of Care operators ("PoCs"), and Patient Transporters. RNs, APs, APNs, RPNs, and physicians, dentists, psychologists, and psychiatrists are licensed personnel requiring an AoM and trial testimony purposes of an expert having the same or similar license and specialization, if any, while Technicians, Patient Care Technicians ("PCTs"), Point of Care operators ("PoCs"), and Patient Transporters do not require an AoM or trial expert testimony from an expert having the same qualifications, and no AOM is required as to vicarious liability claims based on medal of such personnel. If you disagree with me on this point, this is a pure-matter-of-law issue, and we should file a motion ASAP so that we could move forward.

Assuming you agree with me on the prior point, New Jersey law does not require specialization for the purposes of expert opinions addressing APs' and RNs' – rather than RPNs'/APNs' – conducts, meaning that "a" non-specialized AP or RN is the right expert. (Again, please let me know right away if you disagree so that we can promptly litigate this aspect.) In contrast, unlike RNs and APs, RPNs and APNs are specialized. There are about a dozen of such specializations available, but – my review of the record shows that – the specializations relevant to my case could only be family medicine or emergency medicine. (Once again, if you disagree with me on this, please let me know ASAP.)

Next, there is also the issue of shift assignment. Nurses, technicians, and patient transporters usually work either 12-hour shifts (typically, 7 A.M. to 7 P.M., and 7 P.M. to & A.M.), or 10- or 8-hour shifts. The 8-hour ones are either from 7 A.M. to 3 P.M., 3 P.M. to 11 P.M., and 11 P.M. to 7 A.M., or 8 A.M. to 4 P.M., 4 P.M. to 12 A.M., and 12 A.M. to 8 A.M., but each hospital could have variations. Therefore, so my inquiries are based on the periods of an average day that I correlate to an abstract shift(s), and if I saw someone at, say, 3 P.M. and then 2 A.M., I define his/her shift as an evening and night shift. With that, let me finally start asking you about:

The male-appearing Nurse-1 who seemingly made two notes in my records on February 6, 2021, *i.e.*, it seems that he was Mr. Joseph N. Mazur, RN, and – at the time – it appears that he was not specialized. However, not to be presumptuous, I am propounding my:

B-20

**Interrogatory # 1**: State the room number and the specialization of the department encompassing this room where the Plaintiff was held for observations from the afternoon of February 6, 2021, to her February 7, 2021, afternoon discharge.

**Interrogatory #2**: State the name and exact type of license, plus the February 2021 specialization, if any, as well as the latest known address, of the nurse who was assigned to work the evening shift and the night shift attending the room where the Plaintiff was placed after she had been removed from the ER and began being held for observations on February 6, 2021.  If two different nurses worked the evening and night shift attending this room, expressly state so and provide the aforesaid information as to each of them.

Now, about Mr. Joseph N. Mazur.  His LinkedIn page depicts a jolly man similar to the one I remember from my first encounter with him during the afternoon on February 6, 2021, when he was chatty and friendly, although I remember his skin tone and hair color being a tad darker, but it might have been because he was wearing greenish blue nurse's scrubs, plus I saw him against light-colored (I think, pale yellow) walls of my JCMC room, but – on his LinkedIn photo – he is in a red/black shirt against a burgundy background, and that could make his face and hair look lighter.  His LinkedIn page states that he is an RN, with no specialized license even now, although he claims to have begun specializing, work wise rather than license-wise, in being an operating nurse.  His LinkedIn page also states that he worked at the RWJ BH/JCMC for nine months, from September 2020 to May 2021 at the Emergency Department Observation Unit and, since then, he has changed jobs twice.  Therefore, I am making my:

**Request to produce #1:**  Please produce a copy of the JCMC employment file of Mr. Mazur, including the latest address known, the time of license and specialization used in February 2021, plus his resumes and letters of recommendations, if any, considered for the purposes of his employment at JCMC, the JCMC trainings that he attended in person and/or online and completed/failed, disciplinary complaints and disciplinary actions, if any, and all known medical malpractices suits implicating him, with an affidavit of search and an affidavit of content.

**Stipulation # 2:** Since there is no record of any hypertension medication administered to the Plaintiff during the period from 00:01 A.M. to 6 A.M. on February 7, 2021, neither Nurse-1 nor any other JCMC medical provider administered *any* hypertension medication to the Plaintiff in any form during this period.

**Admission # 1:** As a matter of law, it is not an acceptable standard of care for any medical provider to administer a medication to a patient who is not unconscious or lacks mental capacity to understand at least basic information: (a) without clarifying at least the general nature of the medication being administered to the patient; (b) without disclosing a known potential side effect to the patient if such a side effect presents a serious risk, e.g., the risk of CVAs; and (c) without first obtaining the patient consent to be administered a medication entailing such a risk.

**Admission # 2:** As a matter of law, it is not an acceptable standard of care for any medical provider to administer a medication to a patient: (a) informing the patient that this medication belongs to a particular type; while (b) knowing that the medication being administered belongs to a completely different type, since the point that people should not lie is so basic that the

prohibition against lying spans not only every type of medical license and specialization, but also all professions and all human beings.

Now, we can switch briefly to Nurse-2 who was standing there silently, complying with Mr. Mazur's directives. I do not know if Nurse-2 was an RN or a PCT, or POC, or a Patient Transporter. It is self-evident that his duty to speak up depended on his title/license. Therefore, I have

**Stipulation # 3:** Nurse-2 did not have a professional license in February 2021,

Or, if you don't want to so stipulate, I completely understand, and I have:

**Request to produce #2:** Please produce the full-name-addresses-telephone-number-and-photo portions of the JCMC employment files of **all** RNs, PCTs. POCs, Technicians, and Patient Transporters assigned to work the night shift on the **floor** containing the department where the Plaintiff was held for observations from February 6 to 7, 2021. (It should not be a large pool of since night shifts are always less staffed.) If the wing of the floor where the department was contained more than one department, please make sure that these portions of the employment files of **all** RNs, PCTs. POCs, Technicians, and Patient Transporters who worked the night shift on the entire **floor**, rather than only in the department containing this room, are produced. Please accompany with an affidavit of search and affidavit of content.

Once we so stipulate or you so produce, we can develop the Nurse-2 aspect further.

Next is Nurse-3. There is a lot to be said about her since there is a possibility that Nurse-3 was Ms. Maria Christina Bernardo, although, as I detail below, I have uncertainties about it.

Relevant here, Mr. Bernardo has her photo on LinkedIn, and the woman on the photo looks very close to how I remember Nurse-3. However, it is true that I was wailing in pain, with uncontrollable tears running down my face, and I was smudging my tears so that I would be able to see, plus I was sitting in my JCMC bed with a bright light almost right above my head, while Nurse-3 was standing in the shade at the feet side of my bed, and she was in my room for three, at most five, minutes, so I cannot be certain that it was Ms. Bernardo. Notably, on LinkedIn, Ms. Bernardo states that she specializes in family medicine. However, I noticed that other webpages associated with her assert that she specializes in emergency medicine. Her Linkedin page also states that she has a Doctor of Nursing post-graduate degree. Thus, I have

**Request to produce # 4:** Please produce a copy of the JCMC employment file of Ms. Bernardo, including her photograph on JCMC record, her address on February 2, 2023, the type of her license and specialization in February 2021, and the latest known, her resume and letters of recommendations, if any, considered for the purposes of her employment at JCMC, JCMC trainings she attended in person and/or online and successfully completed/failed, disciplinary complaint and disciplinary actions, if any, and all known medical malpractices suits implicating her. Please accompany with an affidavit of search and affidavit of content.

In addition, in light of Ms. Bernardo's LinkedIn statement that she has a Doctor of Nursing degree,

B-22

**Stipulation # 4:** Select one of the following two options: (a) Ms. Bernardo's medical expertise present in February 2021 was substantively indistinguishable to that of an RNP or an APN; or (b) Ms. Bernardo's medical expertise present in February 2021 was substantively indistinguishable from that of an MD in light of her Doctor of Nursing degree; or (c) in light of Ms. Bernardo's Doctor of Nursing degree, her knowledge of medicine in February 2021 should have been at least as high as that of an RNP or APN specializing in her field.

For my purposes, it does not matter which option you select, as long as you select one: so that I would retain an expert corresponding to your selection. In the event your position is that Ms. Bernardo's Doctor of Nursing degree allowed her to have less knowledge than an RNP or APN, please let me know ASAP so that we would move the Court for a clarification as to whether, as a matter of common sense and AoM exceptions, a someone's advanced degree entitles him/her to be dumber than a person without such an advanced degree. I recognize that, as a general matter, a nurse, no matter how many degrees (s)he has, is not an MD. But if your position is that Ms. Bernardo was a *de facto* family medicine or emergency medicine physician in February 2021, I am not planning to challenge you on this aspect: all I need is to know your position with clarity. Correspondingly, if you don't make a selection, I would have no choice but to move the Court to compel stipulation or to enter a presumption of you obstructing my ability to retain a proper expert.

Next, while I am planning to depose Ms. Bernardo one way or another, but, as I have mentioned *supra*, there is an ambiguity as to whether Ms. Bernardo was or was not Nurse-3. My reasons for concluding that there is an ambiguity arises from my treatment records that contain three relevant notes made by Ms. Bernardo.

The first note was made by her at 21:17 (9:17 P.M.) on February 2021: she stated that I was "seen and examined," was "in no distress," and that I "denied CP, SOB, dizziness," etc. (CP is chest pain, SOB is shortness of breath). However, I was not examined by *any* nurse in the evening of February 6, 2021. Rather, at 20:31 (9:31 P.M.), Dr. Peter Benjamin Koch, seemingly a cardiologist (who provided a really good summary of my reports with very minor errors, he was similar to Dr. Wang), made his report of my condition being good, cardiologically speaking. Notably, Ms. Bernardo closed her 21:17 note (that was drafted to create an impression that she was the one who saw and examined me) with a confession: "cardiology consult appreciated."

This incongruity suggests that Ms. Bernardo writes, at least occasionally if not systemically, about actions of others as if these were her own actions. If so, Ms. Bernardo surely wrote her second note, which was about my first transaction (detailed right below), but it might have been that she was paraphrasing someone else's report: given how nonsensical Ms. Bernardo's second note was.

That second note was made at 1:26 A.M. on February 7, 2021, *i.e.*, at the end of my interactions with Nurses -1, -2, and -3, when I was wailing in pain, with uncontrollable tears running down my face from pain, and I was begging Nurse-1 to administer me the same hypertension medication that Dr. Wang had administered to me at the ER about 16 hours prior. While begging Nurses-1, -2, and -3, I was explaining that I was having the same symptoms of a

B-23

hypertensive emergency that I had been having before, *i.e.,* that my head was "exploding" from inside pain, especially forehead and the upper top of my head, plus my head and upper torso (down to my shoulders and a couple of inches below shoulder-level) felt "burning," while the lover three-quarters of my arms, especially below the elbows, plus my hands and my entire legs felt "shiveringly cold": since I experienced the same symptoms during the wee hours of February 6, 2021, I immediately recognized my symptoms, and I knew that the February 6, 2021, EMT staff and JCMC ER staff found that I had a hypertensive emergency.

As you can remember from my amended complaint, when I saw Nurse-3, I also begged her for help and told her about my hypertensive emergency symptoms and blood pressure readings, but she stayed in my room for about three minutes (five at most) and left telling Nurse-1 the cryptic, "Weird, let's just say noted" without talking to me or touching me. Now look at the note Ms. Bernardo made at 1:26 A.M. on February 7, 2021. That note reads:

> Patient anxious appearing, stating she has abd pain, worse to epigastric areas. She is unable to sleep and feels itching all over not improved with benadryl. Patient tearful and upset. On exam, patient skin flushed, abd with mild diffused tenderness. BP noted, will give Ativan and reeval for improvements. CT abd/pel ordered.

As I detail below, part of the note is so nonsensical that it seems it was a result of a children "Telephone" game, *i.e.*, as if someone reported something to Ms. Bernardo who did not even see me at all, and the information reported to her was then distorted by Ms. Bernardo and became pure nonsense, potentially due to her tendency to present tasks performed by others as her if they were done by her. (And this is the reason why I am uncertain if Ms. Bernardo was Nurse-3.)

So, let's start with two stipulations and two admissions based on Ms. Bernardo's aforesaid note.

**Admission # 3:** As a matter of common sense, Ms. Bernardo's phrase "BP noted" was a statement indicating that the Plaintiff had an abnormal blood pressure since the issue of whether the Plaintiff had "a" blood pressure, that is, blood pressure as a sign of life, *i.e.*, that the Plaintiff was not dead, was not considered by the JCMC staff during the night from February 6 to February 7, 2021.

**Admission # 4:** As a matter of common sense, Ms. Bernardo's phrase "BP noted" was a statement indicating that the Plaintiff's abnormal blood pressure was determined as a result of actual measurements that could have been but were not recorded by Ms. Bernardo, given that Ms. Bernardo did not write the phrase "BP noted" as a result of having clairvoyant abilities.

**Stipulation # 5:** Ms. Bernardo's "BP noted" statement is unique for the purposes of the Plaintiff's JCMC's records and KIR records: since no other medical practitioner attending the Plaintiff during her 11 days of JCMC treatment and then during 2.5 weeks at KIR ever stated "BP noted" without stating the actual readings obtained. (I plan to seek expansion of this stipulation to all those medical practitioners who treated me once you obtain my medical records: since I know for sure that nobody would write such a nonsense.)

B-24

**Stipulation # 6:** Ms. Bernardo's statement that the Plaintiff "feels inching all over": (a) is not accompanied by Ms. Bernardo's statement that the Plaintiff scratching any part of the Plaintiff's body; (b) lacks support in the remainder of the Plaintiff's medical records generated by JCMC and KIR (since these records of a single report of the Plaintiff ever "itching" either "all over" or at any part of her body at any time in the past or present); and (c) cannot be supported by Dr. Wang's February 6, 2021, 9:35 statement "Pt indicates she had similar episode earlier in the week.  Also developed non pruritic rash across her shoulders that resolved that day," given that Dr. Wang duly recorded the Plaintiff's report that her purpura was non pruritic.  ("Pruritic" means "itchy."  Please note that I plan to seek expansion of this stipulation to all those medical practitioners who treated me once you obtain my medical records: since I know for sure that no doctor ever wrote that I reported "itching," moreover "itching all over.")

Now, let's dig a little bit deeper into Ms. Bernardo's note since there is so more there to find.

First, note that Dr. Wang's reference to a non-pruritic rash had a minor error: the purpura that I developed during the February 2, 2021, hypertensive urgency covered not only my shoulders but also my back and upper chest, and the purpura did not clear entirely on February 2, 2021; rather, it began to clear that day and almost cleared by February 6, 2021, when I showed Dr. Wang and the February 6, 2021, ER nurse a couple of tiny purpura spots that remained on my left shoulder.  However, Dr. Wang correctly recorded the fact that my purpura was non pruritic.  Therefore, I could not help wondering where, on Earth, could Ms. Bernardo get that I felt "itchy all over."

In light of what appears to be Ms. Bernardo's tendency to use other people's reports to paraphrase other people's functions as functions that she herself performed, my guess is that her statement about me "itching all over" was a result of the fact that I had reported my February 2, 2021, purpura to Nurse-1 when he first talked to me in the afternoon of February 6, 2021, and he might have told about it to Ms. Bernardo, but either Nurse-1 or Ms. Bernardo did not know the difference between "purpura" and "pruritis," and that's why she wrote the nonsensical "itching all over": because one of them substituted "purpura" for "pruritis" since both words have a Latin origin and begin with "P."  That said, my Sherlock Holmes' abilities are, of course, irrelevant.

Instead, look at the "souvenir" that Ms. Bernardo's statement created for you.  Given that Ms. Bernardo stated that my alleged "itching all over" was treated with Benadryl, and that I have "not improved with benadryl," this necessarily means:

That the alleged treatment with Benadryl had to take place at least some non-negligible period of time prior to Ms. Bernardo making her "benadryl" and "itching" note since it takes Benadryl 30 minutes to have effect (*see* https://www.nhs.uk/medicines/diphenhydramine).  Accordingly, for me to be treated with Benadryl and to have "no improvement," as Ms. Bernardo stated, this alleged "itching" and the alleged Benadryl treatment had to take place no later than at 1 A.M. on February 7, 2021, and not earlier than at 21:17 (9:17 P.M.) on February 6, 2021 (when Ms. Bernardo adopted Dr. Koch's examination who wrote that I was just fine).

However, as you can see in my JCMC records, during these four hours and nine minutes, that is, from 9:17 P.M. on February 6, 2021, to 1:26 A.M. on February 7, 2021, there is no notation of me complaining of any "itching" or of me being prescribed Benadryl.  In fact, there is no

B-25

mention in my JCMC treatment records of anyone prescribing me Benadryl for any "itching," ever. The only nonsensical statement of "itching" that was continuing regardless of me being treated in the *past* with Benadryl is that of Ms. Bernardo. Taken to its logical conclusion, her statement about me "itching all over" and "not improving" with Benadryl offers two alternatives, and you can adopt the one you hate less since they are equally awful for your client.

One alternative is that, while I was secretly "itching all over" without scratching myself (all while being clearly quite busy wailing in pain, smudging uncontrollable tears, having my blood pressure taken thrice, my abdomen examined by Nurse-1, begging for the hypertension medication administered by Dr,. Wang and for ice packs), someone secretly noticed that secret itching, secretly prescribed me that Benadryl, and then secretly administered to me that Benadryl (which comes only in uniquely characteristic oblong harsh-pink pills or harsh-pink-and-white caplets) that I, amazingly enough, secretly took but could not remember either taking or even seeing, even though my extremely detailed visual memory is among my most known features.

In sum, your first option is that Ms. Bernardo or someone else on JCMC's staff made one of the most classic errors by treating me without creating any record of either my condition or the need for treatment, or the treatment. As an icing on this secretive cake, I was allegedly administered Benadryl, that is, Diphenhydramine, an over-the-counter medication that, as I noted in my amended complaint, belongs to the group of over-the-counter sleep-inducing medications that increase the risk of stroke. Plus, if the foregoing were not enough, that Benadryl was allegedly administered to me shortly prior to Ativan, which is particularly knows for increasing the risk of strokes. Hence, the Benadryl-first-and-Ativan-shortly-thereafter combination alleged by Ms. Bernardo's 1:26 A.M. note shows that the JCMC staff did everything possible to cause me strokes and succeeded at that, giving me a clear-cut ticket to punitive damages, thank you.

The second option is less crazy but even more concerning. This option is that Ms. Bernardo realized that she wrote nonsense about me "itching all over" but, instead of correcting this nonsense, she just added diphenhydramine to my bill of medications: without administering me any Benadryl (since, in reality, I had no "itching" and was not treated by any harsh-pink pills or harsh-pink-and-white caplets). True, this version meets the Occam's razor method of analysis. However, this version also means that: (a) Ms. Bernardo outright lied in her 1:26 A.M. February 7, 2021, note about me "itching all over," being treated with Benadryl, and not improving; plus (b) added Benadryl that was never administered to me to my medications bill (that I am providing to you). Since your client billed my health insurance, and my health insurance paid JCMC, it means that Ms. Bernardo and your client committed insurance fraud, congratulations.

Of course, there is also a third option, *i.e.*, that a completely different JCMC patient was actually "itching all over" and treated with Benadryl, and his/her complaints and prescription of Benadryl were actually entered into his/her JCMC record, and then (s)he complained that the itching was not reducing, and that was reported to Ms. Bernardo, but she added the report of that patient not improving, plus the Benadryl charge, to my records. If you like this third option better, it is all yours: I will then posit to the jury that I probably should be grateful that, at least, I did not get one of my legs amputated/kidneys removed: since JCMC may confuse one patient with another.

B-26

Now,

**Stipulation # 7:** Ms. Bernardo's note made at 1:26 A.M. on February 7, 2021, states that Benadryl, administered to the Plaintiff for "itching all over," provided no relief, thus demonstrating that Benadryl had to be administered at least some non-negligible period of time prior to the time of Ms. Bernardo's note; but (b) the Plaintiff's JCMC records contain no record of either the Plaintiff's complaints about any "itching" or Benadryl being prescribed, and no name and title/license of the prescribing provider; even though (c) the Plaintiff's JCMC's medications bill contains a charge for Benadryl; and (d) the Plaintiff's medication bill was submitted by JCMC to the Plaintiff's health insurance for payment that was in fact made by the health insurance.

Unfortunately, we are not fully done with Ms. Bernardo since she also ordered my pelvic exam (even though the issue of my pelvis was never raised by me, and no complaints were recorded, as my JCMC records show), but Ms. Bernardo neither ordered any exam for my cerebrum nor even mentioned my severe frontoparietal head pain in her note (while my JCMC records show that I was constantly complaining of that pain, although it was described as a "headache" by other medical practitioners at JCMC).  Therefore, I would like to request:

**Stipulation # 8:** Ms. Bernardo ordered the Plaintiff's pelvic examination, even though JCMC records generated in February 2021 do not reflect a single complaint by the Plaintiff about any pelvic pain, disorder, or condition, but Ms. Bernardo did not order any examination as to the Plaintiff's cerebrum, even though Ms. Bernardo: (a) knew or should have known that the Plaintiff was admitted to JCMC with hypertensive emergency; (b) admitted at 1:26 A.M. on February 7, 2021, that the Plaintiff had blood pressure qualifying as abnormal (by stating "BP noted"); (c) directed the Plaintiff's treatment with Ativan without accompanying such a treatment with any hypertension medication; (d) did not disclose a risk of ischemic stroke associated with Ativan; and (e) did not obtain the Plaintiff's consent to be treated with Ativan.

**Stipulation # 9**: The FDA approved Ativan, a benzodiazepine, for use as an antidepressant (*see* https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/017794s044lbl.pdf), but Ativan was *never* approved for use as a hypertensive medication, and the FDA stressed that, while "[s]mall decreases in . . . hypotension may occur[, such decreases are] usually not clinically significant [and] probably [occur due to] being related to the relief of anxiety produced by Ativan."

**Stipulation # 10:** In January 2017, that is, three years **prior** to the events underlying the Plaintiff's complaint, a peer-reviewed study demonstrating that the use of benzodiazepine drugs was associated with an increased risk of ischemic strokes was released and made publicly available.  (*See* https://www.sciencedaily.com/releases/2017/01/170116091422.htm.)

With that, we are done with the First Transaction, but – since Ms. Bernardo is a gift that keeps on giving – she and her third note will continue into the Second Transaction.

## 2. Second Transaction

The Second Transaction covers the period from the wee hours, about 2:45 A.M., on February 7, 2021, to about noon of that date and consists of two subparts.

B-27

The first subpart are the events related to me taking my own Carvedilol and Losartan around 2:45 A.M., *i.e.*, about an hour and a few minutes after Nurse-1 had given me that whitish small pill. The second subpart is about the statements made to me by Nurse-4 and all medical providers who examined me and falsely assured me that some unspecified "they" already knew unspecified "everything," and my severe frontoparietal pain would necessarily be examined.

So, let's start with *why* I took my own Carvedilol and Losartan: the answer, as you know from my amended complaint, is – because I had 235/128 mmHg blood pressure around 1:26 A.M. on February 7, 2021, when I was wailing in pain and explaining that my blood pressure was making my frontoparietal pain unbearable, but all I could get from Nurses -1, -2, and -3 were three small packs of instant ice, one large pack filled with ice cubes, and the whitish pill that had no hypertension-relieving effect. As you also know from my amended complaint, the looks of Nurse-4 was consistent with being a biological female, plus she looked paler than Nurse-3 (although it might have been due to daylight and/or because Nurse-3 turned on the overall room light: I remember a very even light across the entirety of my JCMC room, and her standing there, looking at me, she was slightly to the left of my bed, kind of between my bed and the empty bed that was next to the window), *i.e.*, she was not standing in the shadows, like Nurse-3 was a few hours prior, when Nurse-1 turned the bright spotlight-like light above my head, and it could have been the reason why Nurse-4's complexion looked lighter than that of Nurse-3.

At this juncture, I don't see a reason to ask you to produce a separate set of employment files and photos: because my interactions with Nurse-4 took place, I think, shortly before the night-shift ended: I remember that, already after talking to Nurse-4, I became dizzy from not just pain but also the lack of sleep; I saw a breakfast meal being brought but could not eat it, and there was some nurse who entered to state that she was my morning nurse, and then there were doctors or technicians who examined my abdomen and pelvis, and did a cardiological Echo test. Therefore, I will first try to find Nurse-4 among the night-staff nurses, technicians, etc. since it seems that she came before the morning February 7, 2021, shift took over around 7 A.M. If I don't find Nurse-4 among the night-shift staff, I will ask you for employment files of the morning shift.

My first hospitalization stay with JCMC was like visiting Lewis Carroll's Wonderland, and while I remember Nurse-3 looking like a biological female and having Asian features, the notes made in my JCMC medical treatment records are, predictably enough, lacking any information about who she was. Instead, my interactions with her are reflected in the notes made by two familiar characters, *i.e.*, Mr. Mazur (who was, likely, Nurse-1) and Ms. Bernardo (who was, potentially, Nurse-3).

As you remember from my amended complaint, Nurse-4 not only chastised me for taking my own Coreg (*i.e.*, Carvedilol) and Losartan but, to top it off, complained that I was not thrilled with her "educating" me, plus she refused to leave without expropriating my own Coreg and Losartan pills that Katherine had given me when the February 6, 2021, EMTs had taken me to the JCMC ER at dawn on February 6, 2021. Please also note that my general medical records show that my hypertension medications used to manage my blood pressure at home were Coreg and Losartan (Coreg was the primary, but Losartan was prescribed to me and purchased by me first: it was in Fall of 2019, albeit I was using it sparingly since its constant use as my primary

B-28

hypertension medication attempted in Fall 2019 caused me hyperkalemia).  Therefore, I could not have had Losartan "added" to my meds: because I already had it and had been using it, given that Dr. Bentsianov prescribed it to me in Fall 2019, and Dr Schwartz added Coreg and made it my primary medication later in 2019, and I even mentioned my occasional use of Losartan to Dr. Schwartz during the telehealth appointment that I had with him shortly before my strokes.  And, as you might recall from my amended complaint (or you can just see it from any info on the internet, e.g., at the FDA website, or even from the documents Ms. Arauz gave me at discharge), Losartan is an angiotensin receptor blocker, that is, an "ARB," while Coreg is a beta-blocker.

With this information in mind, let's now look at what and when Ms. Bernardo and Mr. Mazur wrote in my JCMC medical treatment during the wee hours of February 7, 2021.  Eighteen pages apart but – in real time – only 11 minutes apart, they made their independent notations.  I am starting with Ms. Bernardo, who – not surprisingly – beat Mr. Mazur and wrote at 5:47 A.M. on February 7, 2021:

> Per RN, patient took her own coreg 12.5mg because she felt as though she is having hypertensive crisis.  Patient anxious appearing, states that we are not doing anything to control BP despite education on starting ARB and close monitoring.  Educated to not take her own medications as she has scheduled doses here, she refuses and states that she will take her meds as though she needs it.  She completed CT and is awaiting read of CT. Case endorsed to NP Arauz at 0700.  Pertinent history, physical exam and lab data reviewed.  I participated in the evaluation, management and treatment of this patient.  The orders and chart were reviewed and approved by my collaborating physician Dr. Law.

I kept the grammar, spelling, capitalization, punctuation, spacing, and the lack thereof as they are in original.  Based on Ms. Bernardo statements, let me ask for a few stipulations and productions, plus propound one interrogatory.

**Stipulation # 1:** The Plaintiff informed JCMC staff in the morning of February 7, 2021, that she had taken her own hypertension medications during the night from February 6, 2021, to February 7, 2021, because: (a) the Plaintiff had experienced symptoms that she had associated with a hypertensive emergency; (b) the Plaintiff knew how a hypertensive emergency or at least a hypertensive urgency felt because, on February 6, 2021, she was brought to the JCMC ER with blood pressure 188/125 mmHg, as shown by her JCMC record and correctly reported that she felt her hypertension increasing to the February 6, 2021, ER nurse, which prompted Dr. Wang to direct that the Plaintiff be administered Labetalol; (c) the Plaintiff was not provided with *any* hypertension medication by *any* JCMC staff during the period from 00:01 A.M. the latest to 5:46 A.M. the earliest on February 7, 2021; (d) Ms. Bernardo expressly acknowledged that, at 1:27 A.M. on February 7, 2021, the Plaintiff experienced an abnormal blood pressure; and (e) Ms. Bernardo acknowledged that the Plaintiff took her own hypertension medication during the night from February 6 to 7, 2021.

**Stipulation # 2:**  The Plaintiff's JCMC's medical treatment records generated during both of her February 2021 JCMC stays, as well as her KIR records, contain multiple entries reflecting the

Plaintiff's reports of head pain and JCMC and KIR staff administering the Plaintiff Tylenol on multiple occasions, thus reflecting the Plaintiff's continuous head pain and, during the period from at least February 6, 2021, to February 11, 2021, the Plaintiff experienced multiple episodes of abnormally elevated blood pressure.

**Stipulation # 3:** Ms. Bernardo's 5:47 A.M. February 7, 2021, note beginning with the phrase, "Per RN" stated that the Plaintiff's "[c]ase [was] endorsed to NP Arauz at 0700," *i.e.*, that "NP Arauz" took over – meaning, was transferred – the Plaintiff's case at 7:00 A.M. on February 7, 2021, and that Ms. Arauz even joined Ms. Bernardo in reviewing the Plaintiff's JCMC medical records, but Ms. Bernardo made these statements **one hour and 13 minutes prior** to the point in time when such a transfer and review had allegedly taken place, which is an impossibility for the purposes of a nonhyperbolic linear progression of time adopted in not only Anglo-American common-law but all forms of jurisprudence and all sciences other than micro- and astrophysics.

Simply put, the timeline of Ms. Bernardo's note is either nonsense (unless she asserts that she was utilizing a time machine) or reflects Ms. Bernardo's propensity to inject her notes with false information, taking advantage to JCMC's policies and procedures being self-evidently amenable to such falsities.

**Stipulation # 4:** While the Plaintiff had cardiological, abdominal, and pelvic examinations conducted on February 7, 2021, none of these examinations was conducted, moreover completed, by 5:47 A.M. on February 7, 2021, even though Ms. Bernardo stated in her 5:47 A.M. February 7, 2021, note that the examinations were **already conducted**, thus verifying that Ms. Bernardo's was making false statements in her notes on multiple occasions about multiple matters, if not systemically.

**Stipulation # 5:** While Ms. Bernardo's note beginning with the phrase, "Per RN" did not identify the RN by first or last name, Ms. Bernardo's use of the abbreviation "RN" demonstrates that she was referring to a nurse with a non-specialized license, given that Ms. Bernardo referred to Ms. Arauz as "NP," *i.e.*, as a nurse-practitioner, rather than "RN," *i.e.*, a "registered nurse."

**Stipulation # 6.** While Dr. Donna Chelle Morales, D.O., stated, in her 14:49 (2:49 P.M.) February 6, 2021, order, that ARB was "added" for "additional blood pressure control" of the Plaintiff, public information amenable to judicial notice and the Plaintiff's general medical treatment records shows that: (a) Losartan is an ARB; (b) the Plaintiff was prescribed and regularly purchased Losartan, an ARB, starting from Fall 2019 for additional hypertension control; and (c) no ARB or any other blood pressure medication was administered to the Plaintiff during the period from 00:01 A.M. the latest to 5:45 A.M. the earliest on February 7, 2021.

**Stipulation # 7:** Even though: (a) Ms. Bernardo was informed that the Plaintiff appeared very anxious about the possibility of increases in her blood pressure; and (b) the Plaintiff's JCMC records reflected her systemic complaints about head pain and systemic treatment with Tylenol, Ms. Bernardo did not direct any examination to address the cause of the Plaintiff's head pain and, instead, ordered an examination of the Plaintiff's pelvis that the Plaintiff did not complain about during the night from February 6 to 7, 221, and did not change her directive in the morning of February 7, 2021.

**Stipulation # 8: "**MDs and DOs are both licensed professionals able to treat . . . illnesses or injuries. The differences are subtle, but DOs may be more appropriate if [a patient is] interested in holistic or alternative therapies."  https://www.healthline.com/health/difference-between-md-and-do.

**Stipulation # 9:** An acute ischemic stroke is not among medical conditions that modern medicine finds suitable for "holistic or alternative therapies."  *See* https://www.uptodate.com/contents/ischemic-stroke-treatment-beyond-the-basics ("After an ischemic stroke, the goal of treatment is to restore blood flow to the affected area of the brain as quickly as possible, that is, within the first hours after the onset of stroke symptoms. The main very early treatments for ischemic stroke are: Thrombolytic therapy – This involves giving a medication called alteplase (also known as tPA, for 'tissue plasminogen activator'), or a similar medication called tenecteplase, by IV (through a vein).  It works by breaking up the clot that is blocking blood flow to the brain.  Mechanical thrombectomy – This is a procedure that involves a specialist placing a catheter in the blocked artery and removing the clot.  This is done using a 'stent retriever device' or suction to reopen the blocked artery.  Both thrombolytic therapy and mechanical thrombectomy require care in a hospital that has expertise in these areas and can coordinate emergency services, rapid consultation with a neurologist (a physician who specializes in the brain), intensive care services, and brain and vascular imaging with CT or MRI scans.").

**Stipulation # 10:** Dr. Stephen W. Law is a medical doctor specializing in osteopathic medicine. (If you cannot so stipulate, please proceed to Interrogatory # 1 in this subsection.)

**Stipulation # 11:** While Dr. Morales is referred to as a D.O. in the Plaintiff's medical records, RWJ BH advertises her as an Internist and Cardiologist on her RWJ BH's webpage.

**Request to produce # 1:** Please produce EMT report associated with the Plaintiff being brought by EMTs to the JCMC ER on February 11, 2021, as well as any February 11, 2021. 911/EMT records, including audio recordings, if such were provided to the EMTs or could be obtained by JCMC.  Please accompany with an affidavit of search and affidavit of content.

**Request to produce # 2:**  Please produce the schedule of duty stations/time of duty assignments of Jessica Arauz, APN, for February 6, 7, and 11, 2021, with an affidavit of search and an affidavit of content: so that it would be possible to establish with absolute certainty when and where Ms. Arauz began her shift and worked on February 6, 7, and 11, 2021.

**Request to produce # 3:**  Please produce the schedule of duty station/time attendance of Stephen W. Law, D.O., for February 7, 2021, and all medical providers who conducted examinations of the Plaintiff's pelvis, abdomen, and cardiovascular system on February 7, 2021. Please accompany with an affidavit of search and affidavit of content.

**Interrogatory # 1:** State Drs. Stephen W. Law's and Morales' specializations that were utilized on February 7, 2021, in connection with them being consulting/collaborating physicians for the Plaintiff.  (Response as to Dr. Law is not needed if you stipulated to the Stipulation # 10 in this subsection of the Letter or if this information is produced pursuant to the request to produce # 4 in this subsection of the Letter.)

B-31

Having finally bid adieu to Ms. Bernardo, we can now address Ms. Joseph Mazur (who was, likely, Nurse-1). He made two notes in my JCMC medical treatment records, one at 2:43 A.M. on February 7, 2021, and another on 5:56 A.M. on February 7, 2021.

As you remember from my amended complaint, after Nurse-1 gave me the whitish pill that he brought in a paper souffle cup and, poured me water from the pitcher into waxed small cup, plus lied to me that it was the same hypertension medication that Dr. Wang had directed to be administered to me in the morning of February 6, 2021, I did not see Nurse-1 again. So, let me factor this into my review of Mr. Mazur's notes.

The first note, made at 2:45 A.M., is very short, it reads, "pt refusing to wear cardiac monitoring device." Of course, in reality, this was not true: I did not "refuse" to wear the "device" that was attached to me both times when I was brought by EMTs to the JCMC ER, even though the "device" was systemically showing that my heart was just fine; in fact, I did not even talk to anyone about the "device."

The "device" was a usual EKG Monitor with snap-on leadwires that were constantly "un-snapping" because they were snapped to the small rubber sensors that, if you pealed the back cover, were kinda glueish on their backs, so they were gluing to my skin, and then the snaps were attaching to these sensors, which allowed the device to work: same as it is done for any EKG machine. However, the sensors were frequently ungluing from my skin, and – like in all glued sensors – their tendency to unglue was naturally increasing if I had water on my skin.

As you know from my amended complaint, at about 2:15 A.M. on February 7, 2021, I got completely exhausted holding the small ice packs against my forehead and the large container with melting ice cubes on top of my coronal suture because I had to sit as motionlessly as possible, but it is very hard to sit and be motionless when you are in severe pain and have to keep your freezing hands up to hold ice packs. Therefore, I decided to reposition the large container so that its clip-like "spout" would be the same place as my hand holding small ice packs, so that I would be able to change hands from one to another, but the container with melting ice cubes opened and poured iced water over the front of my hospital gown, even wetting my PJs under the gown, plus sprinkling water on the bedding, and that was when I removed all my closes, threw the wet hospital gown on the floor, and spread my PJs for drying on the left side of my bed.

When I removed my PJs, a saw that the bulk of the leadwires of the device got unsnapped, either due to my undressing or the iced water, or both, and it made the device hang on me like a sad octopus trying to grab onto me with just a couple of its tentacles, pulling my skin. This is why I removed the damn "device" and put it on my bed table, and then wiggled myself under the bedsheet and thin blanket, laying there naked, only in my socks, trying to control my shaking caused by my hypertensive emergency and thinking what to do because it was becoming clearer and clearer to me that Nurse-1 lied to me, and that the JCMC staff would not help me, and I was entirely on my own, without even Katherine available to help me to the small degree she could.

By about 2:45 A.M., I became completely certain that Nurse-1 lied to me and, whatever the whitish pill that he gave me was, was not a hypertensive medication and, most likely, it was some sedative because Nurse-3 was so clearly annoyed with me wailing in pain, so she just

B-32

wanted me to pass out and shut up. This was the moment when I decided to take my own Coreg and Losartan that Katherine had given me. (Just for the record: I was still expecting to die that night, but I was hoping to die more comfortably.) Therefore, I found the plastic bag Katherine gave me on my nightstand and – after taking my own pills – I laid down again, this time with my eyes closed, trying to warm up and waiting for Coreg and Losartan to kick in.

I cannot rule out that Mr. Mazur heard me rifling through the plastic bag, and I also cannot rule out that Mr. Mazur looked inside my room: since the door into my room was kept half opened. If yes, then he could see the "device" on my bedside table and construe it as my "refusal" to wear the "device." Well, I will find out during discovery against him, but – on my part – I know for sure that I did not see him (I was laying with my eyes closed), and I did not make any statement of "refusal" to him or anyone else: it was too hard to talk at that time, and all my efforts went into controlling the burning pain in my head and shivering caused by my hypertensive crisis.

This little snapshot vignette of that night and Mr. Mazur's first note should be read jointly with a note of Ms. Arauz's (whom you are to meet in a few pages) made at 8:30 A.M. on February 7, 2021. Her note read, "Patient found laying in bed flat, no shirt or gown on." Therefore,

**Stipulation # 12:** The facts that the Plaintiff's was laying without a shirt or gown on, and had no heart monitor device attached in the early morning on February 7, 2021, are – at the very least – consistent with the Plaintiff's account that she was provided only with ice packs as remedies for her abnormally high blood pressure, and one of these ice packs opened and spilled iced water on her, prompting the Plaintiff to remove all her clothes short of socks and also remove the heart monitor that had partially detached from her body due to the spilled water and undressing.

With that, we can proceed to Mr. Mazur's second note that was made, as I pointed out, 11 minutes after Ms. Bernardo's note, *i.e.*, at 5:56 A.M. on February 7, 2021. That note reads:

> Patient was concerned that blood pressure was going to become elevated after we had rechecked the patient's blood pressure at patient's request which was 148/89 at 0530. Patient stated that she would take her own medication to control it. Patient was advised not to take their own medication, educated on risks related to overmedicating and taking medication outside of the scope of the healthcare team. Patient stated that she had taken a 12.5mg dose of Coreg brought from home. Charge nurse was notified. APN notified. Patient medication was removed after contacting ADN to ensure medication could be secured in a locked box with security. Patient blood pressure will be continued to be monitored q15m.

However, as you know from my amended complaint, the nurse who chastised me for taking my own Coreg and Losartan, complained that I was ungrateful for being "educated" by her, and refused to leave without expropriating my Coreg and Losartan, that nurse was not only having a female appearance and voice, but also looked vastly different from Mr. Mazur. So, now we know the answer to the weird fact that both Ms. Bernardo and Mr. Mazur made duplicative notes about me taking Coreg and Losartan, but Ms. Bernardo made that note 11 minutes before Mr. Mazur. That answer is: the "RN" referred to in Ms. Bernardo's note was *not* Mr. Mazur, rather, it was that another RN who appeared female and had Asian facial features. In other words, it

shows that Mr. Mazur did not have the guts to face me after lying to me that the pill he had given to me was the same hypertension medication that had been given to me by Dr. Wang; therefore, Mr. Mazur sent the RN with Asian facial features to me, but that RN went to report to Ms. Bernardo first since Ms. Bernardo had a higher ranking, and only then she notified Mr. Mazur.

In light of the foregoing, I would like to request:

**Admission # 1:** The time of when the effect of Losartan becomes felt is 1-2 hours and it fully metabolizes in 3-4 hours. *See* https://www.drugs.com/tips/losartan-patient-tips.

**Admission # 2:** Carvedilol is rapidly absorbed after an oral dose, reaching peak plasma drug concentrations within 1 to 2 hours. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2464772.

**Stipulation # 13:** Given that Ms. Bernardo's LinkedIn webpage states that she obtained her Doctor of Nursing degree in 2017, Ms. Bernardo could not have been referred to by Mr. Mazur as an "ADN" because "ADN" stands for an "associate degree in nursing," meaning that Ms. Bernardo could have been referred to by Mr. Mazur only as the "Charge nurse" or the "APN."

**Stipulation # 14:** Since, during the period from 1:26 A.M. the earliest to 5:30 A.M. the latest on February 7, 2021 (*i.e.*, this period could have started markedly later), the Plaintiff took her own hypertension medication(s), but the Plaintiff's blood pressure reduced only to 148/89 mmHg by 5:30 A.M., the Plaintiff's blood pressure would have been higher than 148/89 mmHg at 5:30 A.M. on February 7, 2021, had she not taken her own hypertension medication(s).

**Stipulation # 15:** Nothing in Mr. Mazur's 5:56 A.M. February 7, 2021, note establishes that Mr. Mazur was the nurse who conducted a check of the Plaintiff's blood pressure at 5:30 A.M. or the nurse who had a communication with the Plaintiff about her taking her own hypertension medication(s) during the night from February 6 to February 7, 2021, and removed the medication(s) from the Plaintiff's possession.

**Stipulation # 16:** Mr. Mazur's 5:56 A.M. February 7, 2021, note establishes that the nurse who had a communication with the Plaintiff about her taking her own hypertension medications informed Mr. Mazur and, in addition, *three* different nurses (whom Mr. Mazur referred to as "Charge nurse," "APN," and "ADN") of the Plaintiff's blood pressure readings obtained after the Plaintiff had taken her own hypertension medication(s).

**Stipulation # 17:** In the morning of February 7, 2021, at least five persons on JCMC medical staff, *i.e.*, Mr. Mazur's, the RN who was the source of Mr. Mazur's and Ms. Bernardo's notes, and the "Charge nurse," the "APN," and the "ADN," knew or should have known of the Plaintiff's 148/89 mmHG blood pressure readings obtained when the effect of her own hypertension medications peaked.

**Stipulation # 18:** Neither Mr. Mazur's, nor Ms. Bernardo, nor any RN or any other nurses whom Mr. Mazur referred to as "Charge nurse," "APN," and "ADN" directed an examination of the cause of the Plaintiff's head pain.

**Stipulation # 19:** Nothing in the Plaintiff's JCMC records shows that any nurse informed either Dr. Morales or Dr. Law of the Plaintiff's complaints about her head pain in the morning of February 7, 2021.

**Stipulation # 20:** The option of ordering an MRI of the Plaintiff's brain was available to every nurse and physician who participated in the Plaintiff's treatment directly or indirectly during the night from February 6 to February 7, 2021, or on February 7, 2021, but no MRI was either ordered or conducted.

**Stipulation # 21:** The fact that, during the Plaintiff's stay at JCMC from February 11 to 19, 2021, the Plaintiff was administered injections of Enoxaparin, an anticoagulant, that can reduce the risk of ischemic strokes, https://www.ahajournals.org/doi/full/10.1161/01.STR.32.4.993, but no JCMC nurse or physician who participated in the Plaintiff's treatment directly or indirectly during the period from February 6 to February 7, 2021, made any statement that could reasonably be construed as at least suggesting that the Plaintiff should be prescribed an anticoagulant in the event she would be discharged from JCMC, demonstrates that nobody on the JCMC staff who attended the Plaintiff on February 7, 2021, even considered the possibility of the Plaintiff experiencing an acute stroke regardless of the Plaintiffs constant reports of severe head pain and, in addition, her report of inability to stand or walk to Nurse-5.

**Stipulation # 22:** The Plaintiff's JCMC records demonstrate that no nurse or physician who participated in the Plaintiff's treatment directly or indirectly during the period from February 6 to February 7, 2021, made any statement that could reasonably be construed as an opposition to discharging the Plaintiff from JCMC without radiological imaging of her cerebrum and without prescribing the Plaintiff anticoagulants or at least recommending her basic over-the-counter blood thinners, like Aspirin.

**Interrogatory # 2:** State the full names, titles, types of professional licenses and specializations, addresses known on February 2, 2023, current addresses (or the latest addresses known) of the persons who conducted – rather than generated reports of – the Plaintiff's cardiological, abdominal, and pelvic examinations on February 7, 2021.

**Stipulation # 23:** As a matter of law, a medical provider's statement that unspecified "they" already know "everything" about a patient's main health complaint, and that the patient would not be discharged from a hospital without having the source of this "everything" examined – without reporting the patient's main health complaint to the patient's attending/consulting physician and without establishing that this main health complaint is actually known to such a physician – is not an acceptable standard of care since the rule that people should not lie is so basic that the prohibition on lying spans not only every type of medical license and specialization, but also all professions and all human beings.

### 3. Third Transaction

The Third Transaction is based on the statements/actions/omissions of Nurse-5, and there are quite a few things to be said about her conduct since it implicates not only matters of my personal injury and *respondeat superior* liability of your clients but also injects matters of

B-35

employment and civil rights laws.  I start with a guess about Nurse-5's identity: more likely than not, Nurse-5 is Ms. Jessica Arauz who has been mentioned *supra*.  My main uncertainty is based on the dramatic inconsistency between: (a) my recollections of the personalities of three nurses that I encountered; and (b) the information in my JCMC treatment records suggesting that all three of them could have been Ms. Arauz.

This is so because Ms. Arauz's name pops up on a few occasions, and these occasions are such that it cannot be completely ruled out that Ms. Arauz was: (a) the ER nurse who saw me when I was brought to the JCMC ER on February 6, 2021 (and administered me Labetalol with Ativan IV in the 10-to-1 ratio per Dr. Wang's orders); (b) the abysmal Nurse-5 who informed me that I was being discharged from JCMC on February 7, 2021, making statements and comments that make the list of the most shocking insults made toward me; and (c) the ER nurse who examined me when I was brought to the ER again on February 11, 2021.  However, my recollections of these three nurses are vastly different in terms of their behavioral style/personalities.

I remember the February 6, 2021, nurse first walking into my ER unit that was a hospital version of a "cubicle" (it had one wall, the other three sides were curtains separating this "cubicle" from the corridor and other "cubicles"); it was when I have finished changing from my PJs into the a hospital gown, and so I was standing next to a small white bed-side table that was in that "cubicle": I was standing with my back to the portion of the curtain where the ER nurse walked in.  The "cubicle" was quite large and brightly lit with a florescent lamp on the ceiling, and I remember that I had already put my hospital gown on and was folding my PJs and putting them into the plastic bag (the one with my cell and the Duane Reade container with Coreg and Losartan that Katherine gave me when the February 6, 2021, EMTs took me to the JCMC ER the first time).  Initially, the ER nurse saw that I was still standing and wanted to return later, but I told her that I was just putting my clothes in, and so she saw me finish stuffing my PJs into the plastic bag, walking a couple of steps to the ER gurney, climbing onto the gurney that was somehow a bit too high for me, and then laying down on the gurney for her examination: it was already while I was telling her about why I had been brought to the ER (*i.e.*, I was telling her about the February 2, 2021, episode, the purpura, the pre-dawn hypertensive emergency on February 6, 2021, and the direct correlation between the severity of my head pain and increases in my blood pressure that made me scream into the ceiling and beg the Almighty for death).

I recall the February 6, 2021, ER nurse wearing thin, either rimless or thin-metallic-rim glasses and no make-up at all.  She looked a bit washed out, and I presumed that it might have been because she was either after a long night shift or due to having to wake up early to come to work.  I very much felt for her, and her personality, at that point, was the best anyone can possibly wish for in a nurse: she was very pleasant, calm, caring, and soft-spoken, and I liked her so much.

When she came into my "cubicle" the second time, it was to check how I was doing, and I told her that I could feel that my blood pressure had begun going up again, and I was terrified of having my head pain increase again to the point when I would start screaming into the ceiling.  She reacted promptly with concern and care.  Thus, in response to me stating that I knew that my blood pressure was going up, and that I was terrified of my head pain increasing because of that, the February 6, 2021, ER nurse measured my blood pressure just once, saw that I was correct

(*i.e.* that my blood pressure was not only elevated but higher than the readings she had obtained during her initial examination of me), told me that she would ask Dr. Wang, and returned shortly thereafter to inject me something that she described as a hypertension medication that he prescribed. She did not tell me the name of the medication, and I was already in such a lousy condition that I did not care what its name was as long as it was a hypertension medication, plus I liked her and – since she appeared trustworthy – I did not feel right to interrogate her.

After she injected the liquid into the tube going into my vein, she left, and I continued laying on the ER gurney on my back, with my head turned left toward the wall (to avoid looking at the lamp on the ceiling since its bright light was bothering me). She returned in less than 15 minutes and asked how I was doing, and I told her that I was yet to feel any effect of the medication and could not help wondering if I needed a higher dose. She responded that I would get relief any moment because it was a fast-acting medication, especially if administered as an IV. She was right: shortly thereafter, my head and upper torso stopped burning, while my hands, feet, arms, and legs warmed up, and I dozed off. (I attributed it to me being exhausted by the predawn hypertensive emergency and the resulting sleepless night: since she did not tell me anything about Ativan: I learned about it two years later, when I got a hard-copy of my JCMC records.)

I kept waking up each time when she (and, I think once, Dr. Wang) walked into my "cubicle": because I am a sensitive sleeper, and I wanted to make sure that I would be able to answer any questions that they might want to ask. Each time after they asked me how I was, I was telling that I was "much better and very grateful for their care," and then I was falling back asleep until, already probably after noon, a different nurse (or a technician, or a patient transporter) waked in, told me that I would be held for observations, helped me fetch my plastic bag from the small bed-side table that kept standing behind the head part of the ER gurney, and she took me on that ER gurney upstairs to the JCMC room where I stayed from February 6 to February 7, 2021. I sincerely thought that I never saw the February 6, 2021, ER nurse again: until I realized that – no matter how hard it was for me to believe it – she might have been the same person as Nurse-5.

Nurse-5, who came into my JCMC room on February 7, 2021, to inform me that I was being discharged (and who made all the unforgettable statements that I quoted and summarized in my amended complaint) had the age, biologically-female appearance, and constitution very close to those of the February 6, 2021, ER nurse, but – personalities-wise – they were like Dr. Jekyll and Mr. Hyde, even though I remember Nurse-5 having very similar dark-chestnut hair color and wearing glasses, albeit the metallic rim of her glasses appeared bright in terms of reflecting light, and this brightness was making it look as if she was trying to throw small lightning bolts at me, even though I realize that it was only the effect of the mix of daylight and her despise toward me.

I also remember Nurse-5 wearing something bright red, either a lipstick or a sweater under her white lab coat, or both: because I remember listening to her voice and thinking that, with this bright red, Nurse-5 looked like a vampire with lips and chest drenched in blood, relishing sucking the blood of her victim, and I was that victim, even though the "blood sucking" and "blood drenching" feelings was purely emotional: it just fitted her demeanor since she was throwing me out to die, wanting only one thing, *i.e.*, that I would disappear. The possibility that Nurse-5, who was savagely gloating over my helplessness and her power over me, might be the

B-37

same person as the soft-spoken, kind February 6, 2021, ER nurse, this possibility literally had never crossed my mind for almost two years (until I got the hard copy of my JCMC records).

When I noticed that Ms. Arauz's name was reflected in my JCMC records as my ER nurse and as Nurse-5, I could not initially process this, and so I looked her up online. Ms. Jessica Arauz, "MSN, APN-C" has thin-rimmed glasses, dark-chestnut hair, and bright red lipstick on her LinkedIn photo, matching my recollections of Nurse-5, except that Nurse-5 was, obviously, not smiling at me. However, I recognize that, if Nurse-5 and the February 6, 2021, ER nurse are the same person, then I know where she saw me walk on February 6, 2021: I had walked in the ER cubicle when I was packing my PJs into the plastic bag and then going to climb onto the ER gurney. That said, in my mind, I cannot reconcile the personality switch; moreover, if Nurse-5 was also the February 6, 2021, ER nurse, then she should have known why I was concerned about my rising blood pressure because it was making my head pain go through the roof, *i.e.*, if Nurse-5 was also the February 6, 2021, ER nurse, then she should have known that – if I was wailing in pain with uncontrollable tears – it meant that I was severely in pain, not "hysterical."

Of course, I cannot rule out that Ms. Bernardo, when she was "reviewing" my records with Ms. Arauz on February 7, 2021, said something to Ms. Arauz (or. Mr. Mazur told something to Ms. Arauz, or both Ms. Bernardo and Mr. Mazur told something to Ms. Arauz), and that "something" was so awful that it caused Ms. Arauz to adopt such a negative attitude toward me on February 7, 2021, regardless of Ms. Arauz's own impression developed on February 6, 2021. One way or another, it is an issue of employment practices, policies, and procedure: a medical provider should either rely on or at least factor his/her own experiences with a patient into his/her actions.

Finally, as you know from my amended complaint, on February 11, 2021, when I was brought to the JCMC ER once again because one of the February 11, 2021, EMTs had called the ER and then told Katherine and me that the ER doctor had remembered me from February 6, 2021, and had insisted that I should be brought to the ER just in case (even though Katherine and I were telling the EMT that Nurse-5 had told me not to return unless my condition changes for worse in comparison with what it was during my February 7, 2021, conversation with her or during the night from February 6 to February 7, 2021, which she defined as the period of my "hysteria"). As you know from my amended complaint, I agreed, and the EMT removed me from the bathtub bench, and – after I was brought to the ER on February 11, 2021 – an ER nurse examined me and asked me *inter alia* the serial-7 question (that was the sole question that I answered incorrectly).

I remember that the February 11, 2021, ER nurse also had below-shoulder dark-chestnut hair and thin glasses, also I don't remember if they were or were not rimless since my February 11, 2021 ER "cubicle" was much smaller, plus it had no lamp of any kind, even on the ceiling within the "cubicle," *i.e.*, the only light was the reflective light coming from the outside corridor above and through the curtains. (In the February 6, 2021, "cubicle," the wall was on my left side when I was laying on the ER gurney, and the wall was awash to the gurney, while in my February 11, 2021, "cubicle," the wall was on my right side when I was laying on the ER gurney, and there was a chair between the gurney and the wall, so the February 11, 2021, ER nurse was sitting on that chair while examining me.) The February 11, 2021, ER nurse was neither as nice, warm, caring, and soft-spoken as the February 6, 2021, ER nurse, nor was nearly as full of despise and

B-38

negativity as Nurse-5. She began talking to me with a traceable note of mixed annoyance and tiredness that I presumed to be a sign of her stern demeanor and hard morning at work, and she stayed in that tone throughout the entire examination.

As you know from my amended complaint, the February 11, 2021, ER nurse asked me the traditional set of stroke questions (and asked me to do the traditional motions associated with a stroke exam). I was immensely relieved that, unlike Nurse-5, the February 11, 2021, ER nurse did not make any statements suggesting that I was lying about my inability to stand or walk, about Katherine having to roll me from/to the recliner to/from the toilet, about me forgetting how to use my phone, or what my legs were for. In light of the February 11, 2021, ER nurse's seeming believe in me, I told the February 11, 2021, ER nurse that Nurse-5 was a "reincarnation of the devil on Earth," and I was sure Nurse-5 would throw me out of JCMC once she saw me. Of course, it would be ironic if the discovery establishes that the February 11, 2021, ER nurse was also Nurse-5: it would mean I told her about her being a reincarnation of the devil.

However, I cannot rule out that the February 11, 2021, nurse was the same person as Nurse-5: because, reviewing my JCMC records, I noticed an interesting fine wrinkle, *i.e.*, my records correctly reflect my answers that I lost my ability to stand and walk on Sunday, that is, on February 7, 2021, but these notes conveniently omit the point that I was stressing, that is, that I *reported my inability to walk and stand to Nurse-5* but she still discharged me without even allowing me to demonstrate it. Therefore, I cannot rule out that my statement to the February 11, 2021, nurse about Nurse-5 being a "reincarnation of the devil on Earth" prompted the February 11, 2023, ER nurse to omit stating that the JCMC staff knew I was unable to stand or walk but still discharged me: either out of a perverted "camaraderie" or because she actually was Nurse-5.

My final observations about Nurse-5 are based on the instructions that she provided me: I am attaching these instructions to this Letter. As you know from my amended complaint, had I complied with her instructions and made the senseless appointments with local GPs that Ms. Arauz identified, I would have likely been dead or in a vegetable state by the time when those appointments would have taken place. With this observation, let me proceed to my requests for:

**Stipulation # 1:** Although the Plaintiff reported to Ms. Arauz the Plaintiff's inability to stand or ambulate, Ms. Arauz neither prescribed any anticoagulant to the Plaintiff nor even recommended the Plaintiff to start taking at least an over-the-counter blood thinner, either verbally or in the documents she provided to the Plaintiff in connection with discharging hers   from JCMC on February 7, 2021.

**Stipulation # 2:** In connection with the Plaintiff's discharge from JCMC on February 7, 2021, Ms. Arauz prescribed the Plaintiff only an UTI antibiotic (Macrobid) and Losartan (that the Plaintiff not only already had prescribed to her since Fall 2019 but had it expropriated from her after the Plaintiff reported that she had taken her own Coreg and Losartan to Nurse-4) and did **not** prescribe any medications other than those the Plaintiff had already been utilizing to manage her conditions.

**Stipulation # 3:** In connection with the Plaintiff's discharge from JCMC on February 7, 2021, Ms. Arauz did **not** prescribe the Plaintiff an MRI of the cerebrum or any other radiological

B-39

examination of the cerebrum and did **<u>not</u>** refer the Plaintiff to a neurologist or recommended the Plaintiff to be examined by a neurologist.

**Stipulation # 4:**  In connection with the Plaintiff's discharge from JCMC on February 7, 2021, Ms. Arauz directed the Plaintiff to schedule follow-up outpatient appointments with: (a) Dr. Sreevani Throta (Ms. Arauz directed the Plaintiff to call Dr. Throta in "1-2 days" after discharge); and, in addition; (b) Dr. Donna Morales (Ms. Arauz directed the Plaintiff to call Dr. Morales "within one week").

**Stipulation # 5:** Ms. Arauz's notes did not state that the appointments with Dr. Throta and Dr. Morales were interchangeable, and the difference in the periods recommended to call to schedule these appointments demonstrates that Ms. Arauz deemed the appointments not interchangeable.

**Stipulation # 6:**  Both Drs. Throta and Morales are Internists (and not Neurologists), even though Dr. Morales is referred to as D.O. in the Plaintiff's records: since RWJ BH webpage of Dr. Morales refers to her as an Internist and Cardiologist.

**Stipulation # 7:** Had the Plaintiff called Dr. Throta in two days, as recommended by Ms. Arauz, that call would have been made on February 9, 2021, and the likelihood that Dr. Throta would have seen the Plaintiff in less than 24 hours is very low, meaning that Dr. Throta would have seen the Plaintiff only on February 11, 2021, or later, *i.e.*, Dr. Throta would have seen the Plaintiff after she had already lost her abilities to move her arms in any direction but vertically, operate her cellphone, and experienced episodes of neglect and disorientation, on top of her February 7, 2021, loss of ability to stand and walk, that is, the conditions that were attributed to the Plaintiff's multiple acute ischemic strokes diagnosed after the JCMC MRI conducted in the morning of February 12, 2021.

**Stipulation # 8:** Had the Plaintiff called Dr. Morales in one week, as recommended by Ms. Arauz, that call would have been made on February 12 or 15, 2021, given that February 13 and 14 fell on a weekend, meaning that Dr. Morales would have seen the Plaintiff already after she had already lost her abilities to move her arms in any direction but vertically, operate her cellphone, and experienced episodes of neglect and disorientation, on top of her February 7, 2021, loss of ability to stand and walk, *i.e.*, after the loss of functions that were attributed to multiple acute ischemic strokes after the JCMC MRI conducted on February 12, 2021.

**Request to produce # 1:** Please produce the portion of the videorecording of the corridor that was in front of the JCMC room where the Plaintiff was held on February 7, 2021, recorded during the period from noon to at least 4:45 P.M., with an affidavit of search, an affidavit of content, description of the native form of the original, and a certificate of preservation for trial.

**Request to produce # 2:** Please produce the portion of the videorecording of the JCMC main lobby recorded on February 7, 2021, for the period from at least noon to at least 4:45 P.M., with an affidavit of search, an affidavit of content, description of the native form of the original, and a certificate of preservation for trial.

**Request to produce # 3:** Please produce the portion of the videorecording of the JCMC round "driveway" recorded on February 7, 2021, for the period from at least noon to at least 4:45 P.M.,

with an affidavit of search, an affidavit of content, description of the native form of the original, and a certificate of preservation for trial.

**Request to produce # 4:** Please produce the portions of the employment files of the EMTs that brought the Plaintiff to the JCMC ER on February 11, 2021, reflecting these EMTs' full names, last known addresses, last known telephone numbers, and photographs, with the dates when the photographs were taken, with an affidavit of search and affidavit of content.

**Request to produce # 5:** Please produce any records, including records of calls, records of content, and an audio recording, if any, related to the call placed by the EMT (who was one of the two EMTs who brought the Plaintiff to the JCMC ER on February 11, 2021) to the JCMC ER, made with regard to the Plaintiff, with an affidavit of search, an affidavit of content, description of the native form of the original, and a certificate of preservation for trial.

**Request to produce # 6:** Please produce a copy of the JCMC employment file of Ms. Arauz, including her photograph on JCMC record, her address on February 2, 2023, and the latest known, type of license and specialization, her resume and letters of recommendations obtained for the purposes of employment at JCMC, JCMC trainings she attended in person or online and successfully completed/failed, disciplinary complaint or disciplinary actions, if any, filed or taken against her, and all known medical malpractices suits implicating her, with an affidavit of content.

**Request to produce # 7:** Please produce JCMC and RWJ BH policies, procedures, and training materials addressing: (a) medical providers' duty to credit the veracity of patients' reports about their physical symptoms; (b) medical providers' duty to credit the veracity of patients' reports regardless of patients' race/ethnicity/national origin, including that reflected in patients' accents; (c) prohibition against medical providers drawing conclusions about patients' education/ intelligence based on patients' ethnicity/national origin, including that reflected in patients' accents; and (d) the methods to address patients' expressions of disagreement with being discharged from JCMC, with an affidavit of search and an affidavit of content.

**Request to produce # 8:** Please produce JCMC and RWJ BH policies, procedures, and training materials addressing JCMC's medical personnel obligations in terms of recording patients' relevant medical information as to: (a) the readings of patients' blood pressure obtained by JCMC staff; (b) the promptness, thoroughness, and correctness of recording symptoms reported by patients, as well as the patients' requests for examinations (of patients' particular body system, part, or pain) in the event patients' requests are not acted upon; (c) the promptness, thoroughness, and correctness of recording medications administered to patients and the time when administered; and (d) recording the reasons why examinations are prescribed in the event no symptoms warranting such examinations are reported, and patients do not request such examinations, with an affidavit of search and an affidavit of content.

**Interrogatory # 1:** State the JCMC ER unit/cubicle number the Plaintiff was held in during the morning on February 6, 2021, as well as the full name(s) of the ER nurse(s) handling this unit.

**Interrogatory # 2:** State the JCMC ER unit/cubicle number the Plaintiff was in during February 11, 2021, as well as the full name(s) of the ER nurse(s) handling this unit, plus all ER physician(s) on duty from 00:01 A.M. to 1:00 P.M.

## 4. Fourth Transaction

Given that a chunk of your disclosure applicable to the Third Transaction could be used for the purposes of the Fourth Transaction, I would avoid any duplication of requests. Therefore, this portion of my requests is the shortest.

As you know from my amended complaint, Nurse-6, having had indulged herself in a personal conversation over a landline phone, took me in a wheelchair down from my first JCMC room to the JCMC lobby, initially did not even try to help me get up, then tried to grab my right arm that had the fractured humerus, then walked around me and raised me from the wheelchair with Katherine's help, then directed Katherine not to help and, thus, effectively dragged me from the wheelchair to a JCMC lobby chair (there were actually two stretches of that drag, first a little bit to the left and then a lot to the right, since she moved me from one lobby chair to another lobby chair), and then asked me if I was fine and – having received my answer that no, I was not fine, but nobody at JCMC cared about that, all they wanted was for me to not die on the premises – Nurse-6 left together with the wheelchair, even though: (a) Katherine was explaining to her that she ordered a new Uber ride and was still waiting for the next Uber; (b) the snow piles left by the February 2021 blizzard were visible through the JCM glass entrance doors, making it obvious that they were blocking driveway access; and (c) Nurse-4 had just experienced, on her own, how hard it was to drag me since I had almost no control over my legs. Thus, I have requests for:

**Stipulation # 1:** A medical provider cannot reduce the time or amount of his/her assistance to a patient on account of having spent time on a personal phone call right prior to this assistance.

**Stipulation # 2:** A medical provider is required to factor in his/her own: (a) experience with a patient, e.g., his/her own experience of dragging an immobile patent; and (b) his/her own observation of external conditions, e.g., snow piles in a driveway seem through glass doors and/or windows, into his/her obligations to determine the period of assistance and the mode of assistance that the provider should render to a patient in his/her care.

**Stipulation # 3:** Nurse-6 was either a Patient Transporter or a POC, or performed the tasks of other unlicensed care providers.

**Admission # 1:** A reasonable person standing in the shoes of a care provider who has just assisted a patient with getting up from a wheelchair (and who has just dragged the patient from a wheelchair to a stationary seat) knows or, at the very least, should know that such a patient's mobility would not get restored within a few-minutes period of time needed for a local ride-sharing motor vehicle to reach the patient.

**Admission # 2:** A reasonable person standing in the shoes of a care provider who has just assisted a patient with getting up from a wheelchair (and who has just dragged the patient from a wheelchair to a stationary seat) knows or should have known that such a patient might incur

B-42

additional injuries in the event the patient attempts to ambulate again in the nearest future while having to proceed without a wheelchair.

**Request to produce # 1:** Please produce the full-name-address-telephone-number-and-photo portions of the JCMC employment files of the nurses, technicians, PCTs, POCs, and Patient Transporters assigned to work the shift that encompassed the period from 2:00 P.M. to 5:00 P.M. on February 7, 2021.

**Request to produce # 2:** Please produce JCMC and RWJ BH policies, procedures, and training materials addressing the process and requirements of taking/assisting a patient with mobility deficiencies: (a) from the patient's hospital room to the JCMC lobby; and (b) from the JCMC lobby to a vehicle taking the patient to a post-hospital location; as well as all requirements addressing providing a wheelchair, including: (i) temporal limitations, if any, on such assistance; (ii) leaving a patient with known mobility deficiency without access to a wheelchair on the JCMC premises; and (iii) definition of "the premises" for the purposes of a wheelchair-based assistance associated with the process of discharging a patient with mobility deficiencies, with an affidavit of search and an affidavit of content.

## 5. Fifth Transaction

The events of the fifth transaction are well detailed in the amended complaint, including the appearances of the Patient Transporter and Nurse-7 who told me that her nickname sounded as "Bibi," and her ancestry was from Latin America.  Having examined the hard-copy JCMC records that I obtained in January 2023, I cannot rule out that Nurse-7 was Ms. Bebe Bhikam, a Patient Care Technician ("PCT").  Thus, I would like to propound and request:

**Interrogatory # 1:** State the specialization of the JCMC department encompassing the JCMC room where the Plaintiff was taken for observations in the evening of February 11, 2021, and remained until evening on February 19, 2021.

**Interrogatory # 2:** State the full name of the care provider having a name or a nickname sounding like "Bibi" who was assigned, during the period encompassing the period from 7:00 P.M. to 11:59 P.M., to the JCMC room where the Plaintiff was taken for observations in the evening of February 11, 2021.

**Request to produce # 1:**  Please produce the JCMC employment file of Ms. Bhikam including her photo, age, addresses on February 2, 2023, and the latest known, title, license, if any, specialization, if any, resume and letters of recommendations, if any, considered for the purposes of her employment at JCMC, JCMC trainings she attended in person and/or online and completed/failed, disciplinary complaints or actions, and all known medical malpractices suits implicating Ms. Bhikam, with an affidavit of search and an affidavit of content.

**Request to produce # 2:**  JCMC employment files (containing full names, age, photos, addresses on February 2, 2023, and the latest known), resumes and letters of recommendations, if any, considered for the purposes of employment at JCMC, JCMC trainings attended in person and/or online and completed/failed, disciplinary complaints and disciplinary actions, and all known medical malpractices suits implicating all Patient Transporters assigned to work the shift

B-43

encompassing the period from 7:00 P.M. to 11:59 P.M. on February 11, 2021.   Please accompany with an affidavit of search and affidavit of content. (Since it was a late evening/night shift, there should not be many Patient Transporters because night shifts tend to have less staff.)

**Request to produce # 3:** Please produce the portion of the videorecording of the corridor in front of the JCMC room when the Plaintiff was taken for observations on February 11, 2021, and remained until February 19, 2021, during the period from 7:00 P.M. to 11:59 P.M. on February 11, 2021.  Please accompany with an affidavit of content.

**Request to produce # 4:** In the event you admit or stipulate that the nurse having nickname sounding like "Bibi" who was assigned, during the period encompassing the period from 7:00 P.M. to 11:59 P.M., to the JCMC room where the Plaintiff was taken for observations in the evening of February 11, 2021, was Ms. Bebe Bhikam, please produce her medical records in possession of JCMC or any entity affiliated directly or indirectly with JCMC and/or RWJ BH. Please accompany with an affidavit of search and affidavit of content.

**Interrogatory # 3:** State the full name, title, license, specialization, address on February 2, 2023, and the latest known, and phone number of the person who assigned Patient Care Technicians' duty stations during the shift encompassing the period from 7:00 P.M. to 11:59 P.M. in the department encompassing the JCMC room when the Plaintiff was taken for observations on February 11, 2021, and remain until February 19, 2021, during the period from 7:00 P.M. to 11:59 P.M. on February 11, 2021.  Please accompany with an affidavit of search and an affidavit of content.

**Request to produce # 5:**  Please produce JCMC and RWJ BH policies, procedures, and training materials addressing the process and requirements of Patient Transporters to speak up or otherwise interfere in actions of JCMC nursing staff or Patient Care Technician staff who direct patients to take actions that: (a) patients ask not to perform due to pain/medical condition; and (b) moan or scream in pain while performing.  Please accompany with an affidavit of search and an affidavit of content.

**Request to produce # 6:**  Please produce JCMC and RWJ BH policies, procedures, and training materials addressing the process and requirements of Patient Transporters to volunteer assistance to JCMC patients, nursing staff, and Patient Care Technician staff making statements that could reasonably be construed as expressing inability to perform a particular physical function.  Please accompany with an affidavit of search and an affidavit of content.

**Request to produce # 7:**  Please produce JCMC and RWJ BH policies, procedures, and training materials addressing the process and requirements of nursing staff and Patient Care Technician staff to report to supervisors the inability to perform a particular physical function associated with a particular duty station and request reassignment of a different duty station, as well as supervisors' obligations to accommodate meritorious requests.  Please accompany with an affidavit of search and an affidavit of content.

**Request to produce # 8:**  Please produce JCMC and RWJ BH policies, procedures, and training materials addressing the process and requirements of nursing staff moving patients who are

B-44

immobile or have difficulty either standing or walking, including material that specifically addresses: (a) the process of log-rolling; (b) the assistance required during log-rolling; (c) the patients suitable and unsuitable for log-rolling; (d) the risk of injury or increased disability that might be caused by log-rolling performed by patients experiencing acute stroke; (e) the process of notifying nursing staff attending patients post ER about the tentative diagnoses and conditions of patients being held for observations. Please accompany with an affidavit of search and an affidavit of content.

**Stipulation # 1:** As a matter of law, a nurse's or POC's, or a Patient Care Technician's threat of discharging a patient based on the patient's reluctance (due to an assertion of medical condition, disability and/or pain) to comply with a command to perform a certain physical activity function is not an acceptable standard of care.

## 6. Sixth Transaction

Finally, as you know from my amended complaint, the Sixth Transaction is based on Nurse-7's (seemingly, Ms. Bebe Bhikam) taking my blood test and "blowing" my vein, leaving my right hand not only with a massive hematoma but also severely in pain for weeks, all because she was drawing my blood while doing a "pee dance" that looked as if she was twerking (given her rather substantial size, the twerking was rendering her trunk and arms particularly unstable).

**Interrogatory # 1:** State the exact date when the nurse identified pursuant to the Interrogatory # 2 of the Fifth Transaction was assigned to perform night-shift phlebotomist functions with regard to the patients held at the department encompassing the JCMC room where the Plaintiff stayed from the evening of February 11, 2021, to February 19, 2021. (My review of records show Ms. Bebe Bhikam performing these function either on February 15 or on February 16, 2021.)

**Stipulation # 1:** Dr. Anna Sharovetskaya, who was the Plaintiff's attending physician during the Plaintiff's JCMC stay from the evening of February 11, 2021, to February 19, 2021, did not prescribe the Plaintiff any blood tests qualifying as tests to be performed during the night shift.

**Interrogatory # 2:** State the name, license, specialization, and title/position of the physician who prescribed the Plaintiff's blood test to be conducted during the night shift of the night when the nurse identified pursuant to the Interrogatory # 2 of the Fifth Transaction was assigned to perform night-shift phlebotomist functions with regard to the patients held at the department encompassing the JCMC room where the Plaintiff stayed from the evening of February 11, 2021, to February 19, 2021.

**Stipulation # 2:** As a matter of law, a phlebotomist's false statement about the identity and/or the last name of the physician who prescribed a patient a blood test made for the purposes of obtaining the patient's consent to conduct the blood test is not an acceptable standard of care since the rule that people should not lie is so basic that the prohibition on lying spans not only every type of medical license and specialization, but also all professions.

**Admission # 1:** Patients are recommended to drink water in advance of blood tests, especially if they have history of problems with blood tests. https://www.phlebotomyusa.com/blog/blood-donating/drink-plenty-of-water-before-donating-blood.

B-45

**Admission # 2:** A patient's request to a phlebotomist to have 15 minutes to drink water to facilitate a blood test is not an unreasonable request to accommodate.

**Admission # 3:** As a matter of common sense, a medical provider who experiences a need to urinate and has an opportunity to use a bathroom before performing his/her next task should go to the bathroom and urinate to avoid having to rush through the task while doing a "pee dance" while performing this task.

**Stipulation # 3:** As a matter of law and common sense, a phlebotomist drawing blood should not engage in simultaneous-with-drawing-blood bodily movements such as "twerking" or "pee dance" because these movements reduce the phlebotomist's stability of his/her body and render such a blood-drawing process more dangerous and is not within an acceptable standard of care.

**Request to produce # 1:** Please produce the results of the blood test(s) performed on the date(s) when the nurse identified pursuant to the Interrogatory # 2 of the Fifth Transaction was assigned to perform night-shift phlebotomist functions with regard to the patients held at the department encompassing the JCMC room where the Plaintiff stayed from the evening of February 11, 2021, to February 19, 2021.  The records produced should expressly show whether the amount of blood drawn was sufficient to perform any blood test at all and the prescribed test in full.  Please accompany with an affidavit of search and an affidavit of content.

**Stipulation # 4:** The presence of a prescribed blood test, together with: (a) the presence of a result showing that the test was not performed or not performed in full; and (b) the absence of a statement that the patient declined the test, are indicative of a failed blood test.

**Request to produce # 2:** Please produce JCMC and RWJ BH policies, procedures, and training materials addressing the process and requirements of the nursing staff who act as phlebotomists addressing: (a) the duty to inform patients about the identity of physicians who prescribed blood tests in the event patients make such an inquiry; (b) the duty to accommodate patients requesting to drink water before blood tests unless such patients either should not drink water or the task of performing a blood test is urgent for medical reasons; (c) the requirement **not** to commence a blood test without first taking a take bathroom break in the event the phlebotomist is experiencing an urge to urinate or defecate; and (d) the prohibition against rushing through a blood test on account of completing the phlebotomist's shift as soon as possible.

### 7. Financial Disclosure Requests

As you know from exhibits for my prior filings, Mr. David A. Mebane is the Executive Vice President and General Counsel of RWJ BH, and – according to his LinkedIn page – the president of the unspecified RWJ BH's captive insurance company.  So, I am starting with the essentials:

**Stipulation # 1:** While JCMC is a wholly owned asset of RWJ BH, JCMC is a separate corporation, even though RWJ BH implicitly accepts joint and several liability for JCMC's wrongful conduct by advertising to, servicing, billing, etc. the general public and patients of JCMC under logos of both RWJ BH and JCMC.

**Stipulation # 2:** One of RWJ BH's assets is its wholly owned captive insurance company.

**Interrogatory # 1:** State the name, juridical entity designation, and address of RWJ BH's captive insurance entity.

**Interrogatory # 2:** State the name(s), juridical entity designation(s), and address(es) of RWJ BH's captive insurance company's reinsurance entity/entities.

**Request to produce # 1:** Please provide the portion of the insurance contract between RWJ BH and its captive insurance company defining the amount of payment per event/accident/ occurrence, as well as the conditions for compensation, if any, in case the natural-person actors involved in a single or multiple event(s)/accident(s)/occurrence(s) were the same or different persons who harmed the same plaintiff. In the event the contract expired and is in the process of renegotiation, please produce the same portion of the active binder. Please accompany with an affidavit of search and an affidavit of content.

**Request to produce # 2:** Please provide the portion of the insurance contract between JCMC and RWJ BH's captive insurance company defining the amount of payment per event/accident/ occurrence, as well as the conditions for compensation, if any, in case the natural-person actors involved in a single or multiple event(s)/accident(s)/occurrence(s) were the same or different persons who harmed the same plaintiff. In the event the contract expired and is in the process of renegotiation, please produce the same portion of the active binder. Please accompany with an affidavit of search and an affidavit of content.

**Request to produce # 3:** Please provide the portion of the insurance contract(s) between RWJ BH's captive insurance company and its reinsurance entity/entities defining the amount of payment per event/accident/occurrence, as well as the conditions for compensation of multiple event(s)/accident(s)/occurrence(s) involving the same plaintiff. In the event the contract expired and is in the process of renegotiation, please produce the same portion of the active binder. Please accompany with an affidavit of search and an affidavit of content.

### 8. Last Preliminary Discovery Request:

As you have noticed from my discussions provided *supra*, my JCMC treatment records contain a truckload of errors, some minor and some serious. It is impossible to list them all here: there are too many, and I provide you with just a few of additional examples, the funniest.

For the purposes of the first one, keep in mind that Katherine, my daughter, has been known as Katherine Kaplan since about 2012, when she had a legal name change, and her prior name was Katrina Kublanov, but – in my February 11, 2021, ER/ED record – she is listed as Katrina Kublanov**a** and, to top it off, as my "parent." Well, no matter how severe were my stroke symptoms, I could not have said this nonsense: I was consistently reporting that my mom died from stroke, and that I had a daughter. Therefore, these weird statements mean that someone looked into my pre-2012 JCMC records of ER visits and copied the old information, plus – inexplicably – added "a" at the end of Katherine's old last name and qualified her my parent instead of my child.

My other favorite is a note made by Dr. Divya K. Shanbhogue, who wrote on March 9, 2021, that she discussed the plan of my care with my "family" on February 12, 2021. However, as you

know from my amended complaint, JCMC had **no** visitations until February 16, 2021 (due to the pandemic), plus Katherine was down with severe symptoms of Covid from February 10, 2021, that lasted even after my return from KIR on March 9, 2021 (this is why she could not take an Uber to pick me up, and I had to prepay for an ambulance with its own wheelchair to drive me from KIR to Katherine's place).  Thus, Dr. Shanbhogue could not have talked to Katherine in person.  And Dr. Shanbhogue never called Katherine.  (Feel free to subpoena Katherine's T-Mobile bills.)  Since the rest of my family is limited to my dad (my mom passed away long ago), and my dad lives in Columbus, Ohio, and never answers any phone calls from unknown numbers (plus, he speaks very poor English and, due to his sciatica, does not travel), Dr. Shanbhogue's alleged discussions of my treatment with "my family" was a figment of her imagination.

The foregoing goes hand-in-hand with the two documents that Ms. Arauz gave me discharging me on February 7, 2021.  The shorter document stated that my address was "31 River Court Apt 519 Jersey City NJ," but – while it is true that I was initially renting an apartment in the same building where Katherine lives now, and my apartment was 519 – I ended my 519 lease and moved in with Katherine into 3309 in December 2015, more than five years prior to the February 7, 2021, notes given to me by Ms. Arauz.  And do you want to know how I know that Ms. Arauz used a half-a-decade-old information? – Because my NJ nondriver identification card that the ER utilized to admit me on February 6, 2021, had Katherine's apartment number, *i.e.*, 3309.  (Please let me know if you want a photo or to examine my old NJ identification card *in camera*.)  Plus, the EMTs picked me up on February 6 and 11, 2021, at 3309: since other people live in 519.

If you don't find these facts amusing enough, I can offer you a couple more fun facts: discharging me, Ms. Arauz wrote that I had "headache," the very headache that JCMC did not examine.  Moreover, Ms. Arauz's notes given to me at discharge read: "DEPART REASON INCOMPLETE INFORMATION."  No wonder it was "incomplete": Ms. Arauz did not want to write that she discharged me by *de facto* threatening me with having my JCMC stay deemed "unauthorized."  And, for a cherry on top, Ms. Arauz's second document given to me during discharge had a boilerplate language stating that a person's loss of balance or weakness in legs could be symptoms of a stroke, and such a patient should seek medical care immediately, and yet Ms. Arauz (being informed by me of *these very symptoms*) still discharged me while telling me (plus stating in writing) that I should return to the JCMC ER only if my condition got worse.

In sum, I can surely present the jury with a laundry list of falsities written by the JCMC staff (who were clearly taking advantage of the lack of the existence and/or enforcement of RWJ BH's/JCMC's policies and procedures protecting patients' safety/rights), but let me start by suggesting to you one more

**Stipulation:** Many statements in the Plaintiff's JCMC medical records and documents provided to the Plaintiff by the JCMC staff were reflective of JCMC's fantasies rather than the realities.

Have a nice evening,

Anna (Anya) Kapellan

Exhibit C

Case 2:23-cv-00597-MEF-JSA Document 47-1 Filed 03/13/24 Page 54 of 115 PageID: 996







## Joseph Mazur RN, BSN

Registered Nurse at Overlook Medical Center- Atlantic Health System

Jersey City, New Jersey, United States

235 followers · 236 connections

**Join to view profile**

 **Overlook Medical Center**

**Rutgers School of Nursing**

## Experience

### Operating Room Nurse
Overlook Medical Center

Feb 2022 - Present · 1 year 6 months

Summit, New Jersey, United States

Case 2:23-cv-00597-MEF-JSA   Document 47-1   Filed 03/13/24   Page 55 of 115 PageID: 997





Jun 2021 - Jan 2022 · 8 months



### Registered Nurse

Jersey City Medical Center - Barnabas Health

Sep 2020 - May 2021 · 9 months

Emergency Department Observation Unit

### Clinical Care Technician

Robert Wood Johnson University Hospital

Jan 2020 - Sep 2020 · 9 months

Emergency Department



### Nursing Assistant

Overlook Medical Center

Jul 2018 - May 2019 · 11 months

Operating Room



### Compliance Middle Office Analyst

JPMorgan Chase & Co.

Jun 2014 - Dec 2016 · 2 years 7 months

Greater New York City Area

Global Compliance Operations

### Intern- Finance, Master Data Management

Movado Group, Inc

May 2012 - May 2014 · 2 years 1 month

Greater New York City Area

Master Data Management/Customer Financial Services

# Education





2019 - 2020



### Rutgers Business School
Bachelor of Science - BS · Finance

2011 - 2015

## Licenses & Certifications



### Basic Life Support for Healthcare Providers (BLS)
American Heart Association



### Registered Nurse
New Jersey Board of Nursing

## Honors & Awards

### Honor Society Member
Honor Society

Nov 2019

### Dean's List- Spring 2019
-

### Dean's List- Spring 2020
-

### Dean's List- Summer 2019
-

### Rutgers Business School- Deans List, Fall 2013

Case 2:23-cv-00597-MEF-JSA   Document 47-1   Filed 03/13/24   Page 57 of 115
PageID: 999





# View Joseph's full profile

 See who you know in common

Get introduced

Contact Joseph directly

Join to view full profile

## People also viewed



**Jillian Carratala, MBA, BSN, RN, NEA-BC**

Director Of Surgical Services at Overlook Medical Center

Summit, NJ



**Megan McCarron**

Registered Nurse at Overlook Medical Center

Morristown, NJ



**Kelly Hartt**

Registered Nurse at Overlook Medical Center

New York City Metropolitan Area



**Kerri Laudati BSN, RN**

Emergency Room Registered Nurse

New York City Metropolitan Area



**Garett Lindenberg**

College Graduate from Ramapo College of New Jersey

Woodcliff Lake, NJ



**katherine Prentiss**

ASC PACU charge at Summit Medical Group of Berkeley Heights, NJ

Basking Ridge, NJ



**Sayward Mazur**

Founding Principal at Mazur Carp & Rubin, P.C.

New York, NY

Case 2:23-cv-00597-MEF-JSA    Document 47-1    Filed 03/13/24    Page 58 of 115
PageID: 1000





New York City Metropolitan Area



### Roqia Hashimi

Family Health Center

Worcester, MA



### Dominick Milano

MSPAS Candidate (PA-S1) at Monmouth University

New York City Metropolitan Area

Show more profiles ⌄

---



## Explore collaborative articles

We're unlocking community knowledge in a new way. Experts add insights directly into each article, started with the help of AI.

**Explore More**

---

# Add new skills with these courses



### Hitting Your Sales Targets



### SAP S/4HANA: Beyond the Basics



### SAP Financials Essential Training

See all courses

# Joseph's public profile badge

Include this LinkedIn profile on other websites

Case 2:23-cv-00597-MEF-JSA   Document 47-1   Filed 03/13/24   Page 59 of 115
PageID: 1001

                                                                                 

   Operating Room Nurse at Overlook Medical Center

[RUTGERS logo]   Rutgers School of Nursing

( View profile )                                                      Linked**in**

**( View profile badges )**

|  |  |
|---|---|
| © 2023 | About |
| Accessibility | User Agreement |
| Privacy Policy | Your California Privacy Choices |
| Cookie Policy | Copyright Policy |
| Brand Policy | Guest Controls |
| Community Guidelines | Language |

Exhibit D

Jersey City Medical Center

| | | | | |
|---|---|---|---|---|
| Patient: | KAPELLAN, ANNA | Admit: | 2/6/2021 | Disch: 2/7/2021 |
| MRN: | 0001728613 | Service: | Medical. | |
| Account #: | 2200266937 | Attending: | Koch MD,Peter Benjamin | |
| DOB/Age/Sex: | ███████████████████ | | | |

---

### *Physician Documentation*

5. Peri█████████████████████████████████████████████████████

**PLAN:**
_Continue ███████████████████
Check ████████████████████████ to be done as outpatient
Stable for outpatient follow-up.  Would consider █████ testing as outpatient.

Discussed with rapid diagnostic unit team.

*Electronically Signed on 02/07/2021 14:41 EST*
*Morales DO, Donna Chelle, DO*


Performing Locations
*1:      This test was performed at:
       JCMC Lab, 355 Grand Street, Third Floor 3 West, CLIA 31D0682132, Jersey City, NJ, 07302-   , US, (201) 915-2485

---

LEGEND: *=Corrected @=Abnormal C=Critical L=Low H=High f=Footnote #=Interp Data R=Ref Lab

Request ID:  649868050                    Page 43 of 43          Print Date/Time:  4/4/2023 11:07 EDT

Exhibit E

Jersey City Medical Center

Patient:    KAPELLAN, ANNA         Admit:    2/11/2021    Disch:  2/19/2021
MRN:      0001728613          Service:   Medical.
Account #:  2200270261          Attending:  Sharovetskaya DO,Anna
DOB/Age/Sex: ▬▬▬▬▬▬▬▬▬

---

## *Physician Documentation*

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ )

▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬ .

*Electronically Signed on 02/19/2021 21:53 EST*
*Marian MD, Valentin D, MD*

Performing Locations
*1:    This test was performed at:
      JCMC Lab, 355 Grand Street, Third Floor 3 West, CLIA 31D0682132, Jersey City, NJ, 07302-   , US, (201) 915-2485
*2:    This test was performed at:
      Quest Diagnostics Lab, One Malcolm Ave, CLIA 31D0696246, Teterboro, NJ, 07608-   , US
*3:    This test was performed at:
      Monmouth Medical Center, 300 Second Avenue, CLIA 31D0114688, Long Branch, NJ, 07740-   , US, (732) 923 7380

---

Exhibit F



## Ciox Health Release of Information

Patient Name:          Anna Kapellan
Date of Birth:          ███████
Medical Record #:      10001728613
Court Case #:

### CERTIFICATION OF RECORDS

Enclosed are the medical records of **Anna Kapellan** Health, LLC ("Ciox") is producing the records as the Health Insurance Portability and Accountability Act business associate of **Jersey City Medical Ctr/ RWJBH** and pursuant to a subpoena or patient authorized request issued to Superior **Rosenberg, Jacobs, Heller, & Fleming PC.**    Please accept this document as certification of the records produced herewith.  The records you requested are maintained by **Jersey City Medical Ctr/ RWJBH.** The records produced herewith are accurate, complete, true, and correct copies of all records retrieved by Ciox from the **Jersey City Medical Ctr/ RWJBH** medical records pursuant to your request.  I further certify that **Jersey City Medical Ctr/ RWJBH** is the custodian of record, that the records were kept in the regular course of business and that this is a regularly conducted business activity, that upon information and belief, these records were made at or near the time the acts, events, conditions, opinions, or diagnoses occurred or within a reasonable time thereafter pursuant to a doctor's orders and finally that these records were made by, or from information transmitted by, a person with knowledge of the acts, events, conditions, opinions or diagnoses stated therein.

_____ No records for dates requested

_____ No patient found

Number of pages:  931

Date: 5/4/2023                          Janel Dickson/ Lead Health Information Specialist
                                        Ciox Health - Release of Information Vendor for

                                        Jersey City Medical/ RWJBH

925 NORTH POINT PARKWAY, SUITE 350 | ALPHARETTA, GA 30005 | 800.367.1500 | CIOXHEALTH.COM

JCMC000001

Exhibit G

Case 2:23-cv-00597-MEF-JSA    Document 47-1    Filed 03/13/24    Page 67 of 115
PageID: 1009

 Gmail

Anna Kapellan <annakapellan@gmail.com>

## JCMC Medical Records

1 message

**Anna Kapellan** <annakapellan@gmail.com>                   Fri, Jun 23, 2023 at 5:33 PM
To: Brian Brenner <bbrenner@rrjhlaw.com>, Sam Rosenberg <srosenberg@rrjhlaw.com>, Kat Kaplan
<katkaplan5@gmail.com>

Dear Brian (and Sam):

It was a pleasure to talk to you, thank you for finding time, and I look forward to our first informal conference that I
pencilled in for 3 pm on June 28, subject to your confirmation of availability.

Attached are the records that I finally got from JCMC in an electronic format: there are two attachments since one
consists of 43 pages that were generated in connection with my February 6 to 7, 2021, stay, and the other consists of 208
pages that were generated as a result of my February 11 to 19, 2021, stay.  Please make sure that you received both
attachments and send me a "received" notice: so that I would not worry that an internet whammy ate this email or a
delicious attachment. 😊

I tried to search these records before sending them to you but, apparently, they are not searchable, even though I thought
otherwise.  Since I remember Katherine fighting with these records and trying to convert them into searchable during my
Juneteenth stay with her, I called Katherine to ask her what was I doing wrong.  Katherine said that no, I wasn't doing
anything wrong, she just decided not to convert them because, when she tried to use the OCR program installed on her
computer, the records were converting but getting distorted and coming only as plain text, messing up and losing
diagrams (like EKG), plus all pages containing multi-column entries (and the bulk of pages is like that), the OCR'ed
version kept having the columns jammed together, making the content too messed up to follow.  This is why Katherine
decided that it was too much work for her to clean it up since it's 251 pages total.  (She reminded me that she OCR'ed
and fixed the documents that Nurse-5 gave me upon my February 7, 3021, discharge from JCMC, and I sent these two
documents to you with my disclosure and discovery letter.)

Therefore, I apologize for misleading you: I didn't use these docs, I just made a quick check comparing their first and last
pages and the number of pages in each set to the hardcopy documents that I had gotten in January, and stopped at that:
since, thus far, there has been nothing for me to do with to these electronic documents.  (Plus, truth to tell,  after using the
hardcopy documents for months, I have gotten used to them, as odd as it might sound, even though I never work with
hardcopy documents in my cases at work: I stopped using anything in hard copy in 2002, when I came back to Proskauer
after my clerkship. 😊)

Therefore, you'd have to either plow through these documents as they are or OCR them on your own, or get an OCR'ed
copy from your client (if you get an OCR'ed version one way or another, I would be very grateful if you share it with me).
If you need extra time to review these documents because they are not OCR'ed, I would completely understand.  (I
unfortunately know from experience that it is a bit of a task because, to my utter bewilderment, the entries in JCMC
records are not chronologically organized, so you'd need to literally leaf through the documents hunting for the relevant
entries that are made out of order: initially, I was literally throwing my hands in the air when I was trying to search for the
relevant entries because I am used to working with medical records in my Department of Veterans Affairs cases, but -
while medical records in my cases also tend to repeat the same thing over and over again with just tiny variations, and so
I am used to the idea that I have to find each tiny variation to determine any progress, but I admit that I never encountered
records that are so poorly organized, chronologically speaking.  Feel free to tell your client on my behalf that they really
need to learn how to organize their record keeping!)

Also, let me remind you that, if you send me a written request for my preliminary statement of damages, I would be happy
to provide it to you, that is, if you need to have an idea about what's in there and how it's calculated.

Have a very lovely evening,
Anya

This electronic communication was generated in connection with an ongoing litigation.  If you received this message in error,

notify the sender at your earliest convenience, and do not open the attachment(s), if any.  Any unauthorized use of this

communication or the attachment(s) might warrant referral to law enforcement authorities.  Further, while this communication

is not meant for docketing in this litigation, the conduct requiring a judicial determination as to propriety of the parties' use of or response to this communication might require disclosure of this communication to the presiding tribunal for the purposes of, e.g., a limited *in camera* review. Any unauthorized alterations to the documents shared or produced as attachment(s) to this communication might warrant referral to the presiding tribunal for the purposes of seeking sanctions, as well as to entities addressing matters of attorneys' ethics.

**2 attachments**

 **JCMC First Stay.pdf**
2002K

**JCMC Second Stay.pdf**
7872K

Exhibit H



## RE: JCMC Medical Records

1 message

**Brian Brenner** <bbrenner@rrjhlaw.com>                 Mon, Jun 26, 2023 at 9:48 AM
To: Anna Kapellan <annakapellan@gmail.com>
Cc: Sam Rosenberg <srosenberg@rrjhlaw.com>, Kat Kaplan <katkaplan5@gmail.com>

Anya,

See the attached OCR'ed copies of the records.

-Brian

3/13/24, 8:11 PM     Case 2:23-cv-00597-MEF-JSA     Document 47-1     Gmail - RE: JCMC Medical Records     Filed 03/13/24     Page 71 of 115

PageID: 1013

---

**2 attachments**

 **ocr - JCMC First Stay.pdf**
2728K

 **ocr - JCMC Second Stay.pdf**
8937K

Exhibit I

 **Gmail**

Anna Kapellan <annakapellan@gmail.com>

## Cover Letter and VATAS records Part 1

1 message

**Anna Kapellan** <annakapellan@gmail.com>                           Sun, Aug 20, 2023 at 9:40 PM
To: Brian Brenner <bbrenner@rrjhlaw.com>, Sam Rosenberg <srosenberg@rrjhlaw.com>, Kat Kaplan
<katkaplan5@gmail.com>

This document is furnished by means of an electronic communication and was generated in connection with an ongoing litigation. If you received this message in error, notify the sender at your earliest convenience and do not open the attachment(s), if any. Any unauthorized use of this communication or the attachment(s) might warrant referral to law enforcement authorities. Further, while this communication is not meant for docketing in this litigation, the conduct requiring a judicial determination as to propriety of the parties' use of or response to this communication might require disclosure of this communication to the presiding tribunal for the purposes of, e.g., a limited *in camera* review. Any unauthorized alterations to the documents shared or produced as attachment(s) to this communication might warrant referral to the presiding tribunal for the purposes of seeking sanctions, as well as to entities addressing matters of attorneys' ethics.

Dear Brian (and Sam):

Please see attached (in five parts, to ensure delivery), and please drop me a word to verify that you received this email.

Have a very lovely evening,

Anya

---

📄 **Part 1.pdf**
1866K

Exhibit J





CERTIFIED MAIL®

9589 0710 5270 1036 6315 15

RDC 99

U.S. POSTAGE PAID
FCM LETTER
JERSEY CITY, NJ 07302
DEC 11, 2023
$0.50
R2305K141169-12

Return to sender
Attn 303 4th
Pt 3 as of
leave of absence to

Ms. Anna Kapellan
31 River Ct., Apt. 3309
Jersey City, NJ 07310

Attn, Bebe Bhikam
Patient Care Technician
Jersey City Medical Center
355 Grand St.
Jersey City, NJ 07302

07302-422155

DELIVER TO
THE ADDRESSEE
ONLY



Jersey City Medical Center
355 Grand St
Jersey City NJ 07302

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**CERTIFIED MAIL®**

9589 0710 5270 0669 2480 86

Ms. Anna Kapellan
31 River Ct., Apt. 3309
Jersey City, NJ 07310

US POSTAGE PITNEY BOWES

ZIP 07302 $ 005.70⁰
02 7W
0008028882 JAN 19 2024

FIRST-CLASS

Exhibit K

**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW JERSEY**

_____

ANNA KAPELLAN,

                Plaintiff,

                v.

JERSEY CITY MEDICAL CENTER, INC., *et al.*,

                Defendants.

_____

No. 23-cv-597 (MEF) (JSA)

**Declaration of
Anna Kapellan, Plaintiff *Pro Se*,
as to the Events Related to Her
Attempts to Execute Service of Process
on Defendant Joseph N. Mazur**

I, ANNA KAPELLAN, hereby declare as follows:

1. I, Anna Kapellan, am the Plaintiff *Pro Se* in the above-captioned matter, and I named Joseph N. Mazur (a Registered Nurse and a former staff of Jersey City Medical Center, Inc. ("JCMC"), who identified himself in my JCMC medical records generated during my February 6-7, 2021, hospitalization at the Rapid Diagnostic Unit, Emergency Department, of JCMC as Joseph N. Mazur ("Defendant Mazur")) as one of the Defendants in this matter.

2. As detailed fully in the Memorandum of Facts and Law (accompanying this Declaration and supported by the exhibits filed together with the Memorandum, as well as the exhibits docketed prior to my filing of the aforesaid Memorandum and, hence, cited in the aforesaid Memorandum under their respective ECF Nos. (hereinafter, referring to this entire body of evidence, collectively, "As detailed in the Memo")), on June 11, 2023, the Counsel to the Institutional Defendants (JCMC, a juridical entity wholly owned by RWJBarnabas Health, Inc. ("RWJBH"), collectively "Institutional Defendants" or "JCMC/RWJBH"), and myself engaged in voluntary preliminary discovery. To demonstrate my good faith, I sent the Counsel eight emails with attachments containing disclosure of my relevant records and documents related to the factual, substantive-law, and procedural-law relevant to the above-designated litigation. One such document was my proposed voluntary mutual discovery and disclosure, and it included a discussion of Defendant Mazur who, on his then-public LinkedIn page, asserted that he was no longer employed at the JCMC/RWJBH and had become employed as a Registered Nurse by the Overlook Medical Center ("OMC"), a hospital located in New Jersey but smaller than the JCMC/RWJBH.

3. As detailed in the Memo, on June 28, 2023, the Counsel and myself had an informal telephonic conference during which I discussed my concerns with my ability to serve Defendant Mazur with process once my Second Amended Complaint would be filed, given Defendant Mazur's aforesaid LinkedIn information suggestive of his willing or unwilling drifter-like lifestyle and the career trajectory amenable to accommodating such a lifestyle.

K-1

4.   Notably, on June 26, *i.e.*, two days prior to the aforesaid informal telephonic conference and in anticipation of discussing with the Counsel matters related to Defendant Mazur's what I believed was his back-then-still-in-New-Jersey address, as well as the effects of his lifestyle and career trajectory on my ability to serve him with process, I conducted research of public information available online with regard to the OMC and determined that the OMC was part the Atlantic Health System ("AHS").  With that, I completed the OMC's online request for information about Defendant Mazur's employment at the OMC (inquiring about the process the OMC utilizes as to such requests and without disclosing Defendant Mazur's name since, back then, I had very little certainty that my guess as to Defendant Mazur being among the natural-person Defendants is this matter was correct; therefore, I was concerned about accidently creating an undue impression of culpability that could have implicitly put Defendant Mazur in bad light with the OMC (Ex. R)).

5.   The next day, *i.e.*, on June 27, 2023, having not received any response to my June 26, 2023, online inquiry, I conducted additional research of public information available online, this time as to AHS and – being uncertain as to when OMC/AHS's response might come – drafted and sent a first-class-mail letter to the AHS, Compliance Department, identifying Defendant Mazur, explaining the information I was looking for, and requesting that, if a response was emailed rather than sent by hard-copy mail, it would be cc'ed to the Counsel (Ex. S).

6.   As detailed in the Memo, while – during the June 28, 2023, informal conference – I requested the Counsel's disclosure of Defendant Mazur's minimal contact information, *i.e.*, just his New Jersey address (since, at that time, I believed that Defendant Mazur was still employed by the OMC, as he kept stating on his then-public LinkedIn, and, therefore, that he continued residing in New Jersey, I was hoping that he was residing at the same address he had utilized during his tenure at JCMC/RWJBH), and the Counsel promised me his assistance in obtaining this disclosure, leaving me with an impression that the disclosure, being so minimal, was forthcoming in the nearest future.  But I did not receive any disclosure from the Counsel until November 19, 2023, when the Counsel provided the Plaintiff with five JCMC/RWJBH policies (albeit, two of these policies, addressing sepsis and coronary emergencies were facially wholly to the circumstances of the Plaintiff's case), and no disclosure as to contact information of Defendant Mazur or any other natural-person Defendant until December 21, 2023).  I also take this opportunity to aver that the summary of my statements to the Counsel reflected in footnote 21 of the accompanying Brief (detailing my discussion of the trajectory of and concerns associated with Defendant Mazur's career) is true and correct, and I stand ready to provide evidentiary support of the same for the Court's *in camera* review.

7.   On July 3, 2023, still hoping that the Counsel's disclosure was forthcoming but finding it improper to not try to take any further actions on my own, I placed five phone calls to the OMC and then to the OMC's outsourced entity handling employment verification for, *inter alia*, the OMC, TheWorkNumber ("TWN").  The total period of time that I spent on the phone was 25 minutes, *i.e.*, 1 minute, 1 minute, 2 minutes, 6 minutes, and 15 minutes. During these telephonic communications, and that all entities within the AHS were

conducting their employment verification through the TWN.  In addition, I was provided with additional information as detailed in ¶¶ 8, 9.

8.    Specifically, during my 15-minute phone call to the OMC, after being transferred numerous times from one OMC Department to another, I was finally transferred to what I was told the OMC Security Department and had a conversation with a person whose voice was consistent with that commonly associated with a male gender, who explained that he was on his shift monitoring the OMC security, took my name and phone number, and listened to my explanations during which I disclosed Defendant Mazur's name and once again stressed that I had very little certainty that my guess as to Defendant Mazur being among the natural-person Defendants in this matter was correct and, hence, was concerned about accidently creating an impression that might implicitly put Defendant Mazur in bad light with the OMC.  The person who spoke to me stated that his name was "Mr. Villanueva" and, having pity to me in light of my wild goose chase, stated that the most he could offer was to look at the information available to Mr. Villanueva at that very moment to determine whether Defendant Mazur was on the OMC employee roll during the previous pay period (which, I presumed but did not verify with Mr. Villanueva, was determined pursuant to the same pay-period schedule as utilized by the Federal government), *i.e.*, the period from June 18 to July 1, 2023, since Mr. Villanueva informed me that employees were removed from the OMC employee roll with a one-pay-period delay (which I found appropriate because Federal pay-period system processes employee roll records in the same fashion because a person who terminated his/her employment necessarily received pay for one pay-period after termination of his/her employment).  Upon a minute-or-so-long check, Mr. Villanueva informed me that no person having the last name of Defendant Mazur was on the OMC employee roll, *i.e.* that Defendant Mazur was either not employed by the OMC during the prior pay-period or never had been.

9.    Further, during my 6-minute phone call to TWN, I was explained by the customer service representative who did not provide me with her name but had a voice consistent with that typically associated with being a female, that the cost of a search of the TWN records for the employment dates of each person being inquired about, as long as that person was employed by an entity participating in TWN services through the AHS, was $60, and I assured her that I was ready to pay the charge.  She, however, clarified that, at a minimum, I had to provide her with Defendant Mazur's Social Security number ("SSN").  In response to my explanations that, unfortunately, I did not know Defendant Mazur's SSN, she stated that, as a default, she could accept my order if I were to provide her with Defendant Mazur's date of birth ("DoB") but warned me that, due to the volume of employees of the entities participating in TWN services through the AHS, a mere name accompanied by a DoB could yield more than one result, and I would be charged $60 per each result to obtain the information as to these periods of employment of all such persons.  However, since Defendant Mazur's DoB had not been provided to me either, I explained to her that I could not provide her even with the DoB.  Therefore, I offered her to run a search by using only Defendant Mazur's first and last names, and middle initial, since this was the only solid piece of information I had.  She refused upon stating that the TWN system was not equipped to accept such an order.

K-3

10.     Also on July 3, 2023, I renewed my online research as to the persons who might have been Defendant Mazur's relatives, and purchased a Whitepages Premium ("WPP") report to that effect.  The WPP report verified the correctness of my prior online research sessions indicating that Defendant Mazur used to reside at 21 Westmoreland Ave. Montvale, NJ 07645, and his next of kin still resided there.  The next-of-kin person was known as Joseph T. Mazur (*i.e.*, he had the same first and last names as Defendant Mazur but the middle initial "T," instead of "N").  And, as detailed in the Memo, in December 2023, I repeatedly sent certified and first-class-mail letters to that address.

11.     On July 31, 2023, I received an email from George Liothake, SCP, SPHR, CHHR, Interim Vice President, Human Resources, CentraState Healthcare System, Director, Workforce Relations, Atlantic Health System (Ex. R) responding to my June 26, 2023, online inquiry to the OMC and informing me that the proper method of verifying whether – and, if yes, when – Defendant Mazur was employed by the OMC was by purchasing a TWN report.

12.     As detailed in the Memo, I was regularly, *i.e.*, every two weeks or more often, checking public information available online as to Defendant Mazur, including his LinkedIn page that was remaining public.  On November 12, 2023, I performed one of such periodic check and saw that – during the preceding two weeks – Defendant Mazur's LinkedIn page was updated to reflect his termination of the OMC employment in July 2023 and his new employment in Colorado.  In light of the information that had been provided to me by Mr. Villanueva, whose statements I considered credible in light of the lack of any personal reason for Mr. Villanueva to be dishonest under the circumstances, I developed a concern that Defendant Mazur's statements on his LinkedIn page might not be reflective of the actual events, *i.e.*, I became uncertain whether Defendant Mazur's LinkedIn statement as to his Colorado employment was reflective of reality as to the date or the fact of employment.

13.     As detailed in the Memo, the Counsel provided me with the last known address of Defendant Mazur at the time of his JCMC/RWJBH employment only on December 21, 2023, *i.e.*, 21 days after the Counsel and I were notified that my Second Amended Complaint was filed and, therefore, had to be served on, *inter* alia, Defendant Mazur: the Counsel's disclosure of Defendant Mazur's last known address took place three days after I filed an application with the Court seeking assistance of the Honorable Jessica S. Allen, U.S.M.J., to force the issue.  Having located two alternative addresses of Defendant Mazur's former landlord, I sent certified and first-class-mail letters to the landlord, but the landlord eventually responded by stating that he had no information as to how to reach Defendant Mazur.

14.     As detailed in the Memo, while I have never received any response from Defendant Mazur's presumed relatives, none of my letters mailed to the Montvale, NJ, address was returned to me as undeliverable.  Moreover, after, on December 26, 2023, I did my regular periodic check as to whether there were any updates on Defendant Mazur's LinkedIn page placed in public domain, I could no longer locate Defendant Mazur's LinkedIn since he made his LinkedIn page private.  Because Defendant Mazur had kept his LinkedIn page public during the preceding six months, I concluded that his election to make it private just

one week after I mailed letters to the Montvale, NJ, address, indicated a possibility that Defendant Mazur's Montvale, NJ, relatives notified him of my inquiries as to how to contact Defendant Mazur in connection with my litigation since the timing appeared too coincidental, and Defendant Mazur has not changed his LinkedIn page back to a public page as of the date of this Declaration.

15. On February 6, 2024, I placed four phone calls to the UCHealth at University of Colorado Anschutz Medical Campus ("UCH-UC-AMC") in an effort to verify Defendant Mazur's employment there, as it had been claimed on his LinkedIn at the end of the period when it had remained placed in public domain. The total amount of time I spent on the phone was 22 minutes (one call was 11 minutes, one was 8 minutes, one was 3 minutes, and one was 1 minute). Specifically, after being connected to the UCH-UC-AMC Operator, I explained the reason for my call and was transferred to the Patient Representative Office despite my explanations that I had never been a UCH-UC-AMC patient. However, the UCH-UC-AMC Patient Representative Operator was very sympathetic to my inquiry and my explanations as to why I was trying to locate Defendant Mazur or at least verify his employment at the UCH-UC-AMC, given that I explained to her that such a fact of employment would have been indicative of Defendant Mazur's Colorado residence. Therefore, the UCH-UC-AMC Patient Representative operator provided me with the (720) 848-7815 phone number of the UCH-UC-AMC Legal Department. I, thus, contacted the UCH-UC-AMC Legal Department and was explained by a UCH-UC-AMC Legal Department staffer that she, too, had no information as to how to determine whether and when Defendant Mazur was employed at the UCH-UC-AMC, but provided me with the phone number of the UCH-UC-AMC Risk Management Department (303) 724-7475. Upon calling the UCH-UC-AMC Risk Management Department, I spoke for 3 minutes to a person having a voice consistent with that of being a female who introduced herself by name phonetically sounding as "Robin." Robin sounded very irritated but, it appeared, immediately understood what I was asking and, cutting my lengthy polite explanations off, asked, "What is his name?" prompting me to respond that the first name of Defendant Mazur was Joseph, with traditional spelling, and the last name was "M" for Mary, "A" for apple, "Z" for zebra, "U" for umbrella, and "R" for Robert. The woman responded, "Wait, I'll check!" and seemingly put me on hold since the phone went silent, without any "elevator music" playing, but did not disconnect. After I waited 4 minutes in silence, the call dropped. Therefore, I redialed. Before I even could say a word (*i.e.*, seemingly recognizing my phone number on her display, since I could not fancy how else she could have known that it was me calling), the woman stated, in the same irritated voice, "I've checked, we have no one like that," and this time hanged up. I followed that call with three more calls placed every half an hour, but nobody answered.

16. In conjunction with executing the instant Declaration, at 6:51 PM EST on February 12, 2024, I once again called the UCH-UC-AMC Risk Management Department at (303) 724-7475. Once again, the person having a voice consistent with being a female who introduced herself by name phonetically sounding as "Robin" answered the phone. Therefore, I stated the reason for my call and stressed that all I was asking for was to verify whether a person whom I am looking for (without even mentioning Defendant Mazur's name) was on the UCH-UC-AMC employee roll, either presently or in the past, and I was looking for

K-5

guidance as to the way to place by inquiry with the UCH-UC-AMC in accordance with UCH-UC-AMC policies.  However, this time, the woman just hanged up on me in the middle of my explanations.  While I certainly find Robin's style of social interactions concerning, I have no reason to doubt the veracity of her February 6, 2024, statement that no person with Defendant Mazur's name was on the UCH-UC-AMC employee roll as of February 6, 2024.

17.    As of now, I have no reason to believe that Defendant Mazur has been added to the UCH-UC-AMC employee roll at any point between February 6, 2024, and the present.

18.    I am not aware of any documentary or testimonial evidence, or any oral statement not made under oath, that would allow me even an opportunity to guess the current whereabouts, place of employment, if any, or the lifestyle of Defendant Mazur.  Accordingly, I based and am continuing to base my presumptions as to Defendant Mazur's lifestyle and career trajectory on the information Defendant Mazur was placing in public domain via his LinkedIn page that Defendant Mazur made private in December 2023.

Under penalties of perjury and pursuant to L. Civ. R. 103.1 and 104.1, and the entailed relevant N.J. RPCs, I certify that my foregoing statements of fact are true and reflect my recollections of the relevant events to the best of my abilities.  I further certify my awareness that – if any of the foregoing statements of fact are willfully false – I am subject to punishment.

Dated:  March 12, 2024

Respectfully submitted,

Anna Kapellan, Plaintiff *Pro Se*
Phone: (201) 993-9790
Email: annakapellan@dmail.com
31 River Ct., Apt. 3309
cc: All Counsel of Record via CM/ECF-PACER        Jersey City, NJ 07310

K-6

## CERTIFICATE OF SERVICE

Local Rule 5.1(a) provides that "[s]ervice of all papers other than the initial summons and complaint shall be made in the manner specified in Fed. R. Civ. P. 5(b)." Fed. R. Civ. P. 5(b)(2)(E) provides that "[a] paper is served under this rule by: sending it to a registered user by filing it with the court's electronic-filing system[, in] which event[] service is complete upon filing." On March 13, 2024, the Plaintiff caused this *Declaration* to be filed with the Court. Accordingly, the Defendants' counsel of record have been duly served with the instant *Declaration*.

Dated:  March 13, 2024

Respectfully submitted,

Anna Kapellan, Plaintiff *Pro Se*
Cellphone: (201) 993-9790,
annakapellan@gmail.com
31 River Ct., 3309, Jersey City, NJ 07310

cc: All Counsel of Record via CM/ECF-PACER

K-7

Exhibit L

Case 2:23-cv-00597-MEF-JSA   Document 47-1   Filed 03/13/24   Page 86 of 115 PageID: 1028



**'GLASSDOOR**

G  Sign in to Glassdoor with Google          ✕

Anna Kapellan
annakapellan@gmail.com

Continue as Anna

To create your account, Google will share your name, email address, and profile picture with Glassdoor. See Glassdoor's privacy policy and terms of service.

Sign In

# JPMorgan Chase & Co

Add a Salary

| Overview | 28K Reviews | 5.5K Jobs | ⋯ More |
|---|---|---|---|

# Total Salary Range for JPMorgan Chase & Co Middle Office Analyst

📊 Confident · 11 Salaries Submitted · Updated Oct 29, 2023

United States ⌄          All Years Of Experience ⌄

Total Pay

# $71K–$112K/yr

$89K (Median Total Pay)

The estimated total pay range for a Middle Office Analyst at JPMorgan Chase & Co is $71K–$112K per year, which includes base salary and additional pay. The average Middle Office Analyst base salary at JPMorgan Chase & Co is $81K per year. The average additional pay is $8K per year, which could include cash bonus, stock, commission, profit sharing or tips.

How was this calculated? ⌄

## Pay Breakdown



$89K
Total Pay

| Pay Type ⓘ % of Total Pay | Range Median |
|---|---|
| Base Pay 91% | $65K – $101K $81K/yr |
| Bonus 9% | $6K – $11K $8K/yr |

How accurate is a **total pay range** of **$71K–$112K/yr?**

# Exhibit M

Newsletters

*Hearst Newspapers participates in various affiliate marketing programs, which means we may get paid commissions on editorially chosen products purchased through our links to retailer sites.*

# How Much Do Hospital Orderlies Make Per Hour?

**Work** | **Careers** | **Hospitality & Tourism Jobs**

By Ashley Donohoe Updated July 25, 2018

     



A hospital orderly, also called a hospital transporter, helps move patients around the facility while also performing basic patient care and housekeeping duties. They often work independently to perform tasks such as cleaning patients' rooms, assisting with feeding and dressing, preparing equipment and supplies, and monitoring patients' health under a nurse's guidance. Since they do not need to complete the formal training that other nursing occupations often require, orderlies can get started working in a hospital right after high school. They do, however, usually receive lower hourly wages than those in other nursing roles do, but experience and additional training can lead to higher wages and more opportunities in the medical field.

**RELATED**

How Long Does It Take to Be a CNA?

Job Description of an Assisted-Living Dietary Aid

Home Health Aide Vs. CNA

What Are the Job Duties of an Acute Dialysis RN?

LVN Vs. RN

## Job Description for Hospital Orderlies

Hospital orderlies perform a variety of patient care, patient transport and housekeeping tasks under a nurse's direction. Common duties assisting patients include pushing wheelchairs and stretchers around the facility; feeding, dressing and bathing them; giving prescribed medications; managing bandages and dressings on wounds; and walking them around. They may also take vital signs like blood pressure and temperature and report concerns about the patient's condition. Their housekeeping tasks can include stocking supplies, cleaning beds and patient transport equipment, washing linens and throwing out trash. Hospital orderlies do strenuous work on their feet to help patients and need to follow safety protocols to prevent injuries on the job. Providing quality care requires an orderly to have patience and compassion while considering patients' needs.

## Education Requirements

Orderlies normally need no formal education beyond a high school diploma. Instead, the hospital provides some short-term training to learn key skills for working with patients. In addition, they may need to obtain basic life support (BLS) certification to meet employer requirements. Available through the American Red Cross, American Heart Association and other training providers, the BLS certification requires learning how to operate automated external defibrillator (AED) devices and do cardiopulmonary resuscitation (CPR) on individuals having trouble breathing. Individuals complete an exam at the end of the BLS training program to receive certificati0n, and renewal is required about every two years.

## Industry

Almost 75 percent of orderlies work in general medical and surgical hospitals, specialty hospitals or psychiatric hospitals. Smaller employers include the government, retirement and assisted living communities, nursing homes and ambulatory healthcare services. Supervised and assigned work by registered nurses and licensed practical nurses, they spend most of their work hours directly with patients. Since hospitals generally do not close, hospital orderlies usually have full-time hours with irregular scheduling that are sometimes needed to serve patients. Part-time patient transporter positions do exist for nursing students and others who need shorter hours.

## Salary and Years of Experience

Based on the May 2017 salary information from the Bureau of Labor Statistics (BLS), orderlies make a median wage of **$13.07** an hour or **$27,180** a year. Half of orderlies receive more, and half make less. The lowest-paid 10 percent make less than **$9.73** an hour or **$20,240** a year, while the highest-earning 10 percent get over **$19.52** an hour or **$40,610** a year. Orderlies employed in psychiatric and substance abuse hospitals are paid the highest average wage of **$17.21** an hour or **$35,800** a year. Nursing care facilities pay one of the lowest average wages of **$12.00** an hour or **$24,950** a year.

Wages often start out low for entry-level orderlies and grow with experience. Some orderlies complete additional training and state requirements to advance to higher paid nursing assistant or registered nursing roles. In July 2018, PayScale.com showed this hourly pay progression by experience for nurse aides, orderlies and attendants:

**0 to 5 years:** $8.19 - $15.24
**5 to 10 years:** $8.28 - $15.83
**10 to 20 years:** $8.84 - $17.16
**20 or more years:** $8.73 - $20.00

## Job Growth Trend

The BLS expects an 8-percent job growth rate for orderlies between 2016 and 2026, which is considered average and is somewhat slower than the 11-percent rate expected for other nursing assistants. This growth is expected to add 4,400 orderly positions by the end of the decade. As the aging population needs long-term care, nursing facilities and hospitals will need additional orderlies to assist patients. Aspiring orderlies can expect good job prospects since high turnover in this occupation creates frequent openings.

Case 2:23-cv-00597-MEF-JSA    Document 47-1    Filed 08/13/24    Page 90 of 115 PageID: 1032

Exhibit N



"*" indicates required fields

✓ Your Information   2 Subject's Information   3 Process Payment

## SUBJECT INFORMATION

**Subject's Name** *

**Previous Address**

Enter a location

Street Address

Address Line 2

City                                              State

ZIP Code

**Date of Birth**                                 **Social Security Number**

mm/dd/yyyy                                        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

**Skip Trace Price**

Price: $75.00

Previous   Next

📞(800) 774-6922

info@undisputedlegal.com



800-990-2939  |  Sign Up  |  Log In

BUSINESS SERVICES     APIs     FIND PEOPLE     HIRE INVESTIGATOR     LOOKUPS     PRICING     BLOG     ABOUT

Account with Restricted Access is required. Please **Sign Up** or Log In. **More Info**.

HomeBusiness ServicesRestricted AccessSkip Tracing

# Professional Skip Tracing Tools

If you're looking for the best way to find someone, this professional **skip tracing tool** will save your hours of work

**DPPA Purpose:**      **Click to Select**

**GLBA Purpose:**      **Click to Select**

**SSN:**

xxxxxx          « the best search option

or

**First Name**                    **Last Name**

xxxxxx                            xxxxxx

**Address**

xxxxxx

**City**                    **State**            **ZIP Code**

xxxxxx          Any State          xxxxxx

SEARCH NOW          CLEAR          Sample of Skip Search
                                   Sample of SSN Report

## HELP AND INSTRUCTIONS FOR SKIP TRACING TOOLS

**What is Skip Tracing?**

- Basically, a "skip trace" is the process of using the information you have about somebody to discover their current location.

- Whether you're in the collections or financial industry or another industry professional that needs to locate people or verify important information, our skip trace tools may be just the solution you need. This skip trace tool is used to locate hard to find individuals, to validate employment information.

**How to Search**

- Select DPPA and GLBA Purpose.

- Search by SSN to get the complete skip tracing details in one step.

- If SSN is not known, use two-step process:
  - **Step 1** (Skip Trace Search). Search by name or address to find a correct person. For name searches enter full name and address or name and state (no city).
  - **Step 2** (Skip Trace Details Report). It can be ordered for each found individual record with SSN.

- Search by address without a name is also possible. Find current and previous residents as well as people associated with the address.

**Results Typically Include**

- Skip Trace Search (by name or address)
  - Full name and aliases, known addresses with reported dates
  - Date of birth and SSN

- Skip Trace Details (by SSN):
  - Full name and aliases, date of birth, age and SSN
  - Last known addresses and phone number
  - Previous addresses and phone numbers for current residents at previous addressees
  - Current neighbors (name, address, phone number) for all reported addresses
  - Relatives and associates with phone, address, age and SSN.

- Not all information is available for all records.

**Information Sources**

- Credit bureau repositories, DMV records, utility records, public records
- Specialized sources not available to general public



# US Collection Services
# 1-800-519-2334

| **JUDGEMENT COLLECTION** | **ASSET SEARCH** | **APARTMENT RENTAL LEASE COLLECTIONS** | **PEOPLE LOCATOR** |
|---|---|---|---|

**You can receive your results by mail, email or fax.**

**Step One Basic**          ○ **$49.95**

**Step Two Guaranteed**          ○ **$79.95**

**Please enter the information for the person you are searching for.**

**First Name**
**(optional)**

**Middle Initial**
**(optional)**

**Last Name**
**(optional)**

**Relationship**
**(optional)**
(I.E. - friend or relative)

**Date of Birth**
**/Approximate Age**
**(optional)**

**Last known address**
**(optional)**

**Last known**
**phone numbers**
**(optional)**

**Additional Comments**
**(optional)**

**Social Security #**
**(optional)**

**Payment Information**

**Payment Method**
○ **Visa**
○ **MasterCard**
○ **AMEX**
○ **Discover**

**Card Number**

**Expiration Date**          Jan ⌄   2023 ⌄

**Name**

**Address**

**City**

**State**

**Zip Code / Postal Code**

**Telephone**

**Fax**

**Email**

**How would you like to receive your results: fax, mail or email**      ○ **Fax**  ○ **Mail**  ○ **Email**

Submit

We do not contact anyone but the person that pays. Everything is confidential. The person has no idea that they are being searched or that someone is looking for them.

Judgment Collection – Asset Search – Apartment Rental Lease Collections – People Locator
Statute Of Limitations For Debt Collection and Judgment Collection

**U.S. Collection Services**
1-800-519-2334 • 954-757-6070
Fax 1-800-619-6731
email : info@uscollectionservices.com

**Click Here For Our Address**

People locator for debt collection. Find people for judgment collection, judgement enforcement or debt collection reasons.

Asset searchs for hidden assets and hidden bank accounts. Need help with a judgment, U.S. Collection Services is at your service.

A Division Of US Record Search And Information Services, Inc.

Judgment Collection,Asset Search,Apartment Rental Lease Collections,People Locator,Statute Of Limitations For Debt Collection and Judgment Collection, enforcement,recovery,collector,debt collection

- 
- 
- 
-

**A Rated Investigations, Inc.**

10 Forest Avenue- Suite 6, Paramus, NJ 07652

T: 201- 674-9609 | F: 201-843-5118 | info@aratedpi.com | www.aratedpi.com

# CLIENT INTAKE DOMESTIC FORM

## Initial Consultation with a Licensed Investigator (half hour) FREE.*
### *Any additional time will be charged based on our hourly fees.

Before we accept any investigation, it is essential that you be interviewed by one of our Licensed Investigators to determine the special needs of your case and provide you with a realistic idea of the services that we are able to provide. The investigator will also estimate the projected expense of your investigation and the amount of time it will take with most cases. However, every case is handle based upon the information provided.

**Client Information:**

Full Name: _____ D.O.B: _____/_____/_____

Address: _____ City:_____ Zip: _____ State:_____

Phone #: _____ Mobile #: _____

Occupation: _____ Employer: _____

Email: _____

Work Address: _____

Relationship to Subject: _____

Have you ever hired a private Investigator in the past? _____

If yes, was it regarding this case? _____

Did the investigation cease? _____

Do you have a restraining order against you? _____

Do you own or carry any weapons? _____

If yes, what type? _____

1

**Primary Subject's Information:**

Full Name: _____ D.O.B: _____/_____/_____

Address: _____ City:_____Zip: _____ State:_____

Phone #: _____ Mobile #: _____ S.S.N: ____/_____/_____

Occupation: _____ Employer: _____

Work Address: _____

Gender:_____ Race:_____ Age:_____ Height_____ Weight:_____Hair:_____ Eyes:_____

Other Names or Aliases: _____ Email: _____

Relationship to the Client: _____ Years you know each other:_____

If you are married or co-habituating, number of years together:_____

Number of Children:_____

Identifying Marks or Tattoos: _____

Does the subject have a criminal record? _____

Does subject own or carry any weapons? _____

If yes, what type? _____

Social Media Profiles:

Facebook Page_____        Google+ Page_____        LinkedIn _____

Has the subject ever hired a private Investigator in the past? _____

If yes, was it regarding this case or a different case? _____

Did the investigation cease? _____

Does the subject have a restraining order? _____

**Subject's Vehicle License & Description:**

Driver License: _____

Vehicle # 1:

Color: _____ Year:_____ Make:_____ Model:_____ Plate No: _____

Vehicle # 2:

Color: _____ Year:_____ Make:_____ Model:_____ Plate No: _____

Vehicle # 3:

Color: _____ Year:_____ Make:_____ Model:_____ Plate No: _____

2

## What type of investigation do you want?

☐ Spousal Surveillance
☐ Surveillance
☐ Infidelity
☐ Premarital Investigations
☐ Alimony
☐ Divorce / Domestic Investigations
☐ Cohabitation
☐ Background Check* (specify which cities)
☐ Cell Phone Forensics
☐ Employment Location
☐ Child Support Investigation
☐ Bank Account Investigation
☐ Hidden Cameras
☐ Child Custody Investigations
☐ Unlisted Phone Number Information
☐ Criminal Record / Prison Records
☐ Asset Investigation

☐ Real Property Records
☐ Camera System
☐ Professional License Verifications
☐ SSN Verification
☐ Computer & Internet Security Services
☐ Service of Legal Process
☐ Cellular Phone Information & Records
☐ Electronic Eavesdropping Sweeps
☐ Locate Investigations
☐ Asset Search
☐ Background
☐ Witnesses
☐ Missing Person
☐ Skip Trace
☐ Undercover
☐ Other

## Surveillance to be conducted on:

☐ Husband
☐ Boyfriend
☐ Daughter / Son

☐ Wife
☐ Girlfriend
☐ Other _____

## Which signs do you see:

☐ Working a lot of overtime
☐ Excessive use of the internet
☐ Additional mileage on the car
☐ Hanging out with new friends
☐ Smells of perfume or alcohol
☐ Working out in the gym, never tried before

☐ Hiding the phone/cell bill
☐ Personal purchase of an extra cell phone
☐ No longer interested in sex
☐ No longer wearing a wedding band
☐ Saying "I need space"
☐ Other sexual position

## Please Explain:(Note: the person being named is "The Subject.")

_____

_____

_____

_____

_____

3

**Possible suspect's information:(Note: "Suspect" is the person that the subject is having an affair with.)**

_____

_____

_____

_____

**Briefly, tell us your story.**

_____

_____

_____

_____

_____

_____

**If we provide the proof you need, will you:**

☐ Leave them and get a divorce          ☐ Separate
☐ Go for therapy together               ☐ I do not know, "I will need help"
☐ Need and Attorney

**Best Time to Call:** _____ **Best Phone Number to Call:** _____

**What is your investigation budget to obtain the information that you are requesting?**

☐ $750 - $1000                          ☐ $1501 - $5000
☐ $1001 - $1500                         ☐ $5001 and up  (VIP)

**Where did you hear about us?**

☐ Internet                              ☐ Television
☐ Referral from a friend or attorney    ☐ Radio
☐ Newspaper/ Magazine/Mailing           ☐ Other _____

**What method did you use to find us?**

☐ Desktop                               ☐ Phone
☐ Laptop                                ☐ Referral
☐ Cellphone

4

I have read all of the above and filled out all the information to the best of my knowledge. I the under signed also promise not to use any information obtained by A Rated Investigations, Inc. in any way that would be considered unlawful in the state of New Jersey.

Signature: FULL Name: _____

Date: _____

Please: DO NOT SUBMIT if you DO NOT WANT A CALL BACK. The Director only speaks with select individuals who are seriously in need of our help and need to hire an investigator.

New Jersey: (908) 707-1900    Toll Free: (800) 488-8868

# J&K INVESTIGATIVE SERVICES, INC

HOME    ABOUT    SERVICE OF PROCESS    INVESTIGATIONS    CONTACT

## Our Most Important Asset is Our Reputation

## Locates & Skip Tracing

J & K Investigative Services, Inc. are expert skip tracers who can locate witnesses, defendants, corporate entities, for purpose of service of process or preparation for possible litigation. We also perform personal locates to find family members, long lost friends and relatives nationwide.



Skip Tracing is not just a skill, it is an art, one developed over many years of experience, intuition and knowing exactly what investigative tools to use for each unique investigation. Skip tracing is an industry term used to describe the process of locating a subject, be it an individual or corporate entity. Skip Tracing is a skill, which requires using known identifiers, such as DOB, SSN and LKA, which are utilized in proprietary database searches in addition to information gathering techniques that are acquired from various sources.

Our Private Investigators have been involved with locates and skip tracing for many years and know exactly what investigative methods to use for your specific search. We keep you closely informed of our progress, and our reported skip trace results are cross-referenced and confirmed to give you a proper location of the subject's home and/or business location.

**Call Us Today at 800-488-8868 or 908-707-1900**

**"WE ARE CONFIDENT THAT WE CAN PROVIDE ANY OF OUR SERVICES TO YOUR COMPLETE SATISFACTION"**

We Accept The Following Credit Cards



You may pay by clicking on the "Pay Pal" button below.



©2024 J&K INVESTIGATIVE SERVICES, INC. | ALL RIGHTS RESERVED.



**Spartan Detective Agency, Inc.**       **SALES TAX: 6.625% on all orders**
2009 Morris Avenue                        Phone (908) 964-3190
Union, New Jersey 07083                   Fax (908) 687-4464

"A Professional Corporation"
## ORDER FORM

| FIRM: | | TO: |
|---|---|---|
| REQUESTOR: | | |
| ADDRESS: | | PHONE /FAX: |
| | | |
| PHONE/ FAX: | | |

*PLEASE CHECK WORK PRODUCT(S) DESIRED*
*ALL FEES ARE REGARDLESS OF FINDINGS UNLESS STATED OTHEREWISE*

| | |
|---|---|
| Skip Trace "No find - No Pay" | $75.00 |
| Corporate Search | $85.00 Regardless of findings |
| Professional License Search | $75.00 |
| Postal Forwarding | $60.00 |
| Child Support[1] | $25.00 |
| Patriot Name Search | $25.00 |
| Credit Reports | $150.00 – (Authorization Required From Entity) |
| Real Property | $250.00 - (No Hit - $125.00) |
| Bank Account Search - Call for high profile pricing | $500.00 Attorney $600.00 Pro-se - (No Hit - $200- $225 per state) |
| Stock and Bond Search  - Call for high profile pricing | $1,600 Attorney $1,700 Pro-se (No Hit - $800-$850) |
| Pending Law Suits | $250.00 PER STATE |
| Federal Tax Liens | $400.00 |
| Property Tax Liens | $200.00 PER STATE |
| Property Tax Records | $400.00 PER STATE (Address of Property Required) |
| Judgments | $75.00 PER STATE |
| Social Security Search | $60.00 |
| Employment | $400.00 Regardless of findings |
| Bankruptcies | $75.00 |
| Telephone Searches – Cell Phone, Landline, Unlisted Numbers | $150.00 each |
| Criminal Searches – Federal, State, County | $150.00 each |
| Inmate Locator | $75.00 |
| Tax IDs | $200.00 (No Hit - $75.00) |
| Estate Bank Account Search | $800.00 (No Hit - $650.00) |
| Non-Military Affidavit | |
| If You Provide Social Security Number or Date of Birth | $25.00 |
| If You Do Not Provide SSN or DOB | $50.00 |
| If You Require Full SSN | $75.00 |
| NJ DMV SEARCHES | $60.00 |
| *(PLEASE COMPLETE ATTACHED SAMPLE LETTER NEW NJDMV REQUIREMENT – DOWNLOAD FROM WEBSITE)* | |
| NJ DMV/MVC - Insurance | $75.00 |
| Out of State DMV Searches | $110.00-$130.00 |
| NJ Investigations –Payment Required in Advance | $125.00/Hour* Per Investigation Plus Expenses (2 Hr. Min) |
| Out of NJ Investigations -Payment Required in Advance | $150.00/Hour* Per Investigation Plus Expenses (2 Hr. Min) |
| Heir Search | $75.00 |
| EXPEDITED SERVICE (WITHIN 24 HRS) - PER SEARCH[2] | $25, $50, and $75 ($150 Depending on Search) |
| EXPEDITED SERVICE (SAME DAY) - PER SEARCH[2] | $50, $100, and $150 ($300 Depending on Search) |

---

[1] PLEASE BE ADVISED THAT IF THE DOB OR SOCIAL SECURITY NUMBER IS NEEDED FOR A SEARCH THERE WILL BE A $60.00 FEE

[2] FOR EXPEDITED SERVICES, PLEASE PROVIDE CASE CAPTION, DOCKET NUMBER AND COURT DATE

\* SAME DAY INVESTIGATIONS - $175/Hour

*Should you have any questions, please feel free to call us at: (908) 964-3190*
*PLEASE SIGN AND FAX BACK TO US IMMEDIATELY at (908) 687-4464*
*THANK YOU FOR YOUR BUSINESS*

**PLEASE STATE ANY AND ALL INFORMATION YOU HAVE FOR US ON THE SEARCH**

| | |
|---|---|
| **NAME:** | |
| | |
| | |
| | |
| **ADDRESS:** | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **SSN:** | |
| **DOB:** | |
| | |
| **OTHER:** | |
| | |
| | |

_____        _____
**AUTHORIZATION, PLEASE PRINT NAME AND SIGN**                **DATE**

*Should you have any questions, please feel free to call us at: (908) 964-3190*
*PLEASE SIGN AND FAX BACK TO US IMMEDIATELY at (908) 687-4464*
*THANK YOU FOR YOUR BUSINESS*

Exhibit O

**Anna Kapellan**
32 Glendale Ave., Staten Island, NY 10304
(201) 993-9790; annakapellan@gmail.com

July 27, 2023

Att:    Compliance Department
       a/k/a Legal Department
       Atlantic Health System ("AHS")
       475 South St.
       Morristown, NJ 07960

Re:     Inquiry About Mr. Joseph Mazur (your current or former employee/contracted nurse)

Dear Staff of the AHS Compliance Department a/k/a. Legal Department:

I am the *pro se* Plaintiff in *Kapellan v. Jersey City Med. Ctr.*, Docket No. 23-cv-0597, a legal proceeding currently pending before the U.S. District Court for the District of New Jersey ("Court"). One of the natural-person Defendants in that matter is identified as Nurse-1 who was my attending nurse during my February 2021 treatment at the Jersey City Medical Center ("JCMC"). As of now, Nurse-1 is believed to be Mr. Joseph N. Mazur ("Mazur").

Mr. Mazur's LinkedIn page (a print enclosed) states that he was first employed by the Overlook Medical Center (OMC") as an Assistant Nurse from July 2018 to May 2019, and then as an Operating Room Nurse from February 2022 to the present. However, my telephonic communication with the OMC Security Department ("OMC-SD") resulted in the SD's statement that Mr. Mazur was not listed in the OMC current database of OMC's personnel, thus suggesting that Mr. Mazur is no longer employed by the OMC and might not have been employed by the OMC either for some time or at any time.

Given that I am planning to file my amended complaint in the above-noted matter naming identified natural-person Defendants, including Nurse-1, I am seeking minimal information from the OMC/AHS with regard to Mr. Mazur's employment history and his current address and the address on February 2, 2023, if it is a different address. (The former is sought for the purposes of determining whether the JCMC verified Mr. Mazur's prior employment and dates/reasons for separation at the time of hiring Mr. Mazur, while the latter is sought for the purposes of preserving diversity jurisdiction, which – as you know – is determined based on the date of my filing of the original complaint, *i.e.*, February 2, 2023).

The minimal information I am seeking as to Mr. Mazur could be summarized in the following four questions:

(1) was Mr. Mazur ever employed by the OMC/AHS?

O-1

(2) if yes, what were the beginning and end dates of his OMC employment(s), and what were the titles that he held?

(3) if Mr. Mazur was separated from his OMC/AHS employment(s), be it once or twice, was/were his separation(s) based on Mr. Mazur's voluntary resignation/expiration of his employment contract or was his separation due to any other circumstances that, at this juncture, need *not* be specified and could merely be defined as "other" (the term "other" includes termination, resignation in lieu of termination, suspension of the employee's nursing license, failure to renew the employee's license, the employer being notified of other concerns about the employee's license, etc.); and

(4) what was Mr. Mazur's address reflected in the OMC/AHS file on February 2, 2023, and the latest address on the OMC/AHS file?  (Of Mr. Mazur was employed at the OMC/AHS only prior to February 2, 2023, then only his last known address is requested).

In the event you cannot disclose this information to me without being served with a subpoena *duces tecum*, please contact me at the above-stated email address by clarifying that you require a subpoena: so that I would inform the Court that my good-faith efforts did not result in the disclosure requested, and I would: (1) obtain a subpoena from the Clerk of the Court as to Mr. Mazur's entire employment file held by the OMC/AHS; and (2) have the subpoena served.  In any event, I request your preservation of Mr. Mazur's employment file to ensure against spoliation.

That said, if OMC/AHS can disclose the above-listed four points of minimal information to me without a subpoena (and, at least at this juncture, I don't believe I would need any additional information from the OMC/AHS, given that I have no claim of any sort against the OMC or AHS), please contact me at the above-stated email clarifying what steps would you require me to take in order to obtain this minimal information.  For instance, in terms of providing this information to me, you can upload this information onto a "cloud" folder and provide me with a link, an ID, and a separately emailed code for retrieval (to ensure a higher level of security), or you can email this information to me at the email address stated above if you don't believe that such minimal information warrants the cloud-uploading process, or you can send me this information by hard-copy mail, etc.  In any of these processes require a records-search and/or mailing fee, please email me the information about the payment process you employ and the amounts of the applicable fees.

Finally, in the event Mr. Mazur has never been employed by the OMC/AHS, I would be very grateful if you could send me an email so stating, cc'ing the email to the counsel for JCMC and RWJ Barnabas Health System, Messrs. Sam Rosenberg and Brian Brenner, whose email addresses are samrosenberg@rrjhlaw.com and bbrenner@rrjhlaw.com. Many thanks in advance for your kind attention to this matter.

Very Truly Yours,

Anna Kapellan

O-2

Exhibit P

Case 2:23-cv-00597-MEF-JSA    Document 47-1    Filed 03/13/24    Page 109 of 115
PageID: 1051

 **Gmail**

<div align="right">Anna Kapellan &lt;annakapellan@gmail.com&gt;</div>

---

## FW: inquiry about a your current/former employee

1 message

---

**Liothake, George** &lt;George.Liothake@atlantichealth.org&gt;                    Mon, Jul 31, 2023 at 1:34 PM
To: "annakapellan@gmail.com" &lt;annakapellan@gmail.com&gt;

Good afternoon,

Thank you for your inquiry.  Atlantic Health System does not provide direct employment verifications, we instead use a vendor, who can be contacted via:
Option a) www.theworknumber.com
Option b) 1-800-367-5690

When you call, please provide Atlantic Health Employer Code: 13212 and follow the prompts for the person you want to verify.

Respectfully,

George Liothake, SCP, SPHR, CHHR
Interim Vice President,  Human Resources, CentraState Healthcare System
Director, Workforce Relations, Atlantic Health System
Office 973.829.4640
Email George.Liothake@atlantichealth.org

-----Original Message-----
From: noreply-acs &lt;noreply-acs@atlantichealth.org&gt;
Sent: Wednesday, July 26, 2023 7:02 PM
To: AtlanticMedicalGroup &lt;atlanticmedicalgroup@atlantichealth.org&gt;
Subject: inquiry about a your current/former employee

First Name :  Anna

Last Name :  Kapellan

Phone Number : (201)993-9790

Email :   annakapellan@gmail.com

Category : Atlantic Medical Group

Sub-Category : ${subCategory}

Subject : inquiry about a your current/former employee

Message : Hello, can you please provide me with contact information (preferably, an email of, if unavailable, the phone number and extension number) of your, meaning Atlantic Health System (AHS), Overlook Medical Center (OMC) HR Department and/or your Legal/Compliance Department: so that I would be able to contact this person/department, preferably by email, with an inquiry as to how I can obtain information about the actual periods of the OMC/AHS employment, if any, of a person who - on his LinkedIn page - claims to be your current employee.  At this juncture, I would prefer not to surve you with subpoena decus tecum since I have no claim of any kind against OMC/AHS; rather, my inquiry addresses this employee's prior employment at the Jersey City Medical Center (RWJ Barnabas Health System). Many thanks in advance, Anna Kapellan

Source Page URL : https://www.atlantichealth.org/contact.html

Referrer Page URL :

Recipients List : {atlanticmedicalgroup@atlantichealth.org}

Exhibit Q

       

Home | My Network | Jobs | Messaging | Notifications | Me ▼ | For Business ▼ | Grow Prem Busi



# Joseph Mazur RN, BSN

Registered Nurse at University of Colorado Hospital- Anschutz Medical Campus

 University of Colorado Anschutz Medical Campus

 Rutgers School of Nursing

Jersey City, New Jersey, United States · Contact info

**235** connections

Connect | Message | More

## Activity
234 followers

### Joseph hasn't posted yet
Recent posts Joseph shares will be displayed here.

Show all activity →

## Experience

 **Operating Room Nurse**
University of Colorado Anschutz Medical Campus
Aug 2023 - Present · 5 mos
Aurora, Colorado, United States

 **Operating Room Nurse**
Overlook Medical Center · Full-time
Feb 2022 - Jul 2023 · 1 yr 6 mos

Summit, New Jersey, United States

 **Operating Room Nurse**
Hudson Regional Hospital · Full-time
Jun 2021 - Jan 2022 · 8 mos

---

RWJBH **Registered Nurse**
Jersey City Medical Center - Barnabas Health
Sep 2020 - May 2021 · 9 mos

Emergency Department Observation Unit

---

RWJBH **Clinical Care Technician**
Robert Wood Johnson University Hospital
Jan 2020 - Sep 2020 · 9 mos

Emergency Department

Show all 8 experiences →

# Education

 **Rutgers School of Nursing**
Bachelor of Science - BS, Registered
Nursing/Registered Nurse
2019 - 2020

Grade: 3.71 GPA

---

 **Rutgers Business School**
Bachelor of Science - BS, Finance
2011 - 2015

# Licenses & certifications

 **Basic Life Support for Healthcare
Providers (BLS)**
American Heart Association

---

**Registered Nurse**
New Jersey Board of Nursing

# Volunteering



**Financial Literacy Teacher**
Junior Achievement of New York
Apr 2016 - Present · 7 yrs 9 mos
Education

Assisted in teaching a class of graduating high
school seniors about financial literacy at St....

**Volunteer**
Good Works
Apr 2016 - Present · 7 yrs 9 mos
Environment

Assisted in park clean up at Cheesequake State
Park in Old Bridge NJ, planting over 100...

Show all 3 volunteer experiences →

## Skills

**Critical Thinking**

**Surgical Nursing**

Show all 16 skills →

## Honors & awards

**Honor Society Member**
Issued by Honor Society · Nov 2019

Associated with Rutgers School of Nursing

**Dean's List- Spring 2019**

Associated with Rutgers School of Nursing

Show all 5 honors & awards →

## Interests

Companies    **Groups**    Schools

**JPMorgan Chase & Co.**
4,591,904 followers

+ Follow

 **Rutgers Business School**
67,929 followers

+ Follow

Show all companies →

## Causes

Politics • Science and Technology

## People also viewed

 **Erika Brensinger** · 3rd+
Registered Nurse

+ Connect

**Tara Donnelly** · 3rd+
Nurse Manager at Overlook Medical Center

+ Connect

 **Julia Connolly, BSN, RN** · 3rd+
NICU RN at NewYork-Presbyterian Hospital

+ Connect

 **Kari Haspel RN, BSN** · 3rd+
Registered Nurse